UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| H.Q. ENERGY SERVICES U.S., INC., Plaintiff, v. | : | Civil Action No. 26-14123 |
| NSTAR ELECTRIC COMPANY (d/b/a Eversource Energy), FITCHBURG GAS and ELECTRIC COMPANY (d/b/a Unitil), MASSACHUSETTS ELECTRIC COMPANY and NANTUCKET ELECTRIC COMPANY (d/b/a National Grid), Defendants. | : | |

## COMPLAINT

Plaintiff H.Q. Energy Services U.S., Inc. ("Hydro-Québec US"), by and through its undersigned counsel, brings this Complaint against NSTAR Electric Company d/b/a Eversource Energy ("Eversource"), Fitchburg Gas and Electric Light Company d/b/a Unitil ("Unitil"), and Massachusetts Electric Company and Nantucket Electric Company d/b/a National Grid (together, "National Grid") (collectively, "Distributors") and alleges upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. In January and February 2026, Hydro-Québec US delivered more than one million megawatt-hours (MWh) of hydroelectric clean energy to the three energy companies, Eversource, Unitil, and National Grid, under long-term "Power Purchase Agreements." These Distributors accepted the approximately $50 million worth of clean energy from Hydro-Québec

US and distributed it to millions of Massachusetts customers, but have refused to pay Hydro-Québec US what they owe for that clean energy.

2. The Distributors do not dispute the delivery, acceptance, or amounts invoiced for the clean energy that Hydro-Québec US delivered in January and February. Instead, the Distributors unilaterally insist that they can simply forgo their known payment obligations to Hydro-Québec US because of certain delivery interruptions that occurred in those same months as a result of frigid, extreme and life-threatening weather conditions and record energy demand in Québec. Delivery interruptions occurring in the face of such conditions are expressly excused under the Power Purchase Agreements into which the Distributors entered. Ignoring that, and acting as their own judge and jury, the Distributors have deliberately withheld the millions of dollars that they admit are due to Hydro-Québec US and have instead engaged in a form of unauthorized "self-help" to compensate themselves for the excused delivery interruptions. Hydro-Québec US has been forced to bring this action to recover what it is owed.

3. An extreme, prolonged, and life-threatening cold weather event gripped much of North America from January to February 2026, including New England and Québec. As a result of that event and its aftermath, TransÉnergie—the electrical grid operator for Québec, which operates under the umbrella of Hydro-Québec Canada (Hydro-Québec US's parent company)—instituted emergency reliability curtailments to protect the safety and reliability of the grid. TransÉnergie's issuance of reliability curtailments is governed by reliability standards developed by the North American Electric Reliability Corporation and adopted by Québec's energy regulator, the Régie de l'énergie. TransÉnergie's emergency reliability curtailments required Hydro-Québec US to partially or entirely limit the delivery of energy to the Distributors at various points in time between January 24, 2026, and February 9, 2026.

4. Those events in January and February 2026 constituted force majeure events that suspended Hydro-Québec US's obligation to perform. The Power Purchase Agreements expressly define force majeure events to include (i) reliability curtailments, as well as (ii) any events that are outside a party's control that could not have been prevented with the exercise of reasonable diligence. Hydro-Québec US promptly sent notices to the Distributors informing them of the interruptions in deliveries and its claim of force majeure events.

5. There is no dispute that such weather conditions existed, that demand on the system was at consecutive high peak levels, or that Hydro-Québec US's deliveries were actually curtailed, preventing Hydro-Québec US from delivering to the Distributors during certain hours on certain days. Nonetheless, claiming that they are entitled to "uninterrupted" service—they are not—and without even assessing the reliability curtailments, the Distributors immediately rejected the force majeure notices and claimed that they were entitled to "cover damages" (as defined in the Power Purchase Agreements) for energy not delivered to them as a result of those curtailments. The Distributors are not entitled to cover damages for these interruptions because they are excused events under the Power Purchase Agreements, and Hydro-Québec US notified the Distributors that any attempt to net or set off those claimed damages against the invoices for delivered energy would be improper and contractually prohibited.

6. Instead of timely paying Hydro-Québec US's invoices for the energy that was actually delivered and accepted in January and February 2026, and pursing their putative cover damages claim through the dispute resolution process provided in the Power Purchase Agreements, the Distributors resorted to an inappropriate form of self-help. They deducted their disputed claims for cover damages from Hydro-Québec US's valid January and February 2026 invoices. The Distributors did so in bad faith, knowing that (i) Hydro-Québec US expressly

disputed the Distributors' claims of cover damages, (ii) the unambiguous terms of the Power Purchase Agreements only permit the netting of "payment obligations due and owing," and not amounts that are disputed and contingent such as their putative cover damages claims, and (iii) their actions would result in a failure to pay for energy they actually received and cause egregious economic harm to Hydro-Québec US. By claiming cover damages for interruptions that are excused due to a force majeure, and by refusing to pay amounts actually owed in full, the Distributors have breached the Power Purchase Agreements.

7. The Distributors have now continued to withhold payment from Hydro-Québec US for more than six months. Even though Hydro-Québec US has provided ample documentary support demonstrating the reliability curtailments in response to the Distributors' demands, the Distributors have simply refused to honor their contracts and have continued to deny the occurrence of a force majeure event altogether. They insist that not even a single hour curtailed was a force majeure event that excused Hydro-Québec US's obligation to perform.

8. The Distributors' acts constitute breaches of the Power Purchase Agreements and were committed in bad faith. There is no tenable reading of the Power Purchase Agreements that would permit netting of *disputed* damages against invoices actually owed. What's more, the Distributors appear to have actively misled Hydro-Québec US for the past six months by demanding volumes of additional information about the force majeure events and then refusing to acknowledge that *any* of the curtailments were valid.

9. The Distributors have also used their illegal netting in an effort to extract two extra-contractual benefits that they did not bargain for: (i) they have sought to place additional, onerous obligations on Hydro-Québec US to assert future force majeure events which are not required under the Power Purchase Agreements, and (ii) Unitil and Eversource have sought to

use the threat of litigation to compel Hydro-Québec US to agree to an unconditional waiver and release of its claim for payment and a written commitment of further assurances that Hydro-Québec US will provide uninterruptable energy, which is beyond what the Power Purchase Agreements require. To be clear, the Distributors' request for assurances is unwarranted: Hydro-Québec US has met its energy delivery commitments and has otherwise complied with its obligations under the Power Purchase Agreements, and those contracts expressly recognize force majeure events. Indeed, it is the Distributors who owe assurances to Hydro-Québec US that they will not continue to repudiate their obligations by engaging in unauthorized netting.

10. Hydro-Québec US has sustained damages of approximately $40 million plus contractual interest flowing from the Distributors' improper and illegal netting. Through this action, Hydro-Québec US seeks to recover those damages, as well as a declaratory judgment affirming that the Power Purchase Agreements do not permit the Distributors' netting of disputed cover damages against Hydro-Québec US's invoices for energy actually delivered. Hydro-Québec US further seeks to hold the Distributors liable for their breaches of the implied covenant of good faith and fair dealing and violations of M.G.L. c. 93A, § 11.

## THE PARTIES

11. Plaintiff Hydro-Québec US is a Delaware corporation that has its headquarters and principal place of business at 124 East 14th Street, Suite 633, New York, New York, 10003.

12. Defendant Eversource is a Massachusetts corporation that has its headquarters and principal place of business at 800 Boylston Street, 17th Floor, Boston, Massachusetts 02199.

13. Defendant Fitchburg Gas and Electric Light Company, a wholly owned subsidiary of Unitil Corp., is a Massachusetts corporation that has its headquarters and principal place of business at 6 Liberty Lane West, Hampton, New Hampshire 03842.

14. Defendants Massachusetts Electric Company and Nantucket Electric Company doing business together as National Grid are Massachusetts corporations that have their headquarters and principal places of business at 170 Data Drive, Waltham, Massachusetts 02451, and 800 Boylston Street, 17th Floor, Boston, Massachusetts 02199, respectively.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy in this action exceeds $75,000.

16. This Court has personal jurisdiction over the Distributors pursuant to M.G.L. c. 223A, § 3, because, among other things, the Distributors have transacted business in Massachusetts.

17. Defendants also consented to personal jurisdiction in this Court through the forum selection clause in each of the Power Purchase Agreements. Section 11.3 of each of the Power Purchase Agreements provides that "each Party agrees that any legal action or proceeding with respect to or arising out of this Agreement . . . shall be brought in or removed to the courts of the Commonwealth of Massachusetts or a U.S. District Court in the Commonwealth of Massachusetts." (Collins Decl. Exs. 1, 2, 3 at Section 11.3.)

18. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. A substantial part of the events giving rise to the claims occurred in Massachusetts. In addition, each Distributor agreed that the Power Purchase Agreement would be governed by Massachusetts law and that suits related to the Power Purchase Agreements, other than suits under the jurisdiction of the United States Federal Energy Regulatory Commission, and as otherwise provided in the Power Purchase Agreement, could be brought in the courts of Massachusetts. This suit is not subject to the jurisdiction of the United States Federal Energy

Regulatory Commission and does not fall under other exceptions in the Power Purchase Agreements.

## FACTUAL BACKGROUND

### Massachusetts Launched A Clean Energy Initiative

19. In 2016, the Commonwealth of Massachusetts enacted a law to increase the state's clean energy consumption. In accordance with that goal, the Distributors collectively launched a competitive solicitation process seeking suppliers of clean energy and issued a Request for Proposal.

20. On January 25, 2018, the Distributors announced that they had selected Hydro-Québec US to supply them with 9.55 terawatt-hours of hydroelectric energy per year.

21. In accordance with the Distributors' selection of Hydro-Québec US, two power transmission lines, the New England Clean Energy Connect and the Appalaches–Maine Line, was built to provide hydropower from Québec to New England.

22. Hydro-Québec US began to supply hydropower to the Distributors through the New England Clean Energy Connect and the Appalaches–Maine Line on January 16, 2026.

### Relevant Provisions of the Power Purchase Agreements

23. On June 13, 2018, Hydro-Québec US entered into a Power Purchase Agreement with each Distributor. Hydro-Québec US agreed to supply the Distributors with power transmitted through the New England Clean Energy Connect in exchange for a fixed price. In the first year of operation, that price was set at $51.51/MWh. (Collins Decl. Exs. 1, 2, 3 at Exhibit D.)

24. Section 4.1(a) provides that Hydro-Québec US has the contractual obligation to sell energy, and the Distributors have the contractual obligation to purchase energy. Those

contractual obligations are "not subject to interruption except to the extent caused by Force Majeure." (Collins Decl. Exs. 1, 2, 3 at Section 4.1(a).)

25. The Power Purchase Agreements provide that Hydro-Québec US will send each Distributor an invoice for the preceding month's delivery. (Collins Decl. Exs. 1, 2, 3 at Section 5.2(a).) Distributors must pay undisputed charges on or before the latter fifteen days from receipt of the invoice or on the last day of the calendar month. (Collins Decl. Exs. 1, 2, 3 at Section 5.2(b).)

26. If a Distributor fails to pay an undisputed charge by the due date, or within ten business days thereafter, that constitutes an event of default under the Power Purchase Agreement. (Collins Decl. Exs. 1, 2, 3 at Sections 5.2(b), 9.1(b).) Any undisputed charges not paid by the due date accrue interest, set to the lesser of either the prime rate specified in the "Money & Investing" section of *The Wall Street Journal* plus 1%, or the maximum rate permitted by law involving transactions with similar characteristics as Hydro-Québec US and the Distributors. (Collins Decl. Exs. 1, 2, 3 at Section 5.3.)

27. In the event that a Distributor wishes to dispute an invoice, Section 5.2(c)(ii) of the Power Purchase Agreements requires that the Distributor give notice of the dispute to Hydro-Québec US within 12 months of receipt of the invoice (or any adjusted invoice that Hydro-Québec US may issue). If notice is given, then no payment of the disputed amount is due until the dispute is resolved. Once the dispute is resolved, payment shall be made within 10 days after the resolution, along with contractual interest accrued at the late payment interest rate. (Collins Decl. Exs. 1, 2, 3 at Section 5.2(c)(ii).)

28. Section 10.1(a) of the Power Purchase Agreements defines "Force Majeure" to include any other event within the control of Hydro-Québec US that could not have been

prevented or avoided through the exercise of reasonable diligence, and that directly prohibits or prevents Hydro-Québec US from performing its obligations under the Power Purchase Agreements, as well as reliability curtailments that were not caused by any act or omission of Hydro-Québec US or an affiliate that directly prohibited or prevented Hydro-Québec US from performing its obligations under the Power Purchase Agreements. (Collins Decl. Exs. 1, 2, 3 at Section 10.1(a).)

29. Section 10.1(b) provides that a party who may not be able to perform its obligations due to a force majeure event must provide prompt notice. The notice requires reasonable detail but does not give the counterparty a right to veto the assertion of a force majeure event or a right to demand documentation. Section 10.1(b) further provides that if a party experiencing a force majeure event provides prompt notice and takes commercially reasonable efforts to cure the force majeure event, that party is excused from contract performance and any resulting damages. (Collins Decl. Exs. 1, 2, 3 at Section 10.1(b).)

30. Section 4.3(a) specifies the appropriate procedures for the Distributors to obtain reimbursement for cover damages for unexcused delivery interruptions that have not been cured. Section 4.3 makes clear that cover damages are only available for uncured delivery shortfalls whereby Hydro-Québec US must pay the Distributors an amount equal to the cover damages if the delivery shortfalls are "not caused by Force Majeure or otherwise excused under the express terms of this Agreement." (Collins Decl. Exs. 1, 2, 3 at Section 4.3(a)).

31. Section 5.2(d) of the Power Purchase Agreements provides a netting procedure through which parties may discharge mutual debts and payment obligations. The netting procedure may only be used for undisputed debts that are "due and owing" between the parties. (Collins Decl. Exs. 1, 2, 3 at Section 5.2(d)).

32. The Power Purchase Agreements do not permit netting for disputed debts.

**In January And February 2026, Hydro-Québec US Delivered, And The Distributors Accepted, More Than $50 Million In Clean Energy**

33. In January 2026, the New England Clean Energy Connect transmission line went into operation and Hydro-Québec US began delivering energy to the Distributors. Each month, Hydro-Québec US has sent the Distributors invoices for the electricity delivered to and accepted by each of them.

34. In January and February 2026 (as further discussed below), Hydro-Québec US supplied more than 1 million MWh of clean energy to the Distributors. The Distributors do not dispute that these clean energy deliveries were delivered and accepted.

35. Under Section 5.2(a) of the Power Purchase Agreements, the Distributors have been invoiced approximately $53 million for the energy that was delivered to, and accepted by, the Distributors in January and February 2026. (Collins Decl. Exs. 1, 2, 3 at Section 5.2(a)).

36. The Distributors do not dispute the invoiced amounts under Section 5.2(c)(ii) of the Power Purchase Agreements.

37. Under Section 5.2(b) of the Power Purchase Agreements, the Distributors were required to pay any invoiced amounts within 15 days of receipt of each invoice or the last day of the calendar month in which each invoice was received. (Collins Decl. Exs. 1, 2, 3 at Section 5.2(b)).

**A Historically Exceptional Winter Storm Hit Québec; Grid Operator TransÉnergie Ordered Reliability Curtailments In Response**

38. Each electric system is governed by a grid operator, who is responsible for managing and balancing the electrical power system. The grid operator acts as the traffic controller for electricity, continuously balancing supply and demand to keep the grid stable, prevent power outages, and ensure electricity safely reaches homes and businesses. Grid

operators follow operating rules that are put in place to direct operations in the event that demand for electricity exceeds supply.

39. In Québec, the grid operator is TransÉnergie. TransÉnergie, in its capacity as reliability coordinator, balancing authority, and transmission service provider for the Québec region, maintains load balance and reliable operation of transmission facilities in accordance with reliability standards developed by the North American Electric Reliability Corporation and adopted by Québec's energy regulator, the Régie de l'énergie.

40. Electric grids may become strained during periods of extreme cold or heat when there is very high demand for energy that exceeds the normal day-to-day demand on the system.

41. Beginning on January 24, 2026, and continuing through February 9, 2026 (the "Force Majeure Events Period"), Québec and its surrounding areas experienced an extreme and prolonged cold weather event that included frigid temperatures and heavy snow. During that extreme and prolonged cold weather event, Québec temperatures were persistently well below normal, averaging more than 9 degrees Fahrenheit below historic averages.

42. The graph below illustrates the deviation from the historical mean temperature in Québec for each day from January 24, 2026 through February 9, 2026:




*[See https://climate.weather.gc.ca/ for the Montreal-Trudeau International Airport station. Based on average mean temperature for each day from 2003 to 2025; calculations did not include data from 2005, 2006, 2011, and 2012 since source data was missing for those years.] Temperatures were converted from Celsius degrees to Fahrenheit degrees.*

43. The news media reported that during the weekend of January 24-25, 2026, Environment and Climate Change Canada, Canada's governmental body responsible for coordinating environmental policies and programs, issued a yellow warning for most of the province of Québec. Forecasts called for highs of -4°F, with wind chills as cold as -36°F. (By way of reference, household freezers are typically set to 0°F.)

44. Local news sources, including CBC News and CityNews Montréal reported life-threatening conditions.

45. Over that weekend, more than 15,000 households in the city of Montréal were affected by a power outage. By Monday, January 26, 2026, over 2,800 households in the city of Montréal and over 3,600 households in the city of Québec were still affected. To combat power outages, residents were reportedly driving in their cars around their neighborhoods to stay warm. In the city of Québec, the Canadian Red Cross opened an emergency shelter for those affected by the power outage.

46. The power outages also claimed the lives of two elderly women. Authorities conducting wellness checks discovered a 66-year-old woman dead in her apartment in Montréal after the power outage and extreme cold. An 87-year-old woman was found in critical condition during another wellness check. She died of hypothermia after she was transported to a hospital.

47. The power outages and snowstorm forced several schools to close.

48. The storm also affected transportation infrastructure in the region. Roads remained icy and slippery—several collisions and vehicles running off the road were reported. The Réseau Express Métropolitain, Greater Montréal's light rail system, reported several hours of delays. At the Montréal airport, dozens of flights were canceled on Monday morning following the weekend storm.

49. The cold weather continued well into February, while customers continued to crank up heat in their homes to stay warm, putting tremendous pressure on Canada's power grid.

50. Those extreme weather conditions led to consistently high peak loads and exceptional energy demand on the Québec system. Peak load in Québec reached 40,747.18 MWh on January 25, 2026, the date of the first delivery curtailment. During the Force Majeure Events Period, Québec peak loads ranged from 93.6% to 99.9% of historical maximums.

51. Prior to the force majeure event, there had never been a period in which Québec peak load equaled or exceeded 38,000 megawatt-hours ("MWh") for seven consecutive days. The below table shows peak load in Québec reaching or exceeding 38,000 MWh for seven consecutive days during the force majeure event Period:

| Date and Hour Ending | Québec Peak Load (MWh) |
|---|---|
| 1/24/2026 18:00 | 40,172.46 |
| 1/25/2026 18:00 | 40,747.18 |
| 1/26/2026 8:00 | 39,312.77 |
| 1/27/2026 8:00 | 38,556.65 |
| 1/28/2026 8:00 | 39,158.90 |
| 1/29/2026 8:00 | 38,127.80 |
| 1/30/2026 9:00 | 39,888.67 |
| 1/31/2026 18:00 | 36,203.12 |
| 2/6/2026 08:00 | 38,230.38 |
| 2/7/2026 18:00 | 36,455.35 |
| 2/8/2026 09:00 | 37,660.24 |
| 2/9/2026 08:00 | 39,668.62 |

"History of electricity demand in Québec" at https://donnees.hydroquebec.com/explore/?sort=modified

52. In response to the extreme and prolonged cold weather, TransÉnergie enacted reliability curtailment measures to stabilize Québec's power grid, maintain the safety and reliability of the system, avoid catastrophic energy failures, and prevent "load shedding" (temporary shutdowns of electric power to particular areas). To implement these reliability curtailment measures, TransÉnergie—bound by the orders and regulations of the energy

regulator in Québec, and, in compliance with energy reliability standards and TransÉnergie's operating instructions—issued orders and directives to curtail deliveries on the Québec Line and rejected requests for scheduled deliveries on the Québec Line, leading to the delivery reductions at issue here. Absent such measures, load shedding and power outages in Québec would have caused extreme harm to persons and businesses.

**Hydro-Québec US's Performance Obligations**
**Were Suspended By The Force Majeure Events**

53. As a result of the events described above, Hydro-Québec US could not deliver all of the clean energy anticipated during that period under the Power Purchase Agreements.

54. Section 4.1(a) of the Power Purchase Agreements allows for Hydro-Québec US's contractual obligation to sell energy to be suspended by a force majeure event.

55. As described above, Section 10.1(a) of the Power Purchase Agreements defines force majeure event to include reliability curtailments under conditions like those that occurred during the Force Majeure Events Period here, as well as an event that (i) was not within the control of the party claiming its occurrence, (ii) could not have been prevented or avoided by such party through the exercise of reasonable diligence, and (iii) directly prohibits or prevents such party from performing its obligations under the Power Purchase Agreements.

56. Here, Hydro-Québec US's delivery interruptions were caused by reliability curtailments implemented by TransÉnergie due to extreme weather conditions. The reliability curtailments were not caused by any act or omission of Hydro-Québec US, were not within the control of Hydro-Québec US, and could not have been prevented or avoided through the exercise of reasonable diligence by Hydro-Québec US. The reliability curtailments caused Hydro-Québec US to be unable to perform its obligations under the Power Purchase Agreements.

57. In compliance with Section 10.1(b), Hydro-Québec US promptly sent an initial force majeure event notice to the Distributors on January 30, 2026, shortly after the initial interruptions. The notice informed the Distributors that "the partial interruption of service is due to extreme weather conditions in Québec and the surrounding areas that are causing a reliability curtailment of resources." Given the complexity of determining the cause of the delivery interruptions, Hydro-Québec US was "still evaluating the facts and circumstances surrounding the curtailments and will provide further elaboration in writing on those issues as soon as practicable" and that Hydro-Québec US reserved all rights, including under the force majeure provision.

58. On February 11, 2026, Hydro-Québec US sent a follow-up force majeure event notice to the Distributors explaining that the interruptions in deliveries were a result of reliability curtailment measures initiated by TransÉnergie, which, under the Power Purchase Agreements, constituted force majeure events excusing Hydro-Québec US's performance.

59. Hydro-Québec US took all commercially reasonable efforts—including directing an increase in the import of energy from neighboring markets, ordering that spot export transactions be eliminated, and directing that interruptible load (under demand reduction programs for commercial and industrial customers) be reduced or canceled—to maintain and/or resume its delivery of electricity to the Distributors during and following the Force Majeure Events Period, delivering over one million MWh of clean energy to the Distributors in January and February 2026.

**Hydro-Québec US Disputes The Distributors'**
**<u>Purported Entitlement To "Cover Damages" For Reliability Curtailments</u>**

60. The Distributors purported to reject Hydro-Québec US's force majeure event notices. The Distributors claimed they were required to replace delivery shortfalls during the

Force Majeure Events Period with energy from other sources, purportedly incurring "cover damages."

61. On February 6, 2026, Eversource and Unitil each sent a "Statement for Cover Damages," demanding purported cover damages from Hydro-Québec US and claiming that Eversource and Unitil incurred these damages due to the energy delivery interruptions in January 2026.

62. On February 11, 2026, Hydro-Québec US sent a letter to each of the Distributors. Hydro-Québec US informed the Distributors that it disputed any claims for cover damages, and rejected their contention that the disputed cover damages would be "set off against invoices otherwise due."

63. On March 2, 2026, National Grid sent a letter stating that it was netting its purported cover damages against Hydro-Québec US's February 13, 2026 invoice for energy actually delivered in January 2026.

64. On March 24, 2026, Unitil sent an adjusted statement purporting to update the cover damages sought for January 2026 and seeking further purported cover damages for February 2026.

65. On March 25, 2026, Eversource sent an adjusted statement purporting to update the cover damages sought for January 2026 and seeking further purported cover damages for February 2026.

66. On March 31, 2026, National Grid sent a letter seeking cover damages for February 2026.

67. Hydro-Québec US has consistently rejected these cover damages in communications with the Distributors.

68. The dispute remains unresolved and continues into the present day. The Distributors continue to falsely claim that Hydro-Québec US owes the purported cover damages that the Distributors allegedly incurred during the delivery interruptions.

69. Although Hydro-Québec US was not required to do so under the Power Purchase Agreements, Hydro-Québec US provided the Distributors with ample additional information regarding the reliability curtailments. Nevertheless, the Distributors have refused to recognize even a single hour of excused delivery interruptions.

**The Distributors Failed To Pay Approximately $40 Million In Invoices**

70. In compliance with Section 5.2(a) of the Power Purchase Agreements, Hydro-Québec US timely invoiced the Distributors for energy delivered in January and February 2026. Each Distributor has failed to timely remit payment for Hydro-Québec US's invoices within fifteen days, as required under Section 5.2(b) and 9.1(b) of the Power Purchase Agreements, and therefore each is in breach.

71. In particular, each Distributor has failed to meet its payment obligations with respect to the following invoices (collectively, the "Unpaid Invoices"), each of which sets forth amounts owed to Hydro-Québec US for the sale and delivery of energy:

(i) On February 13, 2026, Hydro-Québec US invoiced Eversource $8,742,938.23 for January 2026 deliveries. The due date for that invoice was March 2, 2026. Eversource improperly netted disputed cover damages in the amount of $20,132,812.29 against the January 2026 invoice. The amount presently past due from that January 2026 invoice is $8,742,938.23.

(ii) On February 13, 2026, Hydro-Québec US invoiced Unitil $185,740.58 for January 2026 deliveries. The due date for that invoice was March 2, 2026. Unitil improperly netted disputed cover damages in the amount of

$427,035.42 against the January 2026 invoice. The amount presently past due from that January 2026 invoice is $185,740.58.

(iii) On February 13, 2026, Hydro-Québec US invoiced National Grid $7,558,624.37 for January 2026 deliveries. The due date for that invoice was March 2, 2026. National Grid improperly netted disputed cover damages in the amount of $17,277,939.70 against the January 2026 invoice. The amount presently past due from that January 2026 invoice is $7,558,624.37.

(iv) On March 13, 2026, Hydro-Québec US invoiced Eversource $19,782,899.13 for February 2026 deliveries. The due date for that invoice was March 31, 2026. Eversource improperly netted disputed cover damages in the amount of $11,389,874.06 rolled over from January 2026 and $981,890.54 against the February 2026 invoice. (The latter amount reflects a credit for certain cover damages accepted by Hydro-Québec US unrelated to the force majeure event.) The amount presently past due from that February 2026 invoice is $12,371,764.60.

(v) On March 13, 2026, Hydro-Québec US invoiced Unitil $420,596.05 for February 2026 deliveries. The due date for that invoice was March 31, 2026. Unitil improperly netted disputed cover damages in the amount of $241,294.84 rolled over from January 2026 and $20,875.20 against the February 2026 invoice. (The latter amount reflects a credit for certain cover damages accepted by Hydro-Québec US unrelated to the force majeure event.) The amount presently past due from that February 2026 invoice is $262,170.05.

(vi) On March 13, 2026, Hydro-Québec US invoiced National Grid $17,017,387.65 for February 2026 deliveries. The due date for that invoice was March 31, 2026. National Grid improperly netted disputed cover damages in the amount of $9,719,315.33 rolled over from January 2026 and $844,628.84 against the February 2026 invoice. (The latter amount reflects a credit for certain cover damages accepted by Hydro-Québec US unrelated to the force majeure event.) The amount presently past due from that February 2026 invoice is $10,563,944.18.

72. The Distributors do not dispute the amounts of the Unpaid Invoices or the actual delivery of energy for which payment is owed.

73. Although Hydro-Québec US has notified the Distributors that the Unpaid Invoices are due and owing on several occasions, the Distributors have failed to pay the Unpaid Invoices.

74. Pursuant to Section 5.3 of the Power Purchase Agreement, interest is accruing on the Unpaid Invoices at a rate of 7.75% and will continue to accrue at this rate until paid.

**The Distributors Improperly Resorted To Self-Help By Impermissibly Netting The Cover Damages Against Invoices For Power That Was Actually Delivered**

75. Instead of paying Hydro-Québec US's Unpaid Invoices in full as the Distributors were obligated to do, each Distributor improperly and unilaterally reduced the amounts paid to Hydro-Québec US by subtracting from the Unpaid Invoices the disputed cover damages each Distributor allegedly incurred when purchasing energy to make up for the energy shortfall during the Force Majeure Events Period.

76. The netting procedures in Section 5.2 of the Power Purchase Agreements, however, apply only to "mutual debts and payment obligations due and owing." Disputed cover damages are not "mutual debts and payment obligations due and owing" that may be netted.

Nowhere do the Power Purchase Agreements provide for the withholding of payment for undisputed charges because a separate, unrelated dispute exists as to other amounts.f the Distributors actually believed they were entitled to cover damages, the Power Purchase Agreements require notice that an invoice's charges are disputed, and then provide a dispute resolution procedure, which the Distributors did not invoke. (Collins Decl. Exs. 1, 2, 3 at Section 11.) Instead, the Distributors simply held the money for their own account by engaging in unauthorized netting.

77. The Power Purchase Agreements do not permit the Distributors to resort to self-help by using the netting provisions to pocket amounts they actually owe to Hydro-Québec US against cover damages amounts that they claim—but Hydro-Québec US disputes—are owed.

78. The Distributors have also breached the Power Purchase Agreements by inappropriately claiming cover damages even though cover damages are not available where the delivery interruptions were due to a force majeure, as is the case here.

79. The dispute continues to the present day. On August 17, 2026, Hydro-Québec US sent notices to each of the Distributors informing them of a formal dispute under Section 11 of the Power Purchase Agreements. Eversource, Unitil, and National Grid responded to Hydro-Québec US's notices on August 17, August 18, and August 19, 2026, respectively. Further discussions were not fruitful.

80. In compliance with the 15 business-day notice period requirement of Section 11 of the Power Purchase Agreements, Hydro-Québec US properly commenced this action after the close of business on September 8, 2026. (Collins Decl. Exs. 1, 2, 3 at Section 11.).

**COUNT I**
**(Breach of Contract)**

81. Hydro-Québec US repeats and realleges the preceding paragraphs as if fully set forth herein.

82. The Power Purchase Agreements are valid, binding, and enforceable contracts between Hydro-Québec US and the Distributors.

83. Hydro-Québec US has satisfied its contractual obligations under the Power Purchase Agreements and remains ready, willing, and able to continue performing those obligations.

84. The Distributors have breached their contractual obligations to Hydro-Québec US by refusing to pay the Unpaid Invoices incurred when Hydro-Québec US delivered energy to the Distributors and the Distributors accepted such energy. Specifically, the Distributors have failed to pay the Unpaid Invoices issued by Hydro-Québec US.

85. The Distributors have additionally breached their contractual obligations by asserting cover damages for delivery interruptions that were excused due to force majeure in violation of the express terms of the Power Purchase Agreements.

86. As a direct and proximate result of the Distributors' breaches, Hydro-Québec US has incurred losses, including at least $39,685,181.99 in Unpaid Invoices, plus interest which continues to accrue.

87. Hydro-Québec US has incurred these losses as a result of the Distributors' failures to perform their obligations to pay under the Power Purchase Agreements.

88. Hydro-Québec US, complying with its obligations under the Power Purchase Agreements to supply energy to the Distributors, has suffered and continues to suffer damages as a result of the Distributors' breaches.

**COUNT II**
**(Declaratory Judgment Pursuant To 28 U.S.C. §§ 2201, 2202)**

89. Hydro-Québec US repeats and realleges the preceding paragraphs as if fully set forth herein.

90. An actual controversy has arisen and now exists between Hydro-Québec US and the Distributors concerning the appropriateness of the Distributors' application of their respective Power Purchase Agreements' netting provisions.

91. Hydro-Québec US requires a judicial determination of the respective rights of itself and the Distributors under Section 5.2(d), the netting provision, of the Power Purchase Agreements because the Power Purchase Agreements are long-term contracts spanning twenty years and the parties' different interpretations of the netting provision concern not only the present dispute about cover damages, but also potential future disputes involving netting.

92. The present breaches are just one example of how the parties' differing interpretations of the netting provision affect the rights of the parties under the Power Purchase Agreements.

93. Hydro-Québec US requires a judicial determination so as to have clarity and certainty, now and in the future, as to whether the Power Purchase Agreements preclude the Distributors from netting disputed amounts from undisputed invoices.

94. Hydro-Québec US requires a judicial determination that the Distributors are in default of the Power Purchase Agreements under Section 9.1(b) because they have failed to pay the undisputed invoices and such failure continues to the present day.

95. Therefore, Hydro-Québec US seeks a declaration, based on the plain language of the Power Purchase Agreements, that:

(i) The netting provision in Section 5.4(d) of the Power Purchase Agreements, does not permit a party to net claims for disputed amounts against undisputed payment obligations;

(ii) As for the present dispute, the Distributors do not and never had the right to net disputed cover damages against invoices for undisputed payments, and breached the Power Purchase Agreements by doing so;

(iii) Going forward, neither party is permitted to net disputed payment obligations against undisputed payment obligations.

**COUNT III**
**(Breach Of The Implied Covenant Of Good Faith And Fair Dealing)**

96. Hydro-Québec US repeats and realleges the preceding paragraphs as if fully set forth herein.

97. The Power Purchase Agreements are valid, binding, and enforceable contracts between Hydro-Québec US and the Distributors.

98. Hydro-Québec US and the Distributors entered into the Power Purchase Agreements on the assumption of good faith and fair dealing, such that the parties could reasonably expect each other to conform to the terms of the Power Purchase Agreements.

99. The Distributors have breached the implied covenant of good faith and fair dealing by resorting to impermissible netting instead of availing themselves of the ordinary dispute resolution process prescribed by the Power Purchase Agreements.

100. By going outside the bounds of the Power Purchase Agreements, despite adequate and negotiated-for dispute resolution processes available therein, the Distributors acted in bad faith.

101. In addition to their resort to self-help, the Distributors also breached their implied covenant of good faith and fair dealing because they willfully and knowingly refused to pay for the energy they received and accepted from Hydro-Québec US, even though they knew that (i) Hydro-Québec US expressly disputed the Distributors' claim of cover damages, (ii) the unambiguous terms of the Power Purchase Agreements only permit the netting of amounts that are "due and owing," and not amounts that are disputed and contingent such as their putative cover damages claims, and (iii) their actions would cause egregious economic harm to Hydro-Québec US. Moreover, even if the Distributors had a right to net disputed amounts (which they do not), the Distributors acted in bad faith by refusing to meaningfully engage with information provided by Hydro-Québec US, refusing to acknowledge that Hydro-Québec US experienced a force majeure event such that the Distributors were not entitled to cover damages.

102. As a direct and proximate result of the Distributors' breaches, Hydro-Québec US has suffered losses including at least $39,685,181.99 in Unpaid Invoices, plus interest which continues to accrue.

## COUNT IV
## (Massachusetts General Laws, Chapter 93A, § 11)

103. Hydro-Québec US repeats and realleges the preceding paragraphs as if fully set forth herein.

104. At all times relevant to this action, Hydro-Québec US and the Distributors were engaged in "trade or commerce" within the meaning of Massachusetts General Laws Chapter 93A.

105. The Distributors' unfair and deceptive acts set forth above occurred primarily and substantially in Massachusetts.

106. The Distributors committed unfair and deceptive acts or practices under M. G. L. c. 93A, § 11 by willfully and knowingly refusing to engage in good faith with Hydro-Québec US's assertions that a force majeure event excused its performance during the Force Majeure Events Period. Despite demanding and receiving substantial documentation regarding the circumstances giving rise to the reliability curtailments, the Distributors refused to acknowledge even a single hour of force majeure event occurred. Instead, the Distributors have simply rejected force majeure event entirely without articulation of their reasoning.

107. The Distributors' actions further constitute unfair and deceptive acts or practices under M. G. L. c. 93A, § 11 because they willfully and knowingly used impermissible self-help measures in an effort to extract from Hydro-Québec US a version of the Power Purchase Agreements that they did not bargain for; one that allows no energy interruptions whatsoever. Even more egregiously, the Distributors have sought to use this dispute to seek extra-contractual benefits beyond the obvious non-payments by seeking to extract concessions and demand assurances from Hydro-Québec US that it will continue to deliver clean energy under similar circumstances in the future, even in the face of the Distributors' refusal to pay for clean energy actually received.

108. As a direct and proximate result of the Distributor's unfair or deceptive acts or practices, Hydro-Québec US has suffered losses including at least $39,685,181.99 in Unpaid Invoices, plus interest which continues to accrue.

**PRAYER FOR RELIEF**

1. WHEREFORE, Plaintiff Hydro-Québec US respectfully requests that this Court:Grant judgment to Hydro-Québec US on all its claims;
2. Declare that the Power Purchase Agreements' netting provision under Section 5.4(d) does not permit a party to net claims for disputed amounts against undisputed payment

obligations, that, as for the present dispute, the Distributors do not and never had the right to net disputed cover damages against invoices for undisputed payments, and breached the Power Purchase Agreements by doing so, and that going forward neither party is permitted to net disputed payments obligations against undisputed payment obligations.

3. Award Hydro-Québec US such damages that it has sustained as a result of the Distributors' breaches of contract, violations of the implied covenant of good faith and fair dealing, and/or violations of M.G.L. c. 93A, § 11, including:
    a. $21,114,702.83 from Eversource;
    b. $18,122,568.55 from National Grid; and
    c. $447,910.63 from Unitil.
4. Award Hydro-Québec US contractual interest as provided under the Power Purchase Agreements;
5. Award Hydro-Québec US up to treble damages pursuant to M.G.L. c. 93A, § 11;
6. Award Hydro-Québec US reasonable attorneys' fees and costs pursuant to M.G.L. c. 93A, § 11; and
7. Grant Hydro-Québec US such other and further relief that this Court may deem just and proper.

Dated: September 8, 2026
Boston, Massachusetts

Respectfully submitted,

*<u>/s/ Alisha Q. Nanda</u>*

Alisha Q. Nanda (BBO #657266)
Kurt Wm. Hemr (BBO #638742)
Rene H. DuBois (BBO #688849)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
alisha.nanda@skadden.com
kurt.hemr@skadden.com
rene.dubois@skadden.com

Jennifer Permesly (*pro hac vice forthcoming*)
SKADDEN, ARPS, SLATE
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-3000
jennifer.permesly@skadden.com

*Counsel for Plaintiff*
*H.Q. Energy Services U.S., Inc.*