# EXHIBIT 1

**EXECUTION VERSION**

# POWER PURCHASE AGREEMENT

**FOR**

**FIRM QUALIFIED CLEAN ENERGY**

**FROM**

**HYDROELECTRIC GENERATION**

**BETWEEN**

**NSTAR ELECTRIC COMPANY d/b/a EVERSOURCE ENERGY**

**AND**

**H.Q. ENERGY SERVICES (U.S.) INC.**

**as of June 13, 2018**

**TABLE OF CONTENTS**


1. DEFINITIONS ........ 1
2. EFFECTIVE DATE; TERM ........ 14
    2.1 Effective Date ........ 14
    2.2 Term ........ 15
3. PROJECT DEVELOPMENT AND OPERATION ........ 15
    3.1 Commercial Operation Date. ........ 15
    3.2 Delay Damages ........ 16
    3.3 Progress Reports; Site Access; Capacity Deficiency ........ 17
    3.4 Conditions Precedent to the Commercial Operation Date ........ 18
    3.5 Operation of the Hydro-Québec Power Resources ........ 19
    3.6 Interconnection and Delivery Services ........ 22
4. DELIVERY OF PRODUCTS ........ 22
    4.1 Obligation to Sell and Purchase Products ........ 22
    4.2 Scheduling and Delivery ........ 23
    4.3 Failure of Seller to Deliver Products. ........ 24
    4.4 Failure by Buyer to Accept Delivery of Products; Default under TSA ........ 27
    4.5 Delivery Point ........ 28
    4.6 Metering ........ 28
    4.7 Environmental Attributes ........ 29
5. PRICE AND PAYMENTS FOR PRODUCTS ........ 31
    5.1 Price for Products ........ 31
    5.2 Payment and Netting ........ 31
    5.3 Interest on Late Payment or Refund ........ 32
    5.4 Taxes, Fees and Levies ........ 32

**TABLE OF CONTENTS (CONT'D)**

**Page**

6. SECURITY FOR PERFORMANCE....33
   - 6.1 Seller's Support....33
   - 6.2 Cash Deposits....34
   - 6.3 Return of Credit Support....34
   - 6.4 Buyer's Rights and Remedies....34
   - 6.5 Unsecured Credit Limit....35
7. REPRESENTATIONS, WARRANTIES, COVENANTS AND ACKNOWLEDGEMENTS....35
   - 7.1 Representations and Warranties of Buyer....35
   - 7.2 Representations and Warranties of Seller....36
   - 7.3 Continuing Nature of Representations and Warranties....38
   - 7.4 Assignment of Transmission Rights....39
   - 7.5 Forward Capacity Market Participation....39
8. REGULATORY APPROVAL; TERMINATION OF TSA....39
   - 8.1 Receipt of Regulatory Approval....39
   - 8.2 Transmission Approvals....39
   - 8.3 Transmission Service Agreement....39
   - 8.4 DEP Advisory Ruling....40
9. BREACHES; REMEDIES....41
   - 9.1 Events of Default by Either Party....41
   - 9.2 Events of Default by Seller....42
   - 9.3 Remedies....43

## TABLE OF CONTENTS (CONT'D)


**Page**

10. FORCE MAJEURE ....47

 10.1 Force Majeure ....47

11. DISPUTE RESOLUTION ....50

 11.1 Consultation ....50

 11.2 Disputes to be Resolved by FERC ....50

 11.3 Consent to Jurisdiction ....51

 11.4 **Waiver of Jury Trial** ....51

12. CONFIDENTIALITY ....51

 12.1 Nondisclosure ....51

 12.2 Public Statements ....52

13. INDEMNIFICATION ....52

 13.1 Indemnification Obligations ....52

 13.2 Failure to Defend ....52

14. ASSIGNMENT AND CHANGE OF CONTROL ....52

 14.1 Prohibition on Assignments ....52

 14.2 Permitted Assignment by Seller ....53

 14.3 Change in Control over Seller ....53

 14.4 Permitted Assignment by Buyer ....53

 14.5 Prohibited Assignments ....54

15. TITLE; RISK OF LOSS ....54

16. AUDIT ....54

 16.1 Audit ....54

 16.2 Access to Financial Information ....54

**TABLE OF CONTENTS (CONT'D)**

**Page**

17. NOTICES ..... 54

18. WAIVER AND MODIFICATION ..... 56

19. INTERPRETATION ..... 56

19.1 Choice of Law ..... 56

19.2 Headings ..... 56

19.3 Forward Contract ..... 56

19.4 Standard of Review ..... 56

19.5 Change in ISO-NE Rules and Practices ..... 57

19.6 Dodd Frank Act Representations ..... 57

19.7 Change in Law or Buyer's Accounting Treatment, Subsequent Judicial or Regulatory Action ..... 58

20. ASSIGNMENT OF TRANSMISSION RIGHTS ..... 59

21. WAIVER OF IMMUNITIES ..... 60

22. COUNTERPARTS; FACSIMILE SIGNATURES ..... 60

23. NO DUTY TO THIRD PARTIES ..... 60

24. SEVERABILITY ..... 60

25. INDEPENDENT CONTRACTOR ..... 60

26. ENTIRE AGREEMENT ..... 61

# TABLE OF CONTENTS (CONT'D)

**Page**

**Exhibits**

| | |
|---|---|
| Exhibit A | Description of Hydro-Québec Power Resources |
| Exhibit B | Schedule of Guaranteed Qualified Clean Energy to be Delivered from the Hydro-Québec Power Resources |
| Exhibit C | Sample Market Exposure Calculation |
| Exhibit D | Qualified Clean Energy and Environmental Attribute Pricing |
| Exhibit E | Description of the New Transmission Facilities |
| Exhibit F | Form of Progress Report |
| Exhibit G | Form of Seller Guaranty |
| Exhibit H | Description of Baseline Hydroelectric Generation |

# POWER PURCHASE AGREEMENT

This **POWER PURCHASE AGREEMENT FOR FIRM QUALIFIED CLEAN ENERGY FROM HYDROELECTRIC GENERATION** (as amended from time to time in accordance with the terms hereof, this "**Agreement**") is entered into as of June 13, 2018 (the "**Effective Date**"), by and between NSTAR ELECTRIC COMPANY d/b/a EVERSOURCE ENERGY, a Massachusetts corporation ("**Buyer**"), and H.Q. ENERGY SERVICES (U.S.) INC., a Delaware corporation ("**Seller**"). Buyer and Seller are individually referred to herein as a "**Party**" and are collectively referred to herein as the "**Parties**."

**WHEREAS,** an Affiliate (as defined herein) of Seller owns and operates the Hydro-Québec Power Resources (as defined herein); and

**WHEREAS,** the output of the Hydro-Québec Power Resources, delivered through the New Transmission Facilities (as defined herein), shall constitute incremental hydroelectric generation during the Services Term (as defined herein); and

**WHEREAS,** U.S. Transmission Provider (as defined herein) and an Affiliate of Seller submitted a joint proposal in response to the Request for Proposals for Long-Term Energy Contracts for Clean Energy Projects dated March 31, 2017; and

**WHEREAS,** pursuant to Section 83D of the Green Communities Act as added by Chapter 188 of the Acts of 2016, An Act to Promote Energy Diversity ("**Section 83D**"), Buyer is authorized to enter into certain long-term contracts for the purchase of energy or energy and renewable energy certificates from clean energy generators meeting the requirements of Section 83D; and

**WHEREAS,** Buyer and Seller desire to enter into this Agreement whereby Buyer shall purchase and Seller shall sell Qualified Clean Energy and associated Environmental Attributes (each as defined herein) in accordance with the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the premises and of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## 1. DEFINITIONS

In addition to terms defined in the recitals hereto, the following terms shall have the meanings set forth below. Any capitalized terms used in this Agreement and not defined herein shall have the same meaning as ascribed to such terms under the ISO-NE Practices and ISO-NE Rules.

"**Actual Transmission Capacity**" shall mean, at the applicable date of determination under Section 3.3(c), the actual transmission transfer capability of the New Transmission Facilities, as built.

"**Adverse Determination**" shall have the meaning set forth in Section 19.7(b) hereof.

"**Advisory Ruling**" shall have the meaning set forth in Section 8.4(a) hereof.

**"Affiliate"** shall mean, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, is Controlled by, or is under common Control with, such first Person; provided, however, that, with respect to Seller, a Person shall not be an "Affiliate" of Seller unless such Person is Hydro-Québec (including, for the avoidance of doubt, a division of Hydro-Québec) or Controlled by Hydro-Québec.

**"Agreement"** shall have the meaning set forth in the first paragraph of this Agreement.

**"APS"** shall mean the requirements established pursuant to Mass. Gen. Laws ch. 25A, Section 11F½ and the regulations promulgated thereunder that require all retail electricity suppliers in Massachusetts to provide a minimum percentage of electricity from alternative energy portfolio standard generation units, and such successor laws and regulations as may be in effect from time to time.

"**Baseline Hydroelectric Generation**" shall have the meaning set forth in Exhibit H.

"**Baseline Hydroelectric Shortfall Damages**" shall have the meaning set forth in Exhibit H.

**"Business Day"** shall mean a day on which Federal Reserve member banks in New York, New York are open for business; and a Business Day shall start at 8:00 a.m. and end at 5:00 p.m. Eastern Prevailing Time.

**"Buyer"** shall have the meaning set forth in the first paragraph of this Agreement.

**"Buyer's Exposure"** shall mean any positive difference between (a) Market Exposure and (b) the sum of (i) any payment due from Buyer to Seller pursuant to Article 5 which has not yet been made and (ii) any Credit Support provided pursuant to Sections 6.1(b) and 6.1(c).

**"Buyer's Taxes"** shall have the meaning set forth in Section 5.4(a) hereof.

**"Capacity Deficiency"** shall mean, at the applicable date of determination under Section 3.3(c), the amount (expressed in MW), if any, by which the Actual Transmission Capacity is less than the proposed transmission transfer capability of the New Transmission Facilities as set forth in Exhibit E.

**"Cash"** shall mean U.S. dollars held by or on behalf of a Party as Posted Collateral hereunder.

**"Certificate"** shall mean an electronic certificate created pursuant to the GIS Operating Rules or any successor thereto to represent certain generation attributes of each MWh of Energy generated within the ISO-NE control area and the generation attributes of certain Energy imported into the ISO-NE control area. For the avoidance of doubt, Certificate(s) shall include any and all Environmental Attributes associated with the Qualified Clean Energy and Qualified Shortfall Energy from the Hydro-Québec Power Resources and shall represent title to and claim over all such Environmental Attributes.

"**CES**" shall mean the Clean Energy Standard requirements established pursuant to the regulations promulgated at 310 CMR 7.75 that require all retail electricity suppliers in Massachusetts to provide a minimum percentage of electricity from certain clean energy generating sources, and such successor laws and regulations as may be in effect from time to time.

"**CFTC rules**" shall have the meaning specified in Section 19.6 hereof.

"**Commercial Operation Date**" shall mean the date on which the conditions set forth in Section 3.4(b) have been satisfied, as set out in a written notice from Seller to Buyer.

"**Commercially Reasonable Efforts**" or "**Commercially Reasonable Manner**" shall mean, with respect to any purchase or sale or other action required to be made, attempted, or taken by a Party under this Agreement, such efforts as a prudent business would undertake (x) for the protection of its own interests under the conditions affecting such purchase or sale or other action, including the amount of notice of the need to take such purchase or sale or other action, the duration and type of the purchase or sale or other action, the competitive environment in which such purchase or sale or other action occurs, the risk and cost to the Party required to take such purchase or sale or other action, the obligations of the Party under this Agreement to the other Party, and (y) to mitigate any disproportionate impact of such purchase or sale or other action on the other Party.

"**Contract Maximum Amount**" shall mean the highest MWh per hour value of Guaranteed Qualified Clean Energy.

"**Contract Year**" shall mean the twelve (12) consecutive calendar months starting on the first day of the calendar month following the Commercial Operation Date and each subsequent twelve (12) consecutive calendar month period; provided that the first Contract Year shall include the days in the prior month in which the Commercial Operation Date occurred.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Cover Damages**" shall mean, with respect to any Uncured Delivery Shortfall, an amount equal to the positive net amount, if any, of (a) the sum, without duplication, of (i) the Replacement Price applicable to that Uncured Delivery Shortfall multiplied by the amount of the Uncured Delivery Shortfall (in MWh) plus (ii) any additional transmission costs and charges reasonably incurred by Buyer to transmit Replacement Energy with respect to that Uncured Delivery Shortfall to the Delivery Point, but solely to the extent that such costs and charges exceed the amount that Buyer incurred under the TSA with respect to such Uncured Delivery Shortfall, plus (iii) any other costs reasonably incurred by Buyer to purchase Replacement Energy and/or Replacement Environmental Attributes with respect to that Uncured Delivery Shortfall, plus (iv) any applicable penalties and other costs assessed by ISO-NE or any other Person against Buyer as a result of that Uncured Delivery Shortfall, plus (v) any other costs and losses reasonably incurred by

Buyer as a result of that Uncured Delivery Shortfall, minus (b) the applicable Price that would have been paid pursuant to Section 5.1 hereof for the quantity of Products not Delivered as a result of that Uncured Delivery Shortfall multiplied by the amount of the Uncured Delivery Shortfall (in MWh), plus (c) any costs or charges incurred by Buyer under the TSA associated with the aggregate quantity of Energy (expressed in MWh) not Delivered as a result of that Uncured Delivery Shortfall; provided, however, that, for the avoidance of doubt, if and when the TSA is terminated, then, with respect to any Uncured Delivery Shortfalls that occur after such termination, the Cover Damages shall exclude any costs or charges in respect of the TSA. Buyer shall provide a statement for the applicable period explaining in reasonable detail the calculation of any Cover Damages.

**"Credit Rating"** shall mean the rating then assigned to Seller Guarantor's unsecured, senior long-term debt obligations (not supported by third party credit enhancements) or if Seller Guarantor does not have a rating for its senior unsecured long-term debt then one rating notch below the rating then assigned to Seller Guarantor or such third party as an issuer and/or corporate credit rating by S&P, Moody's, or Fitch. In the event of an inconsistency in ratings (a "split rating"), the lowest of the Credit Ratings shall control.

**"Credit Support"** shall mean collateral in the form of (a) Cash or (b) a Letter of Credit.

**"Curable Delivery Shortfall"** shall have the meaning specified in Section 4.3(c) hereof.

**"Default"** shall mean any event or condition which, with the giving of notice or passage of time or both, could become an Event of Default.

**"Defaulted Delivery Shortfall"** shall have the meaning specified in Section 9.2(f) hereof.

**"Defaulting Party"** shall mean the Party with respect to which a Default or Event of Default has occurred.

**"Delay Damages"** shall mean the damages assessed pursuant to Section 3.2(a) hereof.

**"Deliver"** or **"Delivery"** shall mean with respect to (a) Qualified Clean Energy, to physically supply Qualified Clean Energy to the Delivery Point and transfer such Energy into Buyer's ISO-NE account settled at the Delivery Point in accordance with the terms of this Agreement and the ISO-NE Rules, (b) Qualified Shortfall Energy, to physically supply Qualified Shortfall Energy to a delivery point designated by Seller within the New England Control Area and transfer such Energy into Buyer's ISO-NE account settled at the Delivery Point or, as reasonably agreed from time to time by Buyer and Seller, the NEMASSBOST Hub in accordance with the terms of this Agreement and the ISO-NE Rules, and (c) Environmental Attributes, to supply Environmental Attributes associated with such Qualified Clean Energy or Qualified Shortfall Energy, as applicable, in accordance with Section 4.7.

**"Delivery Point"** shall mean the southern terminus of the U.S. Transmission Line at Larrabee Road substation in Lewiston, Maine, as illustrated in Attachment A to the TSA.

"**Delivery Schedule**" shall mean Seller's obligation to Deliver and Buyer's rights to receive the MWhs of Qualified Clean Energy and associated Environmental Attributes during the Services Term as provided in Exhibit B.

"**Delivery Shortfall**" shall have the meaning set forth in Section 4.3(a) hereof.

"**Delivery Shortfall LMP**" shall have the meaning set forth in Section 4.3(c)(viii) hereof.

"**Dispute**" shall have the meaning set forth in Section 11.1(a) hereof.

"**Downgrade Event**" shall mean an event where Seller Guarantor's Credit Rating falls below an Investment Grade Rating, or Seller Guarantor ceases to have a Credit Rating.

"**Eastern Prevailing Time**" shall mean either Eastern Standard Time or Eastern Daylight Savings Time, as in effect from time to time.

"**Effective Date**" shall have the meaning set forth in the first paragraph hereof.

"**Energy**" shall mean electric "energy," as such term is defined in the ISO-NE Tariff.

"**Environmental Attributes**" shall mean any and all generation attributes under the CES, the GWSA, and under any and all other international, federal, regional, state or other law, rule, regulation, bylaw, treaty or other intergovernmental compact, decision, administrative decision, program (including any voluntary compliance or membership program), competitive market or business method (including all credits, certificates, benefits, and emission measurements, reductions, offsets and allowances related thereto) that are attributable, now or in the future, to the favorable generation or environmental attributes of the Hydro-Québec Power Resources, the Qualified Clean Energy or the Qualified Shortfall Energy produced by the Hydro-Québec Power Resources including, but not limited to: (a) any such credits, certificates, benefits, offsets and allowances computed on the basis of the Hydro-Québec Power Resources' generation using renewable technology or displacement of fossil-fuel derived or other conventional energy generation; (b) any Certificates issued pursuant to the GIS in connection with Energy generated by the Hydro-Québec Power Resources; and (c) any voluntary emission reduction credits obtained or obtainable by Seller in connection with the Qualified Clean Energy or the Qualified Shortfall Energy, as the case may be; provided, however, that Environmental Attributes shall not include: (i) any state or federal production tax credits; (ii) any state or federal investment tax credits or other tax credits associated with the construction or ownership of the Hydro-Québec Power Resources; or (iii) any state, federal or private grants, financing, guarantees or other credit support relating to the construction or ownership, operation or maintenance of the Hydro-Québec Power Resources or the output thereof.

"**Event of Default**" shall have the meaning set forth in Section 9.1 hereof and shall include the events and conditions described in Section 9.1 and Section 9.2 hereof.

“**Excused Outage**” shall mean an Excused Outage (as defined in the TSA) other than any such Excused Outage due to outages or reductions in the availability of the Québec Line.

“**Federal Funds Rate**” shall mean the annualized interest rate for the applicable month as set forth in the statistical release designated as H.15, or any successor publication, published by the Board of Governors of the Federal Reserve System.

“**FERC**” shall mean the United States Federal Energy Regulatory Commission, and shall include its successors.

“**FERC Jurisdictional Issue**” shall have the meaning set forth in Section 11.2(a) hereof.

“**Fitch**” shall mean Fitch Investor’s Service, Inc., or its successor.

“**Fixed Amount**” shall mean the applicable dollar amounts set forth in Section 6.5 under the column heading “Fixed Amount.”

“**Fixed Credit Support**” shall have the meaning set forth in Section 6.1(b) hereof.

“**Force Majeure**” shall have the meaning set forth in Section 10.1(a) hereof.

“**Generation Unit**” shall mean a facility that converts a fuel or an energy resource into electrical energy.

“**GIS**” shall mean the NEPOOL Generation Information System or any successor thereto, which includes a generation information database and certificate system, operated by NEPOOL, its designee or successor entity, that accounts for generation attributes of electricity generated or consumed within the New England Control Area.

“**GIS Operating Rules**” are the NEPOOL Generation Information System Operating Rules effective as of the Effective Date, as amended, superseded, or restated from time to time.

“**Good Utility Practice**” shall mean compliance with all applicable laws, codes, rules and regulations, all ISO-NE Rules and ISO-NE Practices, and any practices, methods and acts engaged in or approved by a significant portion of the electric industry in New England or the Province of Québec during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision is made, could have been expected to accomplish the desired result consistent with good business practices, reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is intended to include acceptable practices, methods and acts generally accepted in the electric industry in New England or the Province of Québec.

"**Governmental Entity**" shall mean any federal, state or local governmental agency, authority, department, instrumentality or regulatory body, and any court or tribunal, with jurisdiction over Seller, Buyer or the Hydro-Québec Power Resources.

"**Guaranteed Delivery Term Start Date**" shall mean December 13, 2022, as may be extended pursuant to Sections 3.1(c) through 3.1(f).

"**Guaranteed Qualified Clean Energy**" shall mean Seller's firm obligations to provide Qualified Clean Energy and associated Environmental Attributes pursuant to this Agreement, as provided in the Delivery Schedule included in Exhibit B.

"**GWSA**" shall mean the Massachusetts Global Warming Solutions Act (Mass. Gen. Laws ch. 298), and such successor laws and regulations as may be in effect from time to time.

"**Hydro-Québec**" shall mean Hydro-Québec, a body politic and corporate, duly incorporated and regulated by the Hydro-Québec Act (R.S.Q., Chapter H-5).

"**Hydro-Québec Power Resources**" shall mean, collectively, those existing hydroelectric generating stations, located in the Province of Québec and owned and operated as a system by Hydro-Québec or its subsidiaries from time to time, that produce electric energy, which consists predominantly of low-carbon and renewable hydro-electric energy during the Services Term, which are further described in Exhibit A.

"**ICE**" shall have the meaning set forth in the definition of Off-Peak Forward Price.

"**Immunities Act**" means the United States Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 et seq.

"**Interconnecting Utility**" shall mean, as the context requires, TransÉnergie or the utility providing interconnection service for the Hydro-Québec Power Resources to the transmission system of that utility.

"**Interconnection Agreements**" shall mean, collectively, (a) the agreement(s) required to be executed among U.S. Transmission Provider, TransÉnergie and ISO-NE to interconnect the U.S. Transmission Line with the Québec Line at the U.S./Canada border and (b) the agreement(s) required to be executed among U.S. Transmission Provider and ISO-NE that sets forth such parties' respective rights and obligations following the interconnection at the Delivery Point of the U.S. Transmission Line with certain transmission facilities operated by ISO-NE.

"**ISO**" or "**ISO-NE**" shall mean ISO New England Inc., the independent system operator established in accordance with the RTO arrangements for New England, or its successor.

"**ISO-NE Practices**" shall mean the ISO-NE practices and procedures for delivery and transmission of energy in effect from time to time and shall include, without limitation, applicable requirements of the NEPOOL Agreement, and any applicable successor practices and procedures.

"**ISO-NE Rules**" shall mean all rules and procedures adopted by NEPOOL, ISO-NE, or the RTO, and governing wholesale power markets and transmission in New England, as such rules may be amended from time to time, including but not limited to, the ISO-NE Tariff, the ISO-NE Operating Procedures (as defined in the ISO-NE Tariff), the ISO-NE Planning Procedures (as defined in the ISO-NE Tariff), the Transmission Operating Agreement (as defined in the ISO-NE Tariff), the ISO-NE Participants Agreement, the manuals, procedures and business process documents published by ISO-NE via its web site and/or by its e-mail distribution to appropriate NEPOOL participants and/or NEPOOL committees or as otherwise made available publicly to the Parties, as amended, superseded or restated from time to time.

"**ISO-NE Tariff**" shall mean ISO-NE's Transmission, Markets and Services Tariff, as amended, superseded or restated from time to time.

"**Late Payment Rate**" shall have the meaning set forth in Section 5.3 hereof.

"**Law**" shall mean all federal, state and local statutes, regulations, rules, orders, executive orders, decrees, policies, judicial decisions and notifications, including without limitation international treaty obligations and also including without limitation Section 83D, the regulations promulgated under Section 83D, the Regulatory Approval and any other orders of the MDPU with respect to this Agreement.

"**Letter of Credit**" shall mean an irrevocable, non-transferable standby letter of credit issued by a Qualified Institution utilizing a form acceptable to the Party in whose favor such letter of credit is issued. All costs relating to any Letter of Credit shall be for the account of the Party providing that Letter of Credit.

"**Limited Suspension Period**" shall have the meaning set forth in 4.3(d) hereto.

"**Market Exposure**" shall mean the summation of the amounts calculated for each full calendar month remaining in the Services Term, up to a total of sixty (60) months, of (a) the product of (i) the On-Peak Forward Price minus the On-Peak Energy Price multiplied by (ii) the On-Peak quantity of Guaranteed Qualified Clean Energy, plus (b) the product of (i) the Off-Peak Forward Price minus the Off-Peak Energy Price multiplied by (ii) the Off-Peak quantity of Guaranteed Qualified Clean Energy. The format for calculating the Market Exposure is provided in Exhibit C.

"**MDPU**" shall mean the Massachusetts Department of Public Utilities and its successors.

"**Metered Output**" shall mean the Energy, expressed in MWh, generated by each of the Hydro-Québec Power Resources in each hour during the Services Term.

"**Meters**" shall have the meaning set forth in Section 4.6(a) hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc., and any successor thereto.

"**MW**" shall mean a megawatt alternating current (AC).

“**MWh**” shall mean a megawatt-hour (one MWh shall equal 1,000 kWh).

“**Negative Price Hour**” shall have the meaning set forth in Exhibit H.

“**NEPOOL**” shall mean the New England Power Pool and any successor organization.

“**NERC**” shall mean the North American Electric Reliability Corporation and shall include any successor thereto.

“**Network Upgrades**” shall mean those upgrades to the Pool Transmission Facilities and the Transmission Provider’s transmission and distribution systems, as determined and identified by ISO-NE and contemplated by Section 7.5.

“**New England Control Area**” shall have the meaning as set forth in the ISO-NE Tariff.

“**New Transmission Facilities**” shall mean the Québec Line and the U.S. Transmission Line, which transmission facilities will be used by Seller for delivery of the Qualified Clean Energy under this Agreement.

“**Non-Defaulting Party**” shall mean the Party with respect to which a Default or Event of Default has not occurred.

“**Non-TSA Delivery Shortfall**” shall have the meaning set forth in Section 4.3(c)(iii) hereof.

“**NYMEX**” shall have the meaning set forth in the definition of Off-Peak Forward Price.

“**Off-Peak**” shall mean all hours not defined as On-Peak.

“**Off-Peak Energy Price**” shall mean the Off-Peak Contract Price set forth in Exhibit C.

“**Off-Peak Forward Price**” shall mean the arithmetic average of the future Off-Peak market prices, which shall be the mid-point between the bid and ask prices at the ISO-NE Internal Hub as quoted by the Intercontinental Exchange (“**ICE**”), ICAP Energy, or the New York Mercantile Exchange (“**NYMEX**”), at Buyer’s discretion. If quoted market prices are available from ICE, ICAP Energy, or NYMEX, as applicable, for only part of the Services Term, Buyer will extrapolate the market prices for the period not available based on other available information in a Commercially Reasonable Manner. If quoted market prices from the selected source are not available for any part of the applicable Services Term, the Parties shall agree to alternative sources for market prices for such period.

“**On-Peak**” shall mean all hours included in the period beginning with the hours ending at 0800 and ending at the hour ending 2300 on all weekdays, excluding NERC holidays.

“**On-Peak Energy Price**” shall mean the On-Peak Contract Price set forth in Exhibit C.

“**On-Peak Forward Price**” shall mean the arithmetic average of the future On-Peak market prices, which shall be the mid-point between the bid and ask prices at the ISO-NE

Internal Hub as quoted by ICE, ICAP Energy, or NYMEX, at Buyer's discretion. If quoted market prices are available from ICE, ICAP Energy, or NYMEX, as applicable, for only part of the Services Term, Buyer will extrapolate the market prices for the period not available based on other available information in a Commercially Reasonable Manner. If quoted market prices from the selected source are not available for any part of the applicable Services Term, the Parties shall agree to alternative sources for market prices for such period.

**"Party"** and **"Parties"** shall have the meaning set forth in the first paragraph of this Agreement.

**"Permits"** shall mean any permit, authorization, license, order, consent, waiver, exception, exemption, variance or other approval by or from, and any filing, report, certification, declaration, notice or submission to or with, any Governmental Entity required to authorize action, including any of the foregoing relating to the ownership, siting, construction, operation, use or maintenance of the Hydro-Québec Power Resources under any applicable Law and required for the Delivery of the Products in accordance with this Agreement.

**"Person"** shall mean an individual, partnership, corporation, limited liability company, limited liability partnership, limited partnership, association, trust, unincorporated organization, or a government authority or agency or political subdivision thereof.

**"Power Cost Reconciliation Tariff"** shall mean a fully reconciling cost recovery tariff mechanism that authorizes the establishment of a distribution charge that fully recovers Buyer's net costs under this Agreement (including annual remuneration of up to two and three-quarters percent (2.75%)). The rate reconciliation shall be designed in such a way as to limit the build-up of any under or over-recoveries over the course of the year. A reconciliation shall occur at least annually, but may also be reconciled quarterly or monthly, to the extent necessary to eliminate regulatory lag for the recovery of costs or crediting of over-recoveries to customers.

**"Price"** shall mean the purchase price(s) for Products referenced in Section 5.1 hereof and set forth on Exhibit D.

**"Products"** shall mean Qualified Clean Energy, Qualified Shortfall Energy and associated Environmental Attributes.

**"Purchased Power Accounting Authorization"** shall mean authorization for Buyer, at Buyer's sole discretion, to take appropriate steps to assure avoidance of a material, negative balance sheet impact on Buyer or Buyer's direct or indirect parent company, upon appropriate filing with and approval by the MDPU.

**"Qualified Clean Energy"** shall mean energy produced by a hydroelectric generating resource. For the avoidance of doubt, Qualified Clean Energy as used in this Agreement refers only to that Qualified Clean Energy from the Hydro-Québec Power Resources and delivered over the New Transmission Facilities during the Services Term. This Energy must be tracked in the GIS to ensure a unit-specific accounting of the Delivery of

Qualified Clean Energy to enable the Massachusetts Department of Environmental Protection to accurately account for such Qualified Clean Energy in the state greenhouse gas emissions inventory, created under chapter 298 of the Acts of 2008.

**"Qualified Clean Energy Generation Units"** shall mean Generation Units capable of producing Qualified Clean Energy, or Qualified Shortfall Energy, as the case may be.

**"Qualified Institution"** shall mean a major U.S. commercial bank or trust company, the U.S. branch office of a foreign bank, or another financial institution, in any case, organized under the laws of the United States or a political subdivision thereof having assets of at least $10 billion and a credit rating of at least (a) "A3" from Moody's or "A-" from S&P, if such entity is rated by both S&P and Moody's or (b) "A-" by S&P or "A3" by Moody's, if such entity is rated by either S&P or Moody's but not both.

**"Qualified Shortfall Energy"** shall mean energy produced by a hydroelectric generating resource and Delivered over any transmission line by Seller to Buyer into the New England Control Area during the Services Term. For the avoidance of doubt, Qualified Shortfall Energy as used in this Agreement refers only to that Qualified Shortfall Energy from the Hydro-Québec Power Resources. This Energy must be tracked in the GIS to ensure a unit-specific accounting of the delivery of Qualified Shortfall Energy to enable the Massachusetts Department of Environmental Protection to accurately account for such Qualified Shortfall Energy in the state greenhouse gas emissions inventory, created under chapter 298 of the Acts of 2008.

**"Qualified Shortfall Energy LMP"** shall have the meaning set forth in Section 4.3(c)(viii) hereof.

**"Québec Line"** shall have the same meaning as set forth in the TSA.

**"Québec Line Approvals"** shall mean those agreements, tariffs and approvals associated with service on the Québec Line.

**"Regulatory Approval"** shall mean the MDPU approval, of this entire Agreement, which approval shall include without limitation: (a) confirmation that this Agreement has been approved under Section 83D and the regulations promulgated thereunder and that all of the terms of such Section 83D and such regulations apply to this Agreement; (b) definitive regulatory authorization for Buyer to recover all of its costs incurred under and in connection with this Agreement for the entire term of this Agreement through the implementation of a Power Cost Reconciliation Tariff and/or other cost recovery or reconciliation mechanisms; (c) definitive regulatory authorization for Buyer to recover remuneration of up to two and three-quarters percent (2.75%) of Buyer's annual payments under this Agreement for the term of this Agreement through the Power Cost Reconciliation Tariff; and (d) approval of any Purchased Power Accounting Authorization requested by Buyer in connection with the Regulatory Approval. Such approvals shall be acceptable in form and substance to Buyer in its sole discretion, shall not include any conditions or modifications that Buyer deems, in its sole discretion, to be unacceptable and shall be final and not subject to appeal or rehearing.

"**Regulatory Approval Delay**" shall have the same meaning as set forth in the TSA.

"**Rejected Purchase**" shall have the meaning set forth in Section 4.4(a) hereof.

"**Reliability Curtailment**" shall mean any curtailment of Delivery of Qualified Clean Energy resulting from (a) an emergency condition as defined in the Interconnection Agreements or the ISO-NE Tariff or tariff of another Independent System Operator, if applicable, or (b) any other order or directive of the Interconnecting Utility or the Transmission Provider pursuant to an Interconnection Agreement or tariff.

"**Replacement Energy**" shall mean energy purchased by Buyer as replacement for any Uncured Delivery Shortfall relating to the Qualified Clean Energy to be provided hereunder.

"**Replacement Environmental Attributes**" shall mean any generation or environmental attributes, including any Certificates or other certificates or credits related thereto reflecting generation by Qualified Clean Energy Generation Units that are purchased by Buyer as replacement for any Environmental Attributes not Delivered as required hereunder.

"**Replacement Price**" shall mean (a) the price at which Buyer, acting in a Commercially Reasonable Manner, purchases Replacement Energy and Replacement Environmental Attributes; provided, however, that in no event shall Buyer be required to utilize or change its utilization of its owned or controlled assets, contracts or market positions to minimize Seller's liability, or (b) if Buyer elects in its sole discretion not to purchase Replacement Energy and Replacement Environmental Attributes, the market value as determined by Buyer, acting in a Commercially Reasonable Manner, of (i) energy; provided that such price shall not exceed the LMP at the ISO-NE Internal Hub and (ii) Environmental Attributes; provided that such price shall not exceed the compliance payment required under the CES for the applicable year, in each case, as of the date and the time of the Uncured Delivery Shortfall.

"**Reporting Party**" shall have the meaning set forth in Section 19.6 hereof.

"**Resale Damages**" shall mean, with respect to any Rejected Purchase, an amount equal, without duplication, to (a) the positive net amount, if any, by which the applicable Price that would have been paid pursuant to Section 5.1 hereof for such Rejected Purchase, had it been accepted, exceeds the Resale Price, multiplied by the quantity of that Rejected Purchase (in MWh and/or Environmental Attributes, as applicable), plus (b) any applicable penalties and other costs assessed by ISO-NE or any other Person against Seller as a result of Buyer's failure to accept such Products in accordance with the terms of this Agreement, plus (c) transaction and other administrative costs reasonably incurred by Seller in re-selling such Rejected Purchase that Seller would not have incurred but for the Rejected Purchase. Seller shall provide a written statement for the applicable period explaining in reasonable detail the calculation of any Resale Damages.

"**Resale Price**" shall mean the price at which Seller, acting in a Commercially Reasonable Manner, sells or is paid for a Rejected Purchase; provided, however, that in

no event shall Seller or its Affiliates be required to utilize or change its utilization of the Hydro-Québec Power Resources or its other assets, contracts or market positions in order to minimize Buyer's liability for such Rejected Purchase.

"**RPS**" shall mean the requirements established pursuant to Mass. Gen. Laws ch. 25A, Section 11F and the regulations promulgated thereunder that require all retail electricity suppliers in Massachusetts to provide a minimum percentage of electricity from renewable generation units, and such successor laws and regulations as may be in effect from time to time.

"**RTO**" shall mean ISO-NE and any successor organization or entity to ISO-NE, as authorized by FERC to exercise the functions pursuant to FERC's Order No. 2000 and FERC's corresponding regulations, or any successor organization, or any other entity authorized to exercise comparable functions in subsequent orders or regulations of FERC.

"**S&P**" shall mean Standard & Poor's Financial Services LLC, and any successor thereto.

"**Schedule**" shall mean the actions of Seller and/or its designated representatives pursuant to Section 4.2, of notifying, requesting and confirming to ISO-NE and other Independent System Operator, as applicable, the quantity of Qualified Clean Energy or Qualified Shortfall Energy, as applicable, to be delivered on any given day or days (or in any given hour or hours) during the Services Term at the Delivery Point.

"**Section 83D**" shall have the meaning set forth in the recitals hereof.

"**Seller**" shall have the meaning set forth in the first paragraph of this Agreement.

"**Seller Guarantor**" shall mean Hydro-Québec.

"**Seller Guaranty**" shall have the meaning set forth in Section 6.1(a) hereof.

"**Seller TSA**" shall have the same meaning as the HQUS TSA (as defined in the TSA).

"**Seller's Taxes**" shall have the meaning set forth in Section 5.4(a) hereof.

"**Services Term**" shall have the meaning set forth in Section 2.2(b) hereof.

"**Shortfall Cure Amount**" shall have the meaning set forth in Section 4.3(c) hereof.

"**Shortfall Cure Period**" shall have the meaning set forth in Section 4.3(c)(i) hereof.

"**Summer Period**" shall mean the months of June through September.

"**Term**" shall have the meaning set forth in Section 2.2(a) hereof.

"**Termination Payment**" shall have the meaning set forth in Section 9.3(b) hereof.

"**TransÉnergie**" shall mean Hydro-Québec TransÉnergie, the division of Hydro-Québec that operates Hydro-Québec's transmission system.

"**Transmission Delay**" shall mean, without duplication of the extensions provided in Sections 3.1(c) through 3.1(e), any delay in the satisfaction of Section 3.1(a) or 3.4(b)(ii) (except to the extent such condition has been waived by the Parties), but only if such delay is not attributable to any HQUS Delay (as defined in the TSA).

"**Transmission Provider**" shall mean (a) ISO-NE or other RTO, as applicable, its respective successor or Affiliates; and/or (b) such other third parties from whom transmission services are necessary for Seller to fulfill its performance obligations to Buyer hereunder, as the context requires, including, for the avoidance of doubt U.S. Transmission Provider and TransÉnergie.

"**Transmission System**" shall mean the transmission facilities operated by a Transmission Provider, now or hereafter in existence, which provide energy transmission service for the Qualified Clean Energy to or from the Delivery Point.

"**TSA**" shall mean that certain Transmission Service Agreement, by and between Buyer and U.S. Transmission Provider, dated as of June 13, 2018.

"**TSA Commercial Operation Date**" shall mean the "Commercial Operation Date" as defined in the TSA.

"**TSA Delivery Shortfall**" shall have the meaning set forth in Section 4.3(c) hereof.

"**TSA Transmission Rights**" shall have the meaning set forth in Section 20(a) hereof.

"**Uncured Delivery Shortfall**" shall have the meaning set forth in Section 4.3(a) hereof.

"**U.S. Transmission Approvals**" shall mean those MDPU and FERC filings, agreements, tariffs and approvals associated with service on the U.S. Transmission Line, as listed in the TSA.

"**U.S. Transmission Line**" shall have the same meaning as the NECEC Transmission Line (as defined in the TSA).

"**U.S. Transmission Provider**" shall mean Central Maine Power Company, and its successors and assignees.

"**Unsecured Credit Limit**" shall mean Seller's Fixed Amount, as adjusted by Seller Guarantor's Credit Rating pursuant to Section 6.5.

"**Winter Period**" shall mean the months of December, January and February.

## 2. EFFECTIVE DATE; TERM

2.1 Effective Date. Subject in all respects to Article 8, this Agreement is effective as of the Effective Date.

2.2 Term.

(a) The "**Term**" of this Agreement is the period beginning on the Effective Date and ending upon the final settlement of all obligations hereunder after the expiration of the Services Term or the earlier termination of this Agreement in accordance with its terms.

(b) The "**Services Term**" is the period during which Buyer is obligated to purchase Products Delivered to Buyer by Seller commencing on the Commercial Operation Date and continuing for a period of twenty (20) years from the Commercial Operation Date, unless this Agreement is earlier terminated in accordance with the provisions hereof. Seller shall provide at least twenty (20) days' prior written notice to Buyer of the date on which it believes that the Commercial Operation Date will occur.

(c) At the expiration of the Term or earlier termination of this Agreement pursuant to the terms hereof, the Parties shall no longer be bound by the terms and provisions hereof, except (i) to the extent necessary to make payments of any amounts owed to the other Party arising prior to or resulting from termination of, or on account of a breach of, this Agreement, (ii) to the extent necessary to enforce the rights and the obligations of the Parties arising under this Agreement before such expiration or termination, and (iii) the obligations of the Parties hereunder with respect to confidentiality and indemnification shall survive the expiration or termination of this Agreement.

## 3. PROJECT DEVELOPMENT AND OPERATION

3.1 Commercial Operation Date.

(a) Subject to the provisions of Sections 3.1(c) through 3.1(f), Seller shall achieve the Commercial Operation Date by the Guaranteed Delivery Term Start Date.

(b) Seller shall provide Buyer with written notice of the achievement of the Commercial Operation Date within seven (7) days after that achievement, which notice shall include information demonstrating with reasonable specificity that such achievement has occurred. Seller acknowledges that Buyer will receive such notice solely for information purposes, and Buyer shall have no responsibility or liability for the development, construction, operation or maintenance of the Hydro-Québec Power Resources or any Transmission System or New Transmission Facilities.

(c) To the extent U.S. Transmission Provider elects to extend the deadline for the TSA Commercial Operation Date in accordance with the TSA, the Guaranteed Delivery Term Start Date hereunder shall be extended by such period(s), without additional Credit Support required by Seller under this Agreement.

(d) To the extent a Force Majeure event pursuant to Section 10.1 has occurred that prevents Seller from achieving the Commercial Operation Date by the Guaranteed Delivery Term Start Date, the Guaranteed Delivery Term Start Date hereunder shall be extended for the duration of the Force Majeure event, as contemplated by Section 10.1, without additional Credit Support required by Seller under this Agreement or any liability to Seller under this Section 3.1(d), but under no circumstances shall such extension exceed twelve (12) months. Without

duplication, to the extent a Force Majeure event pursuant to Section 15.1 of the TSA not attributable to any action or omission of Seller or any of its Affiliates has occurred that prevents U.S. Transmission Provider from achieving the TSA Commercial Operation Date by the applicable Critical Milestone (as defined in the TSA) date, the Guaranteed Delivery Term Start Date shall be extended by such period(s) provided under the TSA, as contemplated by Section 10.1, without additional Credit Support required by, or any liability to, Seller under this Agreement, but under no circumstances shall such extension exceed twelve (12) months.

(e) In the event that the TSA Commercial Operation Date is extended due to a Regulatory Approval Delay in accordance with Section 4.1(e) of the TSA, the Guaranteed Delivery Term Start Date hereunder shall be extended by such period(s) provided under the TSA, subject to reduction of the extension, as provided in Section 4.1(e) of the TSA, without additional Credit Support required by Seller under this Agreement.

(f) To the extent Seller is prevented from achieving the Commercial Operation Date by the Guaranteed Delivery Term Start Date due to a Transmission Delay, the Guaranteed Delivery Term Start Date hereunder shall be extended for the duration of the Transmission Delay, without additional Credit Support required by Seller under this Agreement. Buyer shall be entitled to the remedies provided under the TSA with regard to any such Transmission Delay, and Seller shall have no liability to Buyer for Delay Damages solely as a result of any Owner Delay or Concurrent Delay (each as defined in the TSA).

(g) The Parties agree that time is of the essence with respect to the achievement of the Commercial Operation Date and is part of the consideration to Buyer in entering into this Agreement.

(h) Nothing in this Section 3.1 shall be construed to limit or otherwise modify any of the obligations of U.S. Transmission Provider under the TSA or the remedies to which Buyer may otherwise be entitled under the TSA or the express terms of this Agreement.

3.2 Delay Damages.

(a) If the Commercial Operation Date is not achieved by the Guaranteed Delivery Term Start Date (as extended pursuant to Sections 3.1(c) through 3.1(f)), Seller shall pay to Buyer damages for each day from and after such date in an amount equal to $100 per MWh per hour of Contract Maximum Amount (e.g., if the Contract Maximum Amount were 364 MWh per hour Seller would pay Buyer damages in the amount of $36,400 per day), commencing on the Guaranteed Delivery Term Start Date (as extended pursuant to Sections 3.1(c) through 3.1(f)) and ending on the earlier of (i) the Commercial Operation Date, (ii) the date that Buyer exercises its right to terminate this Agreement under Section 9.3, and (iii) the date that is twelve (12) months after the Guaranteed Delivery Term Start Date (**"Delay Damages"**). Delay Damages shall be due under this Section 3.2(a) without regard to whether Buyer exercises its right to terminate this Agreement pursuant to Section 9.3; provided, however, that if Buyer exercises its right to terminate this Agreement under Section 9.3, Delay Damages shall be due and owing only to the extent that such Delay Damages were due and owing at the date of such termination.

(b) Each Party agrees and acknowledges that (i) the damages that Buyer would incur due to Seller's delay in achieving the Commercial Operation Date by the Guaranteed Delivery Term Start Date would be difficult or impossible to predict with certainty, and (ii) it is impractical and difficult to assess actual damages in the circumstances stated, and therefore the Delay Damages as agreed to by the Parties and set forth herein are a fair and reasonable calculation of such damages. Notwithstanding the foregoing, this Article shall not limit the amount of damages payable to Buyer hereunder if this Agreement is terminated as a result of Seller's failure to achieve the Commercial Operation Date. Any such termination damages shall be determined in accordance with Article 9.

(c) By the fifteenth (15th) day following the end of the calendar month in which Delay Damages first become due and continuing by the fifteenth (15th) day of each calendar month during the period in which Delay Damages accrue (and the following month if applicable), Buyer shall deliver to Seller an invoice showing Buyer's computation of such damages and any amount due Buyer in respect thereof for the preceding calendar month. On or before the later of (x) fifteen (15) days from receipt of the applicable invoice or (y) the last day of the calendar month in which the applicable invoice was received (or in either event the next Business Day if such day is not a Business Day), Seller shall pay to Buyer, by wire transfer of immediately available funds to an account specified in writing by Buyer or by any other means agreed to by the Parties in writing from time to time, the amount set forth as due in such invoice. If Seller fails to pay such amounts when due, Buyer may draw upon the Credit Support or the Seller Guaranty for payment of such Delay Damages, and Buyer may exercise any other remedies available for Seller's default hereunder.

3.3 <u>Progress Reports; Site Access; Capacity Deficiency</u>.

(a) <u>Progress Reports</u>. Within ten (10) days after the end of each calendar quarter after the Effective Date and until the Commercial Operation Date, Seller shall provide Buyer with a report regarding progress towards the Commercial Operation Date, including the status of permitting and acquisition of real property rights for the Québec Line, in accordance with the form attached hereto as Exhibit F, and shall provide supporting documents and detail regarding the same upon Buyer's request. Seller shall permit Buyer and its advisors and consultants to review and discuss with Seller and its advisors and consultants such progress reports during business hours and upon reasonable notice to Seller.

(b) <u>Site Access</u>. Buyer and its representatives shall have the right but not the obligation, during business hours, at Buyer's sole cost and expense and upon reasonable notice to Seller, to inspect the Hydro-Québec Power Resources or the Québec Line, subject to Seller's reasonable site access rules.

(c) <u>Capacity Deficiency</u>. To the extent that a Capacity Deficiency exists on the Commercial Operation Date as permitted by Section 4.4.1(b)(i) of the TSA, then on the Commercial Operation Date, the Contract Maximum Amount shall be automatically reduced commensurate with the Capacity Deficiency, which reduced Contract Maximum Amount shall be stated in a notice from Seller to Buyer, which notice shall be binding absent manifest error; provided that, pursuant to Section 4.4.1(b) of the TSA, in the event that, during the twenty-four (24) months following the TSA Commercial Operation Date, such Capacity Deficiency is

reduced or eliminated, then the Contract Maximum Amount shall be automatically increased commensurate with such reduction or elimination, which increased Contract Maximum Amount (i) shall not exceed the MWh/hour set forth in the definition of "Contract Maximum Amount" herein and (ii) shall be stated in a notice from Seller to Buyer, which notice shall be binding absent manifest error.

3.4 Conditions Precedent to the Commercial Operation Date.

(a) Seller's obligation to Deliver the Products and Buyer's obligation to pay Seller for such Products commences on the Commercial Operation Date.

(b) The Commercial Operation Date shall occur on a date on which the following conditions precedent have been satisfied:

(i) Buyer has received Regulatory Approval;

(ii) U.S. Transmission Provider has satisfied the conditions to "Commercial Operation," as set forth in Section 4.3 of the TSA, including the completion of the AC Upgrades (as defined in the TSA) and the CCIS Capacity Upgrades (as defined in the TSA) as contemplated by Section 4.3(c) of the TSA;

(iii) the Québec Line has been constructed in accordance with Attachment A of the TSA, and is capable of operating at the Design Capability (as defined in the TSA), except as otherwise permitted pursuant to Section 4.4.1(b) of the TSA;

(iv) Seller has satisfied all requirements in order to provide for unit-specific accounting of Environmental Attributes, enabling the Massachusetts Department of Environmental Protection to accurately account for such Qualified Clean Energy in the state greenhouse gas emissions inventory, created under chapter 298 of the Acts of 2008, and satisfying the requirements of this Agreement;

(v) Seller (or the party with whom Seller contracts pursuant to Section 3.5(e)) has (x) established all ISO-NE-related accounts and entered into all ISO-NE-related agreements required for the performance of Seller's obligations in connection with the Hydro-Québec Power Resources and this Agreement, which agreements shall be in full force and effect, including the registration of the Hydro-Québec Power Resources in the GIS and (y) satisfied all other requirements of the ISO-NE Rules and the ISO-NE Practices for the Delivery of Products to Buyer at the Delivery Point;

(vi) no default or Event of Default by Seller shall have occurred and remain uncured;

(vii) the Hydro-Québec Power Resources and the Québec Line are owned or leased by, and under the care, custody and control of, Seller or its Affiliate;

(viii) the Hydro-Québec Power Resources are in compliance with all applicable Laws and all Permits for the Delivery of the Products in accordance with this Agreement; and

(ix) Seller confirms receipt by Hydro-Québec and its Affiliates of all Permits (including all Québec Line Approvals) required for the Delivery of the Products in accordance with this Agreement including an authorization from the National Energy Board of Canada to export electricity to Seller during the Services Term in a quantity at least equal to the proposed transmission transfer capability of the Québec Line, which authorization does not include any conditions or modifications that Hydro-Québec deems to be unacceptable.

3.5 Operation of the Hydro-Québec Power Resources.

(a) Compliance With Utility Requirements. To the extent necessary for it to perform its obligations under this Agreement (including without limitation under Sections 3.1, 4.5 and 4.7), Seller shall comply with, and shall cause the Hydro-Québec Power Resources and the Québec Line to comply with: (i) Good Utility Practice; and (ii) all applicable rules, procedures, operating policies, criteria, guidelines and requirements imposed by ISO-NE, any Transmission Provider, any Interconnecting Utility, Régie de l'Énergie and/or any other regional reliability entity with jurisdiction over the Hydro-Québec Power Resources or the Québec Line, including, in each case, all practices, requirements, rules, procedures and standards related to Seller's or its Affiliate's ownership, operation and maintenance of the Hydro-Québec Power Resources and the Québec Line and Seller's performance of its obligations under this Agreement (including, without limiting Seller's obligations in Sections 3.1, 4.5 and 4.7, obligations related to the generation of the Hydro-Québec Power Resources and operation of the Québec Line and the Scheduling, interconnection of the Québec Line with the U.S. Transmission Line at the U.S./Canada border, and transmission of Qualified Clean Energy to the U.S./Canada border, and the transfer of associated Environmental Attributes), whether such requirements were imposed prior to or after the Effective Date. Seller or its Affiliates shall be solely responsible for registering as the "Generator Owner and Generator Operator" of the Hydro-Québec Power Resources with Régie de l'Énergie and any applicable regional reliability entities, as applicable.

(b) Permits. Seller shall maintain or cause to be maintained in full force and effect all Permits (including without limitation all Québec Line Approvals) necessary for it to perform its obligations under this Agreement, including all Permits necessary to operate and maintain the Hydro-Québec Power Resources and the Québec Line, but excluding any U.S. Transmission Approvals (which, for the avoidance of doubt, shall be the responsibility of U.S. Transmission Provider).

(c) Maintenance and Operation of Hydro-Québec Power Resources. Seller shall, at all times during the Term and as necessary for it to perform its obligations under this

Agreement, cause the Hydro-Québec Power Resources and the Québec Line to be maintained and operated in accordance with Good Utility Practice. As between Buyer and Seller, Seller shall bear all costs related thereto. Seller or its Affiliates may contract with other Persons to provide operation and maintenance functions, so long as Seller or its Affiliates maintain overall control over the operation and maintenance of the Hydro-Québec Power Resources throughout the Term.

(d) Interconnection Agreement. Seller shall cause TransÉnergie to comply with the terms and conditions of the Interconnection Agreement to which it is a party and shall be responsible for obtaining the Hydro-Québec Power Resources' interconnection to TransÉnergie's transmission and distribution systems at a level that is capable of satisfying the Capacity Capability Interconnection Standard under the ISO-NE Rules, as required by ISO-NE and contemplated by Section 7.5.

(e) ISO-NE Status. Seller shall, at all times during the Services Term, either: (i) be an ISO-NE "Market Participant" pursuant to the ISO-NE Rules; or (ii) have entered into an agreement with a Market Participant that shall perform all of Seller's ISO-NE-related obligations in connection with the Hydro-Québec Power Resources and this Agreement.

(f) Qualified Clean Energy Generation Units. Seller shall be solely responsible at Seller's cost for demonstrating that the Hydro-Québec Power Resources from which the Products are Delivered are Qualified Clean Energy Generation Units, and for Delivering Baseline Hydroelectric Generation in accordance with Section 4.3(b) and Exhibit H, throughout the Services Term. Seller shall take all actions necessary to register for and maintain participation in the GIS to register, monitor, track, and transfer Environmental Attributes. Seller shall provide such additional information as Buyer may request relating to such qualifications and participation, and the registration, monitoring, tracking and transfer of Environmental Attributes.

(g) Compliance Reporting. Seller shall provide such information as required of the supplier under the GWSA, the CES and the regulations, guidelines and policies issued thereunder. In addition, within thirty (30) days following the end of each calendar quarter, Seller shall provide Buyer information pertaining to emissions, fuel types, and any other information to the extent reasonably requested by Buyer to comply with the CES, the disclosure requirements contained under applicable law and any other such disclosure regulations which may be imposed upon Buyer during the Term, which information requirements will be provided to Seller by Buyer at least fifteen (15) days before the beginning of the calendar quarter for which the information is required. Seller shall provide Buyer with such additional information to the extent reasonably requested by Buyer to comply with the CES, RPS, APS or any other applicable program under Massachusetts law requiring electric generation with certain Environmental Attributes.

(h) Insurance. Seller shall cause Hydro-Québec to maintain self-insurance with respect to the types of coverage and with such terms and conditions as are reasonable for a power system and transmission line, as applicable, of the type and size of the Hydro-Québec Power Resources and the Québec Line, and as otherwise legally required for the Hydro-Québec

Power Resources and the Québec Line and consistent with Good Utility Practice, for the duration of the Term.

(i) Contacts. Each Party shall identify a principal contact or contacts, which contact(s) shall have adequate authority and expertise to make day-to-day decisions with respect to the administration of this Agreement.

(j) Compliance with Law. Without limiting the generality of any other provision of this Agreement, Seller shall be responsible for complying with all applicable requirements of Law, including all applicable rules, procedures, operating policies, criteria, guidelines and requirements imposed by FERC and any other Governmental Entity, whether imposed pursuant to existing Law or procedures or pursuant to changes enacted or implemented during the Term, including all risks of operational and environmental matters relating to the Hydro-Québec Power Resources. Seller shall indemnify Buyer against any and all claims arising out of or related to such environmental matters and against any costs imposed on Buyer as a result of Seller's violation of any applicable Law, or ISO-NE or NERC requirements. For the avoidance of doubt, Seller shall be responsible for procuring, at its expense, all Permits required for the operation of the Hydro-Québec Power Resources and all Québec Line Approvals in compliance with applicable requirements of Law.

(k) FERC Status. Seller shall be responsible for ensuring that it is in compliance with all FERC directives and requirements necessary for Seller to fulfill its obligations under this Agreement. As part of Seller's satisfaction of this responsibility, Seller shall obtain and maintain FERC authorization to sell Products at market-based rates at all times on and after the Commercial Operation Date.

(l) Maintenance. No later than (i) the Commercial Operation Date and (ii) two months prior to the end of each calendar year thereafter during the Term, Seller shall submit to Buyer a schedule of planned maintenance for the following calendar year for the Québec Line. The Parties acknowledge that, throughout the Term, U.S. Transmission Provider and TransÉnergie shall coordinate all planned maintenance for the New Transmission Facilities with ISO-NE, consistent with ISO-NE Rules, and shall promptly provide applicable information concerning scheduled outages, as determined by ISO-NE, to Buyer. To maximize the value of the Products, to the extent possible and consistent with ISO-NE Rules, Seller shall cause maintenance of the Québec Line not to be scheduled during the Winter Period or Summer Period, and shall cause the Québec Line to be operated so as to maximize the Delivery of Qualified Clean Energy during the hours of anticipated peak load and Energy prices in New England; provided, however, that planned maintenance may be scheduled during such period to the extent the failure to perform such planned maintenance is contrary to operation of the Québec Line in accordance with Good Utility Practice.

(m) Agreement between Seller and U.S. Transmission Provider; Agreement between Buyer and U.S. Transmission Provider.

(i) Unless Seller obtains the prior written consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), Seller shall not: (A) agree to any amendment to Sections 3.3.5, 14.3, 14.6, 14.7, 14.8, and 14.10 of the Seller TSA or (B) agree to

an amendment and restatement, supplement, or other modification or amendment of the Seller TSA that adversely and materially affects Buyer's rights under this Agreement. Seller shall provide Buyer a copy of any proposed amendment to the Seller TSA no fewer than ten (10) Business Days prior to the execution thereof.

(ii) Unless Buyer obtains the prior written consent of Seller (such consent not to be unreasonably withheld, conditioned or delayed), Buyer shall not: (A) agree to any amendment to the sections of the TSA for which Seller is a third-party beneficiary as contemplated by Section 23.8 of the TSA, (B) agree to any amendment and restatement, supplement, or other modification or amendment of the TSA that adversely and materially affects Seller's rights under this Agreement or (C) agree to terminate the TSA by mutual agreement with U.S. Transmission Provider.

(iii) In the event that Buyer grants a written waiver of any term or condition of the TSA, and such waiver has a material adverse effect on the rights or obligations of Seller under this Agreement, the Parties shall negotiate in good faith to amend or clarify this Agreement or to waive the applicable provision of this Agreement to mitigate the material adverse effect on Seller resulting from such waiver and to restore the Parties to their respective positions had such waiver of the TSA term or condition not been granted.

3.6 Interconnection and Delivery Services. Seller and Buyer acknowledge and agree that U.S. Transmission Provider shall be responsible for all costs associated with any additions, upgrades, reinforcements or other modifications to the New England Transmission System required for the interconnection of the U.S. Transmission Line at the Delivery Point at a level that is capable of satisfying the Capacity Capability Interconnection Standard under the ISO-NE Rules, in each case, as required by ISO-NE and contemplated by Section 7.5, including the costs to complete the Network Upgrades to the extent required under Section 7.5, consistent with all standards and requirements set forth by the FERC, ISO-NE, any other applicable Governmental Entity and the Interconnecting Utility.

## 4. DELIVERY OF PRODUCTS

4.1 Obligation to Sell and Purchase Products.

(a) Beginning on the Commercial Operation Date and subject to Section 4.1(b), Seller shall sell and Deliver, and Buyer shall purchase and receive, all right, title and interest in and to the Products in accordance with the terms and conditions of this Agreement and as set forth in the Delivery Schedule; provided, however, that the Products Delivered in any hour (or shorter period to the extent that ISO-NE schedules Energy deliveries over a shorter period) shall not exceed the lesser of (x) the total Metered Output generated by the Hydro-Québec Power Resources in such period and (y) the amount of Qualified Clean Energy Delivered to the Delivery Point in such period, in accordance with the terms and conditions of this Agreement. For the avoidance of doubt, (i) if the aggregate amount of Metered Output generated by the

Hydro-Québec Power Resources during any hour (or shorter period to the extent that ISO-NE schedules Energy deliveries over a shorter period) is in excess of the amount of Qualified Clean Energy Delivered to the Delivery Point for that period, the Products associated with such excess shall not be considered to be Products for such period for purposes of this Agreement, and (ii) if the amount of Qualified Clean Energy Delivered to the Delivery Point for any hour (or shorter period to the extent that ISO-NE schedules Energy deliveries over a shorter period) exceeds the aggregate amount of Metered Output generated by the Hydro-Québec Power Resources in that period, the Products associated with such excess shall not be considered to be Products for such period for purposes of this Agreement. The aforementioned obligations for Seller to sell and Deliver the Products and for Buyer to purchase and receive the same are firm and not subject to interruption except to the extent caused by Force Majeure, excused under Section 4.2(a) or cured in accordance with Section 4.3(c). The Delivery Schedule is set forth in Exhibit B. All Deliveries of Energy and associated Environmental Attributes must be produced by the Hydro-Québec Power Resources that are specified in Exhibit A and Delivered in accordance with this Agreement.

(b) Buyer shall not be obligated to accept or pay for any Environmental Attribute or comparable certificate, credit, attribute or other similar product produced by or associated with the Hydro-Québec Power Resources which does not constitute an Environmental Attribute associated with the specified MWh of generation from Qualified Clean Energy Generation Units.

(c) Except in the case of any default by Buyer, Seller shall not sell, divert, grant, transfer or assign the Products or any right, claim, certificate or other attribute associated with such Products to any Person other than Buyer during the Term. Seller shall not claim or enter into any agreement or arrangement under which such Products can be claimed by any Person other than Buyer. Buyer shall have the exclusive right to resell or convey such Products in its sole discretion.

4.2 Scheduling and Delivery.

(a) During the Services Term and in accordance with Section 4.1, Seller shall Schedule and Deliver Guaranteed Qualified Clean Energy in accordance with this Agreement, all ISO-NE Practices and ISO-NE Rules and other Independent System Operator’s rules and practices, as applicable. Seller shall transfer the Qualified Clean Energy or Qualified Shortfall Energy, as applicable, to Buyer through Internal Bilateral transactions executed through ISO-NE and settled at the Delivery Point or, in the case of Qualified Shortfall Energy and as reasonably agreed from time to time by Buyer and Seller, the NEMASSBOST Hub, in each case, in accordance with all ISO-NE Practices and ISO-NE Rules. Any such Internal Bilateral transactions will specify the hourly delivery of Scheduled Qualified Clean Energy or Qualified Shortfall Energy and will be entered into daily, with any necessary adjustments being made pursuant to ISO-NE settlement protocols, and Seller will not receive any payment associated with a Marginal Loss Revenue Fund allocation in connection with any such Internal Bilateral transactions. Any such Internal Bilateral transactions will be entered in the Day-Ahead Energy Market or, as reasonably agreed from time to time by Buyer, in the Real-Time Energy Market, and consistent with ISO-NE Rules and ISO-NE Practices at the time, and, unless due to the failure of Buyer to confirm any Internal Bilateral transaction submitted by Seller by the

applicable scheduling deadline, Buyer shall have no obligation to pay for any Qualified Clean Energy not transferred to Buyer in the Day-Ahead Energy Market or Real-Time Energy Market or for which Buyer is not credited in the ISO-NE Settlement Market System (including, without limitation, as a result of an outage on any electric transmission system). Notwithstanding any other provision of this Agreement, if during the Services Term, the LMP at the Delivery Point is negative, or, in the reasonable opinion of Seller, is likely to become negative, then Seller may deliver to Buyer a written notice stating that such condition has occurred or is likely to occur and the period during which such condition has occurred or is likely to occur. Buyer and Seller hereby agree that in such event Seller shall be under no obligation to schedule or transfer Deliveries of Qualified Clean Energy to the Delivery Point during such period. Seller shall provide Buyer with detailed information, including but not limited to, the start and stop times of such periods of curtailment under this Section 4.2(a) as well as the quantity curtailed, for all such periods of non-delivery during the preceding calendar month, which information shall be provided prior to Seller's delivery of the invoice to Buyer.

(b) The Parties agree to use Commercially Reasonable Efforts to comply with all applicable ISO-NE Rules and ISO-NE Practices in connection with the Scheduling and Delivery of Energy hereunder. Without limiting the generality of the foregoing, Seller shall submit an Internal Bilateral transaction for the Scheduled Qualified Clean Energy, or Qualified Shortfall Energy, as the case may be, by the applicable scheduling deadline and Buyer shall confirm the Internal Bilateral transaction submitted by Seller by the applicable scheduling deadline. Penalties or similar charges assessed by a Transmission Provider, ISO-NE or other Independent System Operators, as applicable, and caused by Seller's noncompliance with the Scheduling obligations set forth in this Section 4.2 shall be the responsibility of Seller.

(c) Without limiting the generality of this Section 4.2, Seller or the party with whom Seller contracts pursuant to Section 3.5(e) shall at all times during the Services Term be designated as the "Lead Market Participant" (or any successor designation) for the Hydro-Québec Power Resources and shall be solely responsible for any obligations and liabilities imposed by ISO-NE, other Independent System Operators, as applicable, or under the ISO-NE Rules and ISO-NE Practices with respect to the Delivery of Qualified Clean Energy up to the Delivery Point, or Qualified Shortfall Energy up to the designated delivery point within the New England Control Area, as applicable, including all charges, penalties, financial assurance obligations, losses, ancillary service charges, and other ISO-NE, other Independent System Operator, as applicable, or applicable system costs, charges or revenues, in each case, associated with the Delivery of Qualified Clean Energy up to the Delivery Point, or Qualified Shortfall Energy up to the designated delivery point within the New England Control Area, as applicable. To the extent Buyer incurs such costs, charges, penalties or losses which are the responsibility of Seller (including amounts not credited to Buyer as described in Section 4.2(a)), Seller shall reimburse Buyer for the same.

4.3 Failure of Seller to Deliver Products.

(a) In the event that Seller fails to satisfy any of its obligations to Deliver any of the Products or any portion of the Products hereunder in accordance with Section 4.1, Section 4.2 and Section 4.7, and to the extent such failure is not caused by Force Majeure or otherwise excused under the express terms of this Agreement (a **"Delivery Shortfall"**) and Seller has not

cured such failure as provided, and to the extent permitted, in Section 4.3(c) (an **"Uncured Delivery Shortfall"**), Seller shall pay Buyer an amount for such Uncured Delivery Shortfall equal to the Cover Damages. Such payment shall be due no later than the date for Buyer's payment for the next applicable month as set forth in Section 5.2 hereof. Each Party agrees and acknowledges that (i) the damages that Buyer would incur due to an Uncured Delivery Shortfall would be difficult or impossible to predict with certainty, and (ii) it is impractical and difficult to assess actual damages in the circumstances stated, and therefore the Cover Damages as agreed to by the Parties and set forth herein is a fair and reasonable calculation of such damages.

(b) The Parties' rights and obligations in respect of Baseline Hydroelectric Generation are as set forth in Exhibit H.

(c) Notwithstanding anything to the contrary in Section 4.1(a) or this Section 4.3, in the event of a Delivery Shortfall caused solely by or arising solely from (x) a Non-Excused Outage (as defined in the TSA) (a **"TSA Delivery Shortfall"**) and/or (y) an outage or reduction in the availability of the Québec Line as a result of a physical condition that affects the transfer capability of the Québec Line (each a "**Curable Delivery Shortfall**"), Seller shall have the right to Deliver Qualified Shortfall Energy and associated Environmental Attributes, in addition to the Guaranteed Qualified Clean Energy, in order to cure all or any portion of the amount of such Curable Delivery Shortfall (such amount, as expressed in MWh, the **"Shortfall Cure Amount"**), as follows:

(i) Seller may Deliver the Shortfall Cure Amount in the same Contract Year in which the Curable Delivery Shortfall occurred or in the immediately succeeding Contract Year (the **"Shortfall Cure Period"**).

(ii) Unless and until the TSA is terminated, if a Curable Delivery Shortfall is caused by or arises from a TSA Delivery Shortfall and Seller cures such TSA Delivery Shortfall, in whole or in part, through the Delivery of Qualified Shortfall Energy during the Shortfall Cure Period, Buyer shall increase the Price to be paid for such Qualified Shortfall Energy by the amount that would have been due from Buyer to the U.S. Transmission Provider under the TSA with respect to such TSA Delivery Shortfall (such TSA amounts to be converted to a $/MWh basis and limited to the cured TSA Delivery Shortfall) had the Non-Excused Outage (as defined in the TSA) giving rise to such TSA Delivery Shortfall not occurred. If the TSA is terminated, the Price for Qualified Shortfall Energy Delivered after such TSA termination shall not include any amount that would have been due from Buyer to the U.S. Transmission Provider under the TSA.

(iii) The total amount of Curable Delivery Shortfalls caused by or arising from any event or condition other than a Non-Excused Outage (as defined in the TSA) (each a **"Non-TSA Delivery Shortfall"**) in any Contract Year that may be cured through

Deliveries of Qualified Shortfall Energy shall not exceed the amount, expressed in MWh, equal to (A) the Contract Maximum Amount, multiplied by (B) 720. No such limitation shall apply to Deliveries of Qualified Shortfall Energy to cure TSA Delivery Shortfalls.

(iv) Any Curable Delivery Shortfall occurring during the final Contract Year may only be cured through Deliveries of Qualified Shortfall Energy during such final Contract Year or through the payment of Cover Damages.

(v) As set forth in Exhibit H, any Qualified Shortfall Energy Delivered under this Agreement shall not be taken into account in determining whether Seller has satisfied its obligation to deliver Baseline Hydroelectric Generation for the applicable period set forth in Exhibit H.

(vi) In the event that a Curable Delivery Shortfall occurs during the Winter Period or Summer Period, the Shortfall Cure Amount of Qualified Shortfall Energy with respect to such Curable Delivery Shortfall may only be delivered during the corresponding period of the Shortfall Cure Period. In the event that a Curable Delivery Shortfall occurs during On-Peak hours, the Shortfall Cure Amount of Qualified Shortfall Energy with respect to such Curable Delivery Shortfall may only be delivered during On-Peak hours during the Shortfall Cure Period. For example, if a Curable Delivery Shortfall occurs during On-Peak hours during the Winter Period, the Shortfall Cure Amount of Qualified Shortfall Energy with respect to that Curable Delivery Shortfall must be delivered during On-Peak hours in the Winter Period during the Shortfall Cure Period.

(vii) If, at the end of any Contract Year, (x) the amount of Non-TSA Delivery Shortfalls in such Contract Year exceeds the amount, expressed in MWh, equal to the Contract Maximum Amount, multiplied by 720, or (y) there are any other Uncured Delivery Shortfalls for the Shortfall Cure Period ending at the end of such Contract Year for which Cover Damages have not previously been paid, then Seller shall pay Buyer an amount for such Uncured Delivery Shortfalls equal to the Cover Damages.

(viii) At the end of each Contract Year, Buyer shall calculate (A) the weighted average LMP at the Delivery Point for the time period in which each Curable Delivery Shortfall occurred during such Contract Year (the **"Delivery Shortfall LMP"**) and (B) the weighted average LMP at the Delivery Point for the time period in which each Qualified Shortfall Energy Delivered occurred during

such Contract Year (the "**Qualified Shortfall Energy LMP**"). If the Delivery Shortfall LMP is greater than the Qualified Shortfall Energy LMP for a Contract Year, then Seller shall pay to Buyer an amount equal to the product of such difference multiplied by the Qualified Shortfall Energy Delivered during such Contract Year. If the Qualified Shortfall Energy LMP is greater than the Delivery Shortfall LMP for a Contract Year, then Buyer shall pay to Seller an amount equal to the product of such difference multiplied by the Qualified Shortfall Energy Delivered during such Contract Year. If the Delivery Shortfall LMP is equal to the Qualified Shortfall Energy LMP, then no payment shall be required.

(ix) No Qualified Shortfall Energy shall be delivered over the U.S. Transmission Line to the Delivery Point in any hour in which Seller is excused from performing its obligations under this Agreement due to a Force Majeure unless Seller is also Delivering the entire amount of the Guaranteed Qualified Clean Energy in that hour.

(d) Notwithstanding any other provision of this Agreement, Seller shall have the right, but not the obligation, to Deliver the Shortfall Cure Amount pursuant to Section 4.3(a) of this Agreement but shall have no obligation to pay Cover Damages with respect to the portion of any TSA Delivery Shortfall that occurs during the period (the "**Limited Suspension Period**") when (i) Buyer has a right to terminate the TSA due to an event of default under Section 14.2(e) of the TSA and (ii) Buyer has not exercised the right to terminate the TSA as a result of that event of default. In the event that either (x) the event of default under Section 14.2(e) of the TSA is cured pursuant to the terms of the TSA or (y) Buyer terminates the TSA as a result of such event of default, Seller's right to Deliver the Shortfall Cure Amount pursuant to Section 4.3(a) of this Agreement shall continue as contemplated by Section 4.3(c), and Seller's obligation to pay Cover Damages with respect to any TSA Delivery Shortfall that occurs after such Limited Suspension Period and that Seller has not cured as provided, and to the extent permitted, in Section 4.3(c) shall resume immediately upon the curing of such event of default under the TSA or immediately upon termination of the TSA. Nothing set forth in Section 4.3(c) shall affect the rights or obligations of the Parties with respect to an Event of Default under Section 9.2(f).

4.4 Failure by Buyer to Accept Delivery of Products; Default under TSA.

(a) If Buyer fails to accept all or part of any of the Products to be purchased by Buyer hereunder, and such failure to accept (i) is not the result of Reliability Curtailment or (ii) is not otherwise excused under the terms of this Agreement (a "**Rejected Purchase**"), then Buyer shall pay Seller, on the date payment would otherwise be due in respect of the month in which the failure occurred, an amount for such Rejected Purchase equal to the Resale Damages. Each Party agrees and acknowledges that (A) the damages that Seller would incur due to a Rejected Purchase would be difficult or impossible to predict with certainty, and (B) it is impractical and difficult to assess actual damages in the circumstances stated, and therefore the

Resale Damages as agreed to by the Parties and set forth herein is a fair and reasonable calculation of such damages.

(b) In the event that, due to a Buyer breach under the TSA, Seller is unable to Deliver any of the Products in accordance with the obligations under this Agreement, including due to a loss of applicable transmission rights, such failure shall not be deemed a Delivery Shortfall and Buyer shall pay Seller, on the date payment would otherwise be due in respect of each month in which the failure has occurred, an amount equal to the Resale Damages. Each Party agrees and acknowledges that (i) the damages that Seller would incur due to a Buyer default under the TSA would be difficult or impossible to predict with certainty, and (ii) it is impractical and difficult to assess actual damages in the circumstances stated, and therefore the Resale Damages as agreed to by the Parties and set forth herein is a fair and reasonable calculation of such damages.

4.5 Delivery Point.

(a) All Qualified Clean Energy shall be Delivered hereunder by Seller to Buyer at the Delivery Point. Except as set forth in Article 20, Seller shall be responsible for delivering its Qualified Clean Energy to the Delivery Point, and all Deliveries of Qualified Shortfall Energy as provided herein, in each case, consistent with all standards and requirements set forth by the FERC, ISO-NE, other Independent System Operators, as applicable, and any other applicable Governmental Entity or applicable tariff.

(b) Except as set forth in Article 20, Seller shall be responsible for all applicable charges associated with transmission over the Québec Line, interconnection of the Hydro-Québec Power Resources to TransÉnergie's transmission and distribution systems, service and delivery charges in respect of the Delivery of Qualified Clean Energy and any Qualified Shortfall Energy up to the Delivery Point, including all related ISO-NE or other Independent System Operator administrative fees, uplift, and socialized charges, and all other charges or revenues up to the Delivery Point in connection with Seller's obligations hereunder, including without limitation the Delivery of Qualified Clean Energy to and at the Delivery Point. Seller shall indemnify and hold harmless Buyer for any such charges or fees imposed upon Buyer by operation of ISO-NE Rules or otherwise in connection with Seller's performance of its obligations hereunder.

4.6 Metering.

(a) Metering. All electric metering associated with the Hydro-Québec Power Resources, including each Hydro-Québec Power Resource's meter and any other real-time meters, billing meters and back-up meters (collectively, the **"Meters"**), shall be installed, operated, maintained and tested at Seller's expense in accordance with Good Utility Practice and any applicable requirements and standards issued by NERC, the Interconnecting Utility and the GIS Operating Rules. All metering associated with the Hydro-Québec Power Resources shall be sufficient to permit the Metered Output to be tracked in the GIS to ensure unit-specific accounting of the Delivery of Qualified Clean Energy or Qualified Shortfall Energy to enable the Massachusetts Department of Environmental Protection to accurately account for such Qualified Clean Energy or Qualified Shortfall Energy in the state greenhouse gas emissions inventory, created under chapter 298 of the Acts of 2008.

(b) Measurements. Readings of the Meters at each Hydro-Québec Power Resource by the Interconnecting Utility in whose territory that Hydro-Québec Power Resource is located (or an independent Person mutually acceptable to the Parties) shall be conclusive as to the amount of Metered Output.

(c) Inspection, Testing and Calibration. Buyer shall have the right to inspect and test (at its own expense) any of the Meters at the Hydro-Québec Power Resources at reasonable times and upon reasonable notice from Buyer to Seller. Buyer and Seller shall negotiate in good faith and in a Commercially Reasonable Manner to agree upon procedures pursuant to which Seller shall test the Meters from time to time. Buyer shall have the right to have a representative present during any testing or calibration of the Meters at the Hydro-Québec Power Resources by Seller or its Affiliate. Seller shall provide Buyer with timely notice of any such testing or calibration.

(d) Audit of Meters. Buyer shall have access to the Meters and the right to audit all information and test data related to such Meters.

(e) Notice of Malfunction. Seller shall provide Buyer with prompt notice of any malfunction or other failure of the Meters or other telemetry equipment necessary to accurately report the quantity of Metered Output. If any Meter is found to be inaccurate by more than the level of inaccuracy that is allowed under the GIS Operating Rules at the time with respect to the Hydro-Québec Power Resources, the meter readings shall be adjusted as far back as can reasonably be ascertained, but in no event shall such period exceed six (6) months from the date that such inaccuracy was discovered, and any adjustment shall be reflected in the next invoice provided by Seller to Buyer hereunder.

4.7 Environmental Attributes.

(a) Seller shall transfer to Buyer all of the right, title and interest in and to the Environmental Attributes, including any and all Certificates, associated with Qualified Clean Energy or any Qualified Shortfall Energy, as applicable, from the Hydro-Québec Power Resources Delivered to Buyer under this Agreement and paid for by Buyer during the Services Term.

(b) All Energy and associated Environmental Attributes Delivered to Buyer under this Agreement shall meet the requirements set forth in the definitions for Qualified Clean Energy or Qualified Shortfall Energy, as applicable, and the requirements of the CES as in effect at the time of Delivery (subject to the ensuing sentence in this Section 4.7(b)), and Seller's failure to satisfy such requirements shall constitute an Event of Default pursuant to Section 9.1(c). In the event that the CES is repealed, replaced, amended or otherwise modified during the Term, Seller shall be required to maintain unit-specific transfer, tracking and reporting of Environmental Attributes but shall otherwise only be required to use Commercially Reasonable Efforts to cause the Energy and associated Environmental Attributes Delivered to Buyer under this Agreement to comply with any additional obligations resulting from the CES as amended or otherwise modified during the Term, notwithstanding anything to the contrary in this Agreement. The amount of Certificates transferred from Seller to Buyer under this Agreement for any hour (or shorter period to the extent that ISO-NE schedules Energy deliveries over a shorter period) will be the equivalent of the lesser of the aggregate amount of Metered Output or the Qualified

Clean Energy or Qualified Shortfall Energy, as applicable, Delivered during that hour (or such shorter period).

(c) Seller shall comply with all GIS Operating Rules including, without limitation, such rules relating to the creation, tracking, recording and transfer of all Environmental Attributes associated with Qualified Clean Energy or Qualified Shortfall Energy, as applicable, to be purchased by Buyer under this Agreement, which compliance shall be at Seller's sole cost. In addition, at Buyer's request, Seller shall register with and comply with the rules and requirements of another system that tracks, monetizes or otherwise creates or enhances value for Environmental Attributes, which compliance shall be at Seller's sole cost; provided that Seller shall neither be required to incur any costs associated with any registration and compliance with the rules and requirements of another system other than administrative (including, without limitation, legal and accounting), filing and reporting costs associated with any such registration and compliance or costs associated with any such registration and compliance that would have otherwise been incurred by Seller irrespective of such registration and compliance, nor shall Seller in any event be required to incur any costs associated with any registration and compliance with the rules and requirements of another system that would not have otherwise been incurred by Seller irrespective of such registration and compliance if such costs would reasonably be expected to exceed $5,000,000 in the aggregate during the Term.

(d) Seller shall transfer to Buyer the Environmental Attributes associated with the Qualified Clean Energy or Qualified Shortfall Energy, as applicable, Delivered hereunder by means of an irrevocable Forward Certificate Transfer (as defined in the GIS Operating Rules) within fifteen (15) days after the end of the calendar month in which such Qualified Clean Energy or Qualified Shortfall Energy, as applicable, was generated, which Forward Certificate Transfer shall be denoted in the GIS as not being capable of rescission by Seller, and Buyer shall accept such Forward Certificate Transfer as provided in the GIS Operating Rules. No payment shall be due to Seller for any Environmental Attributes until either (x) the Certificates are actually deposited in Buyer's GIS account or a GIS account designated by Buyer to Seller in writing, or (y) (i) Buyer and Seller have entered into the irrevocable Forward Certificate Transfer (as defined in the GIS Operating Rules) of the Environmental Attributes and any Certificates to be Delivered to Buyer in the GIS, and (ii) the Energy with which such Certificates are associated has been Delivered to Buyer.

(e) To the extent that the Environmental Attributes are tracked in any system other than the GIS, Seller shall cause all credits, certificates, benefits, reductions, offsets and allowances created or accounted for in such other system to be (x) retired or to otherwise cease to be available for use in such other system, or (y) transferred to Buyer's account in such other tracking system so long as such a transfer would not affect the treatment of such Environmental Attributes in the GIS or under applicable Law.

(f) The Parties intend for the transactions entered into hereunder to be physically settled, meaning that such Environmental Attributes are to be Delivered in the GIS account of Buyer or its designee as set forth in this Section 4.7.

## 5. PRICE AND PAYMENTS FOR PRODUCTS

5.1 Price for Products. The price for the Delivered Products shall be as specified in Exhibit D.

5.2 Payment and Netting.

(a) Billing Period. The calendar month shall be the standard period for all charges and payments under this Agreement. On or before the fifteenth (15th) day following the end of each month, Seller shall render to Buyer an invoice for the payment obligations incurred hereunder during the preceding month, based on the Qualified Clean Energy and Qualified Shortfall Energy, as applicable, Delivered in the preceding month, and associated Environmental Attributes deposited in Buyer's GIS account or a GIS account designated by Buyer to Seller in writing in the preceding month. Such invoice shall contain supporting detail for all charges reflected on the invoice, and Seller shall provide Buyer with additional supporting documentation and information as Buyer may reasonably request.

(b) Timeliness of Payment. All undisputed charges under this Agreement shall be due and payable in accordance with each Party's invoice instructions on or before the later of (x) fifteen (15) days from receipt of the applicable invoice or (y) the last day of the calendar month in which the applicable invoice was received (or in either event the next Business Day if such day is not a Business Day). Each Party shall make payments by electronic funds transfer, or by other mutually agreeable method(s), to the account designated by the other Party. Any undisputed amounts not paid by the due date shall be deemed delinquent and shall accrue interest at the Late Payment Rate, such interest to be calculated from and including the due date to but excluding the date the delinquent amount is paid in full.

(c) Disputes and Adjustments of Invoices.

(i) All invoices rendered under this Agreement shall be subject to adjustment after the end of each month in order to true-up charges based on changes resulting from ISO-NE billing statements or revisions, if any, to previous ISO-NE billing statements. If ISO-NE resettles any invoice which relates to the Products sold under this Agreement and (A) any charges thereunder are the responsibility of the other Party under this Agreement or (B) any credits issued thereunder would be due to the other Party under this Agreement, then the Party receiving the invoice from ISO-NE shall, in the case of (A) above, invoice the other Party or, in the case of (B) above, pay the amount due to the other Party. Any invoices issued or amounts due pursuant to this Section shall be invoiced or paid, as applicable, as provided in this Section 5.2.

(ii) Within twelve (12) months of the issuance of an invoice, Seller shall adjust any invoice for any arithmetic or computational error, and shall provide documentation and information supporting such adjustment to Buyer. Within twelve (12) months of the receipt of an invoice (or an adjusted invoice), Buyer may dispute any charges

on that invoice. In the event of such a dispute, Buyer shall give notice to Seller and shall state the basis for the dispute. Payment of the disputed amount shall not be required until the dispute is resolved. Upon resolution of the dispute, any required payment or refund shall be made within ten (10) days after such resolution along with interest accrued at the Late Payment Rate from and including the due date (or, in the case of a refund, the payment date) but excluding the date paid. Any claim for additional payment is waived unless Seller issues an adjusted invoice within twelve (12) months of issuance of the original invoice. Any dispute of charges is waived unless Buyer provides notice of the dispute to Seller within twelve (12) months of receipt of the invoice (or adjusted invoice) including such charges.

(d) Netting of Payments. The Parties hereby agree that they may discharge mutual debts and payment obligations due and owing to each other under this Agreement (including, without limitation, any amount due to Buyer under Exhibit H) on the same date through netting of such monetary obligations, in which case all amounts owed by each Party to the other Party for the purchase and sale of Products during the monthly billing period under this Agreement, including any related damages calculated pursuant to this Agreement, interest, and payments or credits, may be netted so that only the excess amount remaining due shall be paid by the Party who owes it. If no mutual debts or payment obligations exist and only one Party owes a debt or obligation to the other during the monthly billing period, such Party shall pay such sum in full when due. The Parties agree to provide each other with reasonable detail of such net payment or net payment request.

5.3 Interest on Late Payment or Refund. A late payment charge shall accrue on any late payment or refund as specified above at the lesser of (a) the prime rate specified in the "Money & Investing" section of *The Wall Street Journal* (or, if such rate is not published therein, in a successor index mutually selected by the Parties) plus one percent (1%), and (b) the maximum rate permitted by applicable Law in transactions involving entities having the same characteristics as the Parties (the **"Late Payment Rate"**).

5.4 Taxes, Fees and Levies.

(a) Seller or its Affiliates shall be obligated to pay all present and future taxes, governmental tariffs, import fees and taxes, and any other fees and levies, imposed on or associated with the Hydro-Québec Power Resources or delivery or sale of the Products on or before the Delivery Point (**"Seller's Taxes"**). Buyer shall be obligated to pay all present and future taxes, fees and levies, imposed on or associated with such Products after the Delivery Point or imposed on or associated with the purchase of such Products by Buyer (other than ad valorem, franchise or income taxes which are related to the sale of the Products and are, therefore, the responsibility of Seller) (**"Buyer's Taxes"**). In the event that Seller shall be required by law or regulation to remit or pay any Buyer's Taxes, at Seller's election, Buyer shall reimburse Seller for such payment or Seller may deduct the amount of any such Buyer's Taxes from any amounts due to Buyer hereunder. In the event that Buyer shall be required by law or regulation to remit or pay any Seller's Taxes, at Buyer's election, Seller shall reimburse Buyer

for such payment or Buyer may deduct the amount of any such Seller's Taxes from the amount due to Seller under Section 5.2. Buyer shall have the right to all credits, deductions and other benefits associated with taxes paid by Buyer or reimbursed to Seller by Buyer as described herein. Nothing shall obligate or cause a Party to pay or be liable to pay any taxes, fees and levies for which it is exempt under law.

(b) Seller shall bear all risks, financial and otherwise, throughout the Term, associated with the eligibility to receive any federal or state tax credits, to qualify for accelerated depreciation for Seller's accounting, reporting or tax purposes, or to receive any other favorable tax or accounting right or benefit, or any grant or subsidy from a Governmental Entity or other Person. Seller's obligations under this Agreement shall be effective regardless of whether the Hydro-Québec Power Resources are eligible for or receives, or the transactions contemplated under this Agreement are eligible for or receive, any federal or state tax credits, grants or other subsidies or any particular accounting, reporting or tax treatment.

## 6. SECURITY FOR PERFORMANCE

6.1 Seller's Support.

(a) Within five (5) Business Days following the receipt of the Regulatory Approval, Seller shall cause Seller Guarantor to deliver to Buyer a guaranty by Seller Guarantor of Seller's payment obligations under this Agreement substantially in the form of Exhibit G (the **"Seller Guaranty"**). Seller shall be required to cause Seller Guarantor to maintain the Seller Guaranty thereafter continuing through and including the date that all of Seller's obligations under this Agreement have been satisfied. Such Seller Guaranty shall be capped at the amount of Unsecured Credit Limit under Section 6.5.

(b) Seller shall be required to post Credit Support in the amount of $20,000.00 per MWh/hour of the Contract Maximum Amount (e.g., $21,800,000 in the event that the Contract Maximum Amount is 1,090 MWh/hour) (**"Fixed Credit Support"**) to secure Seller's obligations under this Agreement in the period beginning on the Effective Date and continuing through and including the date that all of Seller's obligations under this Agreement are satisfied. Fifty percent (50%) of the Fixed Credit Support shall be provided to Buyer on the Effective Date; and the remaining fifty percent (50%) of the Fixed Credit Support shall be provided to Buyer within fifteen (15) Business Days after receipt of the Regulatory Approval.

(c) At any time following the receipt of the Regulatory Approval, if Buyer's Exposure exceeds Seller Guarantor's Unsecured Credit Limit pursuant to Section 6.5, Seller shall provide additional Credit Support in an amount equal to the amount by which the Unsecured Credit Limit is exceeded, rounded up to the nearest $250,000.

(d) If at any time following the receipt of the Regulatory Approval there shall occur a Downgrade Event, Seller Guarantor's Unsecured Credit Limit shall automatically be zero. Seller shall then provide Credit Support in an amount equal to Buyer's Exposure.

(e) If at any time during the Term, the amount of Credit Support is reduced as a result of Buyer's draw upon such Credit Support, Seller shall replenish such Credit Support to the total amount required under this Section 6.1 within five (5) Business Days after that draw.

(f) At any time following the receipt of the Regulatory Approval, when the amount of Credit Support held by Buyer, pursuant to Section 6.1(c), is greater than the amount by which Buyer's Exposure exceeds Seller Guarantor's Unsecured Credit Limit, then upon request of Seller, with such request being made not more often than on a quarterly basis, Buyer shall return excess Credit Support, rounded down to the nearest $250,000 to Seller within five (5) Business Days after receipt of such request. In no event will Seller's Credit Support be less than the Fixed Credit Support.

(g) If Seller fails to provide Credit Support in accordance with this Article 6 to Buyer within five (5) Business Days after receipt of notice, then an Event of Default under Section 9.2 shall be deemed to have occurred and Buyer will be entitled to the remedies set forth in Section 9.3.

6.2 Cash Deposits. Any Cash provided by Seller as Credit Support under this Agreement shall be held in an account selected by Buyer in its reasonable discretion. Interest shall accrue on that Cash deposit at the daily Federal Funds Rate and shall be remitted to Seller upon written request to Buyer, with such request not more often than on a quarterly basis and Buyer shall remit such accrued interest to Seller within a reasonable time following receipt of such request. Seller agrees to comply with the commercially reasonable requirements of Buyer in connection with the receipt and retention of any Cash provided as Credit Support under this Agreement.

6.3 Return of Credit Support. Any unused Credit Support provided under this Agreement shall be returned to Seller only after any such Credit Support has been used to satisfy any outstanding obligations of Seller in existence at the time of the expiration or termination of this Agreement. Provided such obligations have been satisfied, such Credit Support shall be returned to Seller within thirty (30) days after the earlier of (a) the expiration of the Term of this Agreement or (b) termination of this Agreement under Article 8, Section 9.3(b) or Section 10.1(c).

6.4 Buyer's Rights and Remedies. If at any time an Event of Default with respect to Seller has occurred and is continuing, then, unless Seller has paid in full all of its obligations hereunder that are then due, without limiting any other rights and remedies Buyer may have under this Agreement or otherwise at law or in equity, Buyer may exercise one or more of the following rights and remedies: (a) all rights and remedies available to a secured party under applicable Law with respect to Credit Support held by Buyer and the Seller Guaranty, and (b) the right to liquidate any Credit Support held by Buyer or draw on the Seller Guaranty up to the aggregate amount payable to Buyer with respect to Seller's obligations hereunder at the time of such liquidation or drawing and to apply the proceeds of such liquidation or draw to any such amounts payable to Buyer in such order as Buyer may elect. For the purpose of this Section 6.4, Buyer may draw on the undrawn portion of any Letter of Credit provided as Credit Support and the Seller Guaranty up to the aggregate amount payable to Buyer with respect to Seller's obligations hereunder at the time of such liquidation or drawing. Seller shall remain liable for amounts due and owed to Buyer that remain unpaid after the application of Credit Support and draws on the Seller Guaranty pursuant to this Section 6.4.

6.5 Unsecured Credit Limit. The Unsecured Credit Limit is provided in the table below:

| Credit Ratings (Seller Guarantor) | | Unsecured Credit Limits ($ in Millions) |
|---|---|---|
| S&P and/or Fitch Rating | Moody's Rating | Fixed Amount |
| AA- or higher | Aa3 or higher | $15.0 |
| A+, A | A1, A2 | $12.5 |
| A- | A3 | $10.0 |
| BBB+ | Baa1 | $7.5 |
| BBB | Baa2 | $5.0 |
| BBB- | Baa3 | $2.5 |
| Below BBB- / Unrated | Below Baa3 / Unrated | $0 |

## 7. REPRESENTATIONS, WARRANTIES, COVENANTS AND ACKNOWLEDGEMENTS

7.1 Representations and Warranties of Buyer. Buyer hereby represents and warrants to Seller as follows:

(a) Organization and Good Standing; Power and Authority. Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the Commonwealth of Massachusetts. Subject to the receipt of the Regulatory Approval, Buyer has all requisite power and authority to execute, deliver, and perform its obligations under this Agreement.

(b) Due Authorization; No Conflicts. The execution and delivery by Buyer of this Agreement, and the performance by Buyer of its obligations hereunder, have been duly authorized by all necessary actions on the part of Buyer and do not and, under existing facts and Law, shall not: (i) contravene its certificate of incorporation or any other governing documents; (ii) conflict with, result in a breach of, or constitute a default under any note, bond, mortgage, indenture, deed of trust, license, contract or other agreement to which it is a party or by which any of its properties may be bound or affected; (iii) subject to receipt of the Regulatory Approval, violate any order, writ, injunction, decree, judgment, award, statute, law, rule, regulation or ordinance of any Governmental Entity or agency applicable to it or any of its properties; or (iv) result in the creation of any lien, charge or encumbrance upon any of its properties pursuant to any of the foregoing.

(c) Binding Agreement. This Agreement has been duly executed and delivered on behalf of Buyer and, assuming the due execution hereof and performance hereunder by Seller and receipt of the Regulatory Approval, constitutes a legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as such enforceability may be limited by law or principles of equity.

(d) No Proceedings. As of the Effective Date, except to the extent relating to the Regulatory Approval, there are no actions, suits or other proceedings, at law or in equity, by or before any Governmental Entity or agency or any other body pending or, to the best of its knowledge, threatened against or affecting Buyer or any of its properties (including, without limitation, this Agreement) which relate in any manner to this Agreement or any transaction contemplated hereby, or which Buyer reasonably expects to lead to a material adverse effect on (i) the validity or enforceability of this Agreement or (ii) Buyer's ability to perform its obligations under this Agreement.

(e) Consents and Approvals. Except to the extent associated with the Regulatory Approval, the execution, delivery and performance by Buyer of its obligations under this Agreement do not and, under existing facts and Law, shall not, require any Permit or any other action by, any Person which has not been duly obtained, made or taken or that shall be duly obtained, made or taken on or prior to the date required, and all such approvals, consents, permits, licenses, authorizations, filings, registrations and actions are in full force and effect, final and non-appealable as required under applicable Law.

(f) Negotiations. The terms and provisions of this Agreement are the result of arm's length and good faith negotiations on the part of Buyer and equal bargaining power of the Parties. No principle of law or equity regarding construing ambiguities in this Agreement against the drafting Party shall apply.

(g) Bankruptcy. There are no bankruptcy, insolvency, reorganization, receivership or other such proceedings pending against or being contemplated by Buyer, or, to Buyer's knowledge, threatened against it.

(h) No Default. No Default or Event of Default has occurred and is continuing and no Default or Event of Default shall occur as a result of the performance by Buyer of its obligations under this Agreement.

7.2 Representations and Warranties of Seller. Seller hereby represents and warrants to Buyer as of the Effective Date as follows:

(a) Organization and Good Standing; Power and Authority. Seller is a corporation, duly formed, validly existing and in good standing under the laws of Delaware. Subject to the receipt of the Permits and any Québec Line Approvals, Seller has all requisite power and authority to execute, deliver, and perform its obligations under this Agreement.

(b) Authority. Seller (i) has the power and authority to own and operate its businesses and properties, to own or lease the property it occupies and to conduct the business in which it is currently engaged; (ii) is duly qualified and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business

requires such qualification; and (iii) holds all rights and entitlements necessary to purchase the Products from its Affiliate that owns and operates the Hydro-Québec Power Resources and, subject to the receipt of the Permits and any Québec Line Approvals, to deliver the Products to Buyer in accordance with this Agreement.

(c) Due Authorization; No Conflicts. The execution and delivery by Seller of this Agreement, and the performance by Seller of its obligations hereunder, have been duly authorized by all necessary actions on the part of Seller and do not and, under existing facts and Law, shall not: (i) contravene any of its governing documents; (ii) conflict with, result in a breach of, or constitute a default under any note, bond, mortgage, indenture, deed of trust, license, contract or other agreement to which it is a party or by which any of its properties may be bound or affected; (iii) assuming receipt of the Permits and any Québec Line Approvals, violate any order, writ, injunction, decree, judgment, award, statute, law, rule, regulation or ordinance of any Governmental Entity or agency applicable to it or any of its properties; or (iv) result in the creation of any lien, charge or encumbrance upon any of its properties pursuant to any of the foregoing. Seller is qualified to perform as a Market Participant under the ISO-NE Tariff, or is qualified to transact through another Market Participant under the ISO-NE Tariff. Seller will not be disqualified from or be materially adversely affected in the performance of any of its obligations under this Agreement by reason of market power or affiliate transaction issues under federal or state regulatory requirements.

(d) Binding Agreement. This Agreement has been duly executed and delivered on behalf of Seller and, assuming the due execution hereof and performance hereunder by Buyer and receipt of the Permits and any Québec Line Approvals, constitutes a legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as such enforceability may be limited by law or principles of equity.

(e) No Proceedings. Except to the extent associated with the Permits and any U.S. Transmission Approvals, there are no actions, suits or other proceedings, at law or in equity, by or before any Governmental Entity or agency or any other body pending or, to the best of its knowledge, threatened against or affecting Seller or any of its properties (including, without limitation, this Agreement) which relate in any manner to this Agreement or any transaction contemplated hereby, or which Seller reasonably expects to lead to a material adverse effect on (i) the validity or enforceability of this Agreement or (ii) Seller's ability to perform its obligations under this Agreement.

(f) Consents and Approvals. Subject to the receipt of the Permits on or prior to the date such Permits are required under applicable Law and subject to the receipt of any Québec Line Approvals on or prior to the date such Québec Line Approvals are required under applicable Law, the execution, delivery and performance by Seller of its obligations under this Agreement do not and, under existing facts and Law, shall not, require any Permit or any other action by, any Person which has not been duly obtained, made or taken, and all such approvals, consents, permits, licenses, authorizations, filings, registrations and actions are in full force and effect, final and non-appealable. To Seller's knowledge, Seller shall be able to receive the Permits (including the Québec Line Approvals) in due course and as required under applicable Law to the extent that those Permits have not previously been received.

(g) Project Operational. The Hydro-Québec Power Resources are operational and are operated and maintained in accordance with Good Utility Practice and Seller meets all requirements of the ISO-NE Rules and ISO-NE Practices to the extent required for the Delivery of the Products to Buyer.

(h) Self-Insurance. Hydro-Québec maintains self-insurance with respect to the types of coverage and with such terms and conditions as are reasonable for a power system and transmission line, as applicable, of the type and size of the Hydro-Québec Power Resources and the Québec Line, consistent with Good Utility Practice and as otherwise legally required for the Hydro-Québec Power Resources and the Québec Line.

(i) Qualified Clean Energy. The Hydro-Québec Power Resources shall be, as of and after the Effective Date, Qualified Clean Energy Generation Units, and the Energy sold under this Agreement is Qualified Clean Energy or Qualified Shortfall Energy, as applicable.

(j) Title to Products. Seller shall purchase all of the Products sold hereunder directly from its Affiliate that owns and operates the Hydro-Québec Power Resources and has and shall have good and marketable title to all Products sold and Delivered to Buyer under this Agreement, free and clear of all liens, charges and encumbrances, at the time of Delivery hereunder. Seller has not sold and shall not sell any such Products to any other Person, and no Person other than Seller can claim an interest in any Products to be sold to Buyer under this Agreement.

(k) Negotiations. The terms and provisions of this Agreement are the result of arm's length and good faith negotiations on the part of Seller and equal bargaining power of the Parties. No principle of law or equity regarding construing ambiguities in this Agreement against the drafting Party shall apply.

(l) Bankruptcy. There are no bankruptcy, insolvency, reorganization, receivership or other such proceedings pending against or being contemplated by Seller or its Affiliate that owns the Hydro-Québec Power Resources, or, to Seller's knowledge, threatened against either of them.

(m) No Misrepresentations. The reports and other submittals by Seller to Buyer under this Agreement are not false or misleading in any material respect.

(n) No Default. No Default or Event of Default has occurred and is continuing and no Default or Event of Default shall occur as a result of the performance by Seller of its obligations under this Agreement.

(o) Site Control. As of the Effective Date, Seller or an Affiliate of Seller has all real property rights to operate the Hydro-Québec Power Resources, to interconnect the Hydro-Québec Power Resources to the Interconnecting Utility and to perform Seller's obligations under this Agreement.

7.3 Continuing Nature of Representations and Warranties. The representations and warranties set forth in this Article 7 are made as of the Effective Date and deemed made continually throughout the Term, subject to the removal of the references to the Regulatory

Approval, Permits and Québec Line Approvals, as and when the Regulatory Approval, Permits and Québec Line Approvals are obtained. If at any time during the Term, a Party has knowledge of any event or information which causes any of the representations and warranties in this Article 7 to be untrue or misleading, such Party shall provide the other Party with prompt written notice of the event or information, the representations and warranties affected, and the corrective action such Party shall take. The notice required pursuant to this Section 7.3 shall be given as soon as practicable after the occurrence of each such event.

7.4 Assignment of Transmission Rights. Buyer and Seller shall use Commercially Reasonable Efforts to give effect to the assignments contemplated by Article 20, as required from time to time.

7.5 Forward Capacity Market Participation. Seller shall participate in such Forward Capacity Auction qualification process as required to allow Seller to qualify a Seasonal Claimed Capability of not less than 1,090 MW over the U.S. Transmission Line no later than the Guaranteed Delivery Term Start Date, as it may be extended pursuant to Sections 3.1(c) through 3.1(f). The Parties acknowledge and agree that (a) such participation by Seller is only intended to allow ISO-NE to determine which Network Upgrades would be required to (i) deliver such Seasonal Claimed Capability and (ii) satisfy the Capacity Capability Interconnection Standard under the ISO-NE Rules and (b) as contemplated by the TSA, such Network Upgrades, if any, shall be at U.S. Transmission Provider's sole expense. For the avoidance of doubt, but without limiting the condition set forth in Section 3.4(b)(ii), Seller shall have no obligation during the Services Term to pay for such Network Upgrades or to complete the Forward Capacity Auction qualification process.

## 8. REGULATORY APPROVAL; TERMINATION OF TSA

8.1 Receipt of Regulatory Approval. Except to the extent waived by Buyer, the obligations of the Parties to perform this Agreement, other than the Parties' obligations under Sections 6.1(b), 6.1(e), 6.1(g) and 6.3 and Articles 8, 11 and 12, are conditioned upon and shall not become effective or binding until the receipt of the Regulatory Approval. Buyer shall file for Regulatory Approval as soon as practicable following the execution of this Agreement, and in any event shall use Commercially Reasonable Efforts to file within sixty (60) days after the Effective Date. Buyer shall notify Seller within five (5) Business Days after receipt of the Regulatory Approval or receipt of an order of the MDPU regarding this Agreement. This Agreement may be terminated by either Buyer or Seller, without liability under this Agreement as a result of such termination, subject to the return of Credit Support as provided in Section 6.3, in the event that the Regulatory Approval is not received by January 25, 2020.

8.2 Transmission Approvals. The obligation of the Parties to perform this Agreement is further conditioned upon the receipt of U.S. Transmission Approvals and Québec Line Approvals, in each case, on or prior to the date such U.S. Transmission Approvals are required to be obtained in accordance with the TSA or Québec Line Approvals are required to be obtained in accordance with this Agreement.

8.3 Transmission Service Agreement.

(a) Seller may terminate this Agreement in the event that the TSA is terminated for any reason other than a default by Buyer under the TSA, which is also an Event of Default by Buyer under Section 9.1(f)(ii) or (iii) of this Agreement. Unless the TSA is terminated (x) prior to the Commercial Operation Date pursuant to Section 3.3.3(a) or 3.3.5 of the TSA or (y) due to a Non-Excused Outage under the TSA, subject to the return of Credit Support as provided in Section 6.3, such termination of this Agreement by Seller shall be without liability under this Agreement. If the TSA is terminated prior to the Commercial Operation Date pursuant to Section 3.3.3(a) or 3.3.5 of the TSA, then upon Seller's termination of this Agreement under this Section 8.3(a), Seller shall pay Buyer the Termination Payment calculated in accordance with Section 9.3(b)(ii)(B). If the termination of the TSA occurs on or after the Commercial Operation Date due to a Non-Excused Outage under the TSA, then upon Seller's termination of this Agreement under this Section 8.3(a), Seller shall pay Buyer the Termination Payment in accordance with Section 9.3(b)(iv)(B). Nothing herein shall be construed as a waiver or modification of any rights or remedies of Buyer under the TSA.

(b) Buyer may terminate this Agreement in the event that the TSA is terminated for any reason other than a default by Buyer under the TSA which is also an Event of Default by Buyer under Section 9.1(f)(ii) or (iii) of this Agreement. In the event that Buyer terminates this Agreement under this Section 8.3(b), subject to the return of Credit Support as provided in Section 6.3, termination pursuant to this Section 8.3(b) shall be without liability under this Agreement. For the avoidance of doubt, Buyer's right to terminate this Agreement under this Section 8.3(b) shall be without limitation of any right that Buyer may have to terminate this Agreement due to an Event of Default by Seller under Section 9.2 of this Agreement.

(c) If either Buyer or Seller elects to terminate this Agreement as a result of a termination of the TSA as provided in this Section 8.3, such Party will give the other Party at least one hundred eighty (180) days advance written notice of such termination; provided, however, that during any such notice period this Agreement shall remain in full force and effect.

8.4 DEP Advisory Ruling.

(a) Except to the extent mutually waived by both Parties, the obligations of the Parties to perform this Agreement, other than the Parties' obligations under Sections 6.1(b), 6.1(e), 6.1(g) and 6.3 and Articles 8, 11 and 12, are conditioned upon and shall not become effective or binding until the receipt of an advisory ruling from the Massachusetts Department of Environmental Protection, pursuant to 310 CMR 2.09, (i) confirming that the Products Delivered under this Agreement, including, without limitation, any Qualified Shortfall Energy and associated Environmental Attributes Delivered pursuant to Section 4.3(c), meet the requirements of the CES as in effect on the date such advisory ruling is issued and (ii) describing the reporting and other filing and administrative requirements in order for such Products Delivered under this Agreement to satisfy the requirements of the CES (the "**Advisory Ruling**"). Buyer and Seller shall jointly file a request for the Advisory Ruling as soon as practicable following the execution of this Agreement, and in any event shall use Commercially Reasonable Efforts to file such request within sixty (60) days after the Effective Date.

(b) This Agreement may be terminated by either Buyer or Seller, without liability under this Agreement as a result of such termination, subject to the return of Credit Support as provided in Section 6.3, in the event that (i) one Party notifies the other Party within five (5) Business Days after receipt of the Advisory Ruling that the Advisory Ruling is not acceptable to such Party, acting reasonably; provided that the reason the Party determines the Advisory Ruling is not acceptable shall be that such ruling would have a material adverse effect on (1) the ability of such Party to perform its obligations under this Agreement or (2) the benefits such Party expects to receive from the Products being Delivered under this Agreement meeting the requirements of the CES, (ii) the Massachusetts Department of Environmental Protection affirmatively denies the request for an Advisory Ruling, or (iii) the Advisory Ruling is not received within ninety (90) days after the Effective Date; provided that termination under clause (iii) shall occur prior to receipt of the Advisory Ruling and within one hundred fifty (150) days after the Effective Date. The Parties may agree to jointly request a correction by the Massachusetts Department of Environmental Protection to any provision of the Advisory Ruling; provided that no such correction may be the basis for a Party's determination that the Advisory Ruling is not acceptable under clause (i) of this Section 8.4(b), unless such correction (A) has a material adverse effect on such Party's ability to perform its purchase and sale obligations under this Agreement, (B) materially alters the Price, (C) materially increases the cost to such Party of performance under this Agreement, or (D) would result in adverse balance sheet or creditworthiness impacts of such Party.

## 9. BREACHES; REMEDIES

9.1 Events of Default by Either Party. It shall constitute an event of default (**"Event of Default"**) by either Party hereunder if:

(a) Representation or Warranty. Any breach of any representation or warranty of such Party set forth herein, or in filings or reports made pursuant to this Agreement occurs where such breach is not fully cured and corrected within thirty (30) days after the Non-Defaulting Party has provided written notice to the Defaulting Party; or

(b) Payment Obligations. Any undisputed payment due and payable hereunder is not made on the date due, and such failure continues for more than ten (10) Business Days after notice thereof is given by the Non-Defaulting Party to the Defaulting Party; or

(c) Other Covenants. Other than:

(i) any of Seller's obligations to Deliver any of the Products or any portion of the Products or to deliver any of the Baseline Hydroelectric Generation, or

(ii) a Rejected Purchase, or

(iii) an Event of Default described in Section 9.1(a), 9.1(b), 9.1(e) or 9.2,

such Party fails to perform, observe or otherwise to comply with any obligation hereunder, and such failure continues for more than thirty (30) days after notice thereof is given by the Non-Defaulting Party to the Defaulting Party; provided, however, that such period shall be extended for an additional period of up to thirty (30) days, if, despite using Commercially Reasonable Efforts, the Defaulting Party is unable to cure within the initial thirty (30) day period so long as such cure is diligently pursued by the Defaulting Party until such Default had been corrected, but in any event shall be cured within sixty (60) days after the notice from the Non-Defaulting Party; or

(d) Bankruptcy. Such Party (i) is adjudged bankrupt or files a petition in voluntary bankruptcy under any provision of any bankruptcy law or consents to the filing of any bankruptcy or reorganization petition against such Party under any such law, or (without limiting the generality of the foregoing) files a petition to reorganize pursuant to 11 U.S.C. § 101 or any similar statute applicable to such Party, as now or hereinafter in effect, (ii) makes an assignment for the benefit of creditors, or admits in writing an inability to pay its debts generally as they become due, or consents to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of such Party, or (iii) is subject to an order of a court of competent jurisdiction appointing a receiver or liquidator or custodian or trustee of such Party or of a major part of such Party's property, which is not dismissed within sixty (60) days; or

(e) Permit Compliance. Such Party fails to obtain and maintain or cause to be obtained and maintained in full force and effect any Permit (other than the Regulatory Approval or U.S. Transmission Approvals) necessary for such Party to perform its obligations under this Agreement.

(f) Suspension or Termination of Transmission Rights. With respect to Buyer only, (i) Buyer has failed to timely assign to Seller the right to use during the Services Term all the transmission rights held by Buyer pursuant to the TSA as contemplated in Article 20; (ii) Buyer's rights under the TSA are suspended due to a default by Buyer under the TSA or the TSA is terminated due to a default by Buyer under the TSA; or (iii) Buyer has disaffirmed, disclaimed or repudiated the TSA.

9.2 Events of Default by Seller. In addition to the Events of Default described in Section 9.1, each of the following shall constitute an Event of Default by Seller hereunder:

(a) Failure to Maintain Credit Support or Seller Guaranty. The failure of Seller to provide, maintain and/or replenish the Credit Support or the Seller Guaranty as required pursuant to Article 6, and such failure continues for more than five (5) Business Days after Buyer has provided written notice thereof to Seller. For the avoidance of doubt, it shall be deemed an Event of Default if Seller provides Credit Support in the form of a Letter of Credit and, with respect to an outstanding Letter of Credit, one of the following events occurs with respect to the issuer of such Letter of Credit: (i) such issuer shall fail to be a Qualified Institution and Seller fails to replace such Credit Support within five (5) Business Days after such failure; (ii) such issuer shall fail to comply with or perform its obligations under such Letter of Credit and Seller fails to replace such Credit Support within five (5) Business Days after such failure; or (iii) such issuer shall disaffirm, disclaim, repudiate or reject, in whole or in part, or challenge the validity of, such Letter of Credit, and such failure, disaffirmation, disclamation, repudiation or

rejection continues for more than five (5) Business Days after Buyer has provided written notice thereof to Seller; or

(b) Termination of TSA for Failure to Achieve Critical Milestone. The termination of the TSA by Buyer pursuant to Section 14.2(b) of the TSA; or

(c) Failure to Achieve the Commercial Operation Date. The failure of Seller to meet the Commercial Operation Date by the Guaranteed Delivery Term Start Date, as the same may be extended in accordance with Sections 3.1(c) through 3.1(f); or

(d) Failure to Satisfy ISO-NE Obligations. The failure of Seller to satisfy, or cause to be satisfied (other than by Buyer), any material obligation under the ISO-NE Rules or ISO-NE Practices or any other obligation of Seller with respect to ISO-NE or other Independent System Operators, as applicable, and such failure has an adverse effect on Seller's ability to perform its obligations under this Agreement or on Buyer or Buyer's rights or ability to receive the benefits under this Agreement; provided, however, that, if Seller's failure to satisfy any obligation of Seller under the ISO-NE Rules or ISO-NE Practices does not have an adverse effect on Buyer or Buyer's ability to receive the benefits under this Agreement, Seller shall have the opportunity to cure such failure within thirty (30) days after its occurrence; or

(e) Assignment. The assignment of this Agreement by Seller, or the sale or transfer of Hydro-Québec or its subsidiaries' interests (or any part thereof) in the Hydro-Québec Power Resources, except as permitted in accordance with Article 14; or

(f) Recurring Delivery Reduction. The aggregate Uncured Delivery Shortfalls in any Shortfall Cure Period are more than twenty percent (20%) of the Guaranteed Qualified Clean Energy for such Shortfall Cure Period (a **"Defaulted Delivery Shortfall"**); provided, however, that, if (x) any such Uncured Delivery Shortfall is caused by or arises from Non-TSA Delivery Shortfalls, in whole or in part, (y) Seller presents a request to delay termination of this Agreement pursuant to this Section 9.2(f) for a period not to exceed twelve (12) months, together with a detailed plan (including reasonably satisfactory evidence of TransÉnergie's financial and technical capability to timely effectuate such plan) to restore the availability of the Québec Line such that Seller will be capable of fulfilling its minimum Delivery obligations hereunder (such that no Event of Default continues), before the end of such period and without duplication of any similar request to delay termination that has been or will be made under the TSA with respect to the same event of condition, and (z) Seller pays the Cover Damages required under Section 4.3, then Buyer shall forbear terminating this Agreement under this Section 9.2(f) for the duration of such period; provided, further, however, that, in the event that Buyer, acting in a Commercially Reasonable Manner, determines that Seller is not fulfilling its minimum Delivery obligations hereunder at the end of such period, or if Seller fails to exercise diligent, Commercially Reasonable Efforts to timely effectuate such plan, Buyer may terminate this Agreement under this Section 9.2(f).

9.3 Remedies.

(a) Suspension of Performance and Remedies at Law. Upon the occurrence and during the continuance of an Event of Default, the Non-Defaulting Party shall have the right, but not the obligation, to (i) withhold any payments due the Defaulting Party under this

Agreement, (ii) suspend its performance hereunder, (iii) in the case of a default of Seller's payment obligations under this Agreement, exercise and enforce any and all of its rights and remedies under the Seller Guaranty, and (iv) exercise such other remedies as provided for in this Agreement including, without limitation, the termination right set forth in Section 9.3(b), and, to the extent not inconsistent with the terms of this Agreement, such remedies available at law and in equity. In addition to the foregoing, except for breaches for which an express remedy or measure of damages is provided herein, the Non-Defaulting Party shall retain its right of specific performance to enforce the Defaulting Party's obligations under this Agreement.

(b) Termination and Termination Payment. Upon the occurrence of an Event of Default, a Non-Defaulting Party may terminate this Agreement at its sole discretion by providing written notice of such termination to the Defaulting Party. If the Non-Defaulting Party terminates this Agreement, it shall be entitled to calculate and receive as its sole remedy for such Event of Default a **"Termination Payment"** as follows:

(i) Termination by Buyer Prior to Commercial Operation Date. If Buyer terminates this Agreement because of an Event of Default by Seller occurring prior to the Commercial Operation Date, the Termination Payment due to Buyer shall be equal to the sum of (x) all Delay Damages due and owing by Seller through the date of such termination plus (y) the full amount of the Fixed Credit Support required to be provided to Buyer by Seller in accordance with Section 6.1(b).

(ii) Termination by Seller Prior to Commercial Operation Date.

(A) If Seller terminates this Agreement because of an Event of Default by Buyer prior to the Commercial Operation Date, Seller shall only receive a Termination Payment if the Commercial Operation Date either occurs on or before the Guaranteed Delivery Term Start Date or would have occurred by such date but for the Event of Default by Buyer giving rise to the termination of this Agreement. In such case, the Termination Payment due to Seller shall be calculated according to the methodology in Section 9.3(b)(iv)(A), as if the Commercial Operation Date had occurred prior to the date of the termination by Seller.

(B) If Seller terminates this Agreement prior to the Commercial Operation Date pursuant to Section 8.3(a) and the TSA is terminated pursuant to Section 3.3.3(a) or 3.3.5 of the TSA, the Termination Payment due to Buyer shall be equal to the sum of (x) all Delay Damages due and owing by Seller through the date of such termination plus (y) the full amount of the Fixed Credit Support required to be provided to Buyer by Seller in accordance with Section 6.1(b).

(iii) Termination by Buyer on or after Commercial Operation Date. If Buyer terminates this Agreement because of an Event of Default

by Seller occurring on or after the Commercial Operation Date, then the Termination Payment due to Buyer shall be equal to the amount, if positive, without duplication, calculated according to the following formula: (w) the present value, discounted at a rate equal to the prime rate specified in the "Money & Investing" section of *The Wall Street Journal* determined as of the date of the notice of default, plus 300 basis points, for each month remaining in the Services Term, of (A) the amount, if any, by which the forward market price of Energy and Environmental Attributes, as determined by the average of the quotes of at least two nationally recognized energy consulting firms or brokers chosen by Buyer, for Replacement Energy and Replacement Environmental Attributes, exceeds the applicable Price that would have been paid pursuant to Exhibit D, multiplied by (B) the amount of Guaranteed Qualified Clean Energy; plus (x) any costs reasonably incurred or to be reasonably incurred by Buyer for the Qualified Clean Energy not Delivered as a result of such termination in excess of such costs for Replacement Energy, plus (y) any costs and losses reasonably incurred by Buyer as a result of the Event of Default and termination of the Agreement; minus (z) any Owner Termination Payment (as defined in the TSA) received by Buyer pursuant to Section 3.3.5(b) of the TSA.

All such amounts shall be determined by Buyer in good faith and in a Commercially Reasonable Manner, and Buyer shall provide Seller with a reasonably detailed calculation of the Termination Payment due under this Section 9.3(b)(iii).

(iv) Termination by Seller On or After Commercial Operation Date.

(A) If Seller terminates this Agreement because of an Event of Default by Buyer occurring on or after the Commercial Operation Date, the Termination Payment due to Seller shall be equal to the amount, if positive, calculated according to the following formula:

(x) the present value, discounted at a rate equal to the prime rate specified in the "Money & Investing" section of *The Wall Street Journal* determined as of the date of the notice of default, plus 300 basis points, for each month remaining in the Services Term, of (I) the amount, if, any, by which the applicable Price that would have been paid pursuant to Exhibit D, exceeds the forward market price of Energy and Environmental Attributes as determined by the average of the quotes of at least two nationally recognized energy consulting firms or brokers chosen by Seller, for Replacement Energy and Replacement Environmental

Attributes, multiplied by (II) the amount of Guaranteed Qualified Clean Energy; plus,

(y) any costs and losses (including any transmission payments) reasonably incurred by Seller as a result of the Event of Default and termination of the Agreement.

(B) If Seller terminates this Agreement on or after the Commercial Operation Date pursuant to Section 8.3(a) due to a termination of the TSA resulting from a Non-Excused Outage under the TSA, the Termination Payment due to Buyer from Seller shall be equal to the Termination Payment calculated under Section 9.3(b)(iii)(A) (as if Section 9.3(b)(iii)(A) had applied to such termination event).

All such amounts shall be determined by Seller in good faith and in a Commercially Reasonable Manner, and Seller shall provide Buyer with a reasonably detailed calculation of the Termination Payment due under this Section 9.3(b)(iv).

(v) Acceptability of Liquidated Damages. Each Party agrees and acknowledges that (A) the damages and losses (including without limitation the loss of environmental, reliability and economic benefits contemplated under this Agreement) that the Parties would incur due to an Event of Default would be difficult or impossible to predict with certainty, and (B) it is impractical and difficult to assess actual damages in the circumstances stated, and therefore the Termination Payment as agreed to by the Parties and set forth herein is a fair and reasonable calculation of such damages.

(vi) Payment of Termination Payment. The Defaulting Party shall make the Termination Payment within ten (10) Business Days after such notice is effective, regardless of whether the Termination Payment calculation is disputed. If the Defaulting Party disputes the Non-Defaulting Party's calculation of the Termination Payment, in whole or in part, the Defaulting Party shall within ten (10) Business Days after receipt of the calculation of the Termination Payment, provide to the Non-Defaulting Party a detailed written explanation of the basis for such dispute. If the Parties are unable to resolve the dispute within thirty (30) days, Article 11 shall apply.

(c) Set-off. The Non-Defaulting Party shall be entitled, at its option and in its discretion, to withhold and set off any amounts owed by the Non-Defaulting Party to the Defaulting Party against any payments and any other amounts owed by the Defaulting Party to the Non-Defaulting Party, including any Termination Payment payable as a result of any early termination of this Agreement.

(d) Limitation of Remedies, Liability and Damages. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED. THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

## 10. FORCE MAJEURE

10.1 Force Majeure.

(a) The term "**Force Majeure**" shall mean (i) an event: (A) that was not within the control of the Party claiming its occurrence; (B) that could not have been prevented or avoided by such Party through the exercise of reasonable diligence; and (C) that directly prohibits or prevents such Party from performing its obligations under this Agreement, (ii) an Excused Outage, (iii) any failure by Seller to satisfy any of its obligations to Deliver any of the Products or any portion of the Products that is caused by or arises from a Force Majeure under the TSA that is not caused, in whole or in part, by any act or omission by Seller or any of its Affiliates and that directly prohibits or prevents Seller from performing its obligations under this Agreement, or (iv) a Reliability Curtailment that is not caused, in whole or in part, by any act or omission by Seller or any of its Affiliates and that directly prohibits or prevents Seller from performing its obligations under this Agreement. Under no circumstances shall Force Majeure include (t) a change in Law or accounting standards or rules or a change in the interpretation or applicability thereof under Section 19.7(a), (u) an Adverse Determination, (v) any full or partial curtailment in the electric output of the Hydro-Québec Power Resources or in the operation of the Québec Line, in each case, that is caused by or arises from a mechanical or equipment breakdown or other mishap or events or conditions attributable to normal wear and tear or flaws at the Hydro-Québec Power Resources or the Québec Line, unless such curtailment or mishap is caused by one of the following: acts of God such as floods, hurricanes or tornados, or other

significantly unusual and abnormal weather conditions such as severe blizzards or severe ice storms; sabotage; terrorism; or war, (w) any occurrence or event that merely increases the costs or causes an economic hardship to a Party, including due to changes in market conditions, (x) any occurrence or event that was caused by or contributed to by the Party claiming the Force Majeure, (y) Seller's ability to sell the Qualified Clean Energy or Qualified Shortfall Energy or associated Environmental Attributes at a price greater than that set out in this Agreement, or (z) Buyer's ability to procure the Qualified Clean Energy at a price lower than that set out in this Agreement. In addition, a delay or inability to perform attributable to a Party's lack of preparation, a Party's failure to timely obtain and maintain, or cause to be obtained and maintained, all necessary Permits (excepting the Regulatory Approval) or qualifications, a failure to satisfy contractual conditions or commitments, or lack of or deficiency in funding or other resources shall each not constitute a Force Majeure or be the basis for a claim of Force Majeure. Seller may not raise a claim of Force Majeure based, in whole or in part, on curtailment by a Transmission Provider unless (I) either Party has contracted for firm transmission with a Transmission Provider for the Products to be delivered to or received at the Delivery Point and (II) such curtailment is due to "force majeure" or "uncontrollable force" or a similar term as defined under the Transmission Provider's transmission service agreement or tariff.

(b) Subject to Section 3.1(d), if either Party is unable, wholly or in part, by Force Majeure to perform obligations under this Agreement, such performance shall be excused and suspended so long as the circumstances that give rise to such inability exist or would exist if the Party claiming the Force Majeure used Commercially Reasonable Efforts to cure such circumstances, but for no longer period. The Party whose performance is affected shall give prompt notice thereof; such notice may be given orally or in writing but, if given orally, it shall be promptly confirmed in writing, providing details regarding the nature, extent and expected duration of the Force Majeure, its anticipated effect on the ability of such Party to perform obligations under this Agreement, and the estimated duration of any interruption in service or other adverse effects resulting from such Force Majeure, and shall be updated or supplemented to keep the other Party advised of the effect and remedial measures being undertaken to overcome the Force Majeure. Such inability to perform shall be promptly corrected to the extent it may be corrected through the exercise of due diligence. Neither Party shall be liable for any losses or damages arising out of a suspension of performance that occurs because of Force Majeure.

(c) Notwithstanding the foregoing, if the Force Majeure prevents (x) full performance or (y) Delivery of the Guaranteed Qualified Clean Energy in any material respect under this Agreement for a period of twelve (12) consecutive months or more:

(i) except in the case provided in clause (ii) below, the Party whose performance is not prevented by Force Majeure shall have the right, upon written notice to the other Party, to terminate this Agreement; provided, however, that, in the case of any failure by Seller to satisfy any of its obligations to Deliver any of the Products or any portion of the Products that is caused by or arises from a Force Majeure affecting the Hydro-Québec Power Resources or the Québec Line, if (A) Seller presents a request to delay termination of this Agreement pursuant to this Section

10.1(c) for a period not to exceed twelve (12) months, together with a detailed plan (including reasonably satisfactory evidence of Hydro-Québec's or TransÉnergie's financial and technical capability to timely effectuate such plan) to restore the electric output of the Hydro-Québec Power Resources and the availability of the Québec Line such that Seller will be capable of fulfilling its minimum Delivery obligations hereunder, to Buyer before the end of the initial twelve (12) month period in which Seller's ability to Deliver has been prevented, in whole or in part, by such an event of Force Majeure and without duplication of any similar request to delay termination has been or will be made under the TSA with respect to the same event or condition, and (B) Seller pays the full Transmission Service Payment (as defined in the TSA) that Buyer otherwise would be required to pay U.S. Transmission Provider in such instance, then Buyer shall forbear terminating this Agreement under this Section 10.1(c) for the duration of such period; provided, further, however, that, in the event that Buyer, acting in a Commercially Reasonable Manner, determines that Seller is not fulfilling its minimum Delivery obligations hereunder at the end of such period, or if Seller fails to exercise diligent, Commercially Reasonable Efforts to timely effectuate such plan, Buyer may terminate this Agreement. A termination of this Agreement pursuant to this Section 10.1(c)(i) shall be without further recourse to either Party. In no event will any delay or failure of performance caused by any conditions or events of Force Majeure extend this Agreement beyond its stated Term;

(ii) in the case of a failure by Seller to satisfy any of its obligations to Deliver any of the Products or any portion of the Products that is caused by or arises from a Force Majeure under, and as defined in, the TSA that is not caused, in whole or in part, by any act or omission by Seller or any of its Affiliates and that directly prohibits or prevents Seller from performing its obligations under this Agreement, Buyer shall have the right, upon written notice to Seller, to terminate this Agreement on the later of (x) the date that is twelve (12) months after the commencement of such Force Majeure or (y) the termination of the period during which Buyer is forbearing from terminating the TSA to permit U.S. Transmission Provider to resolve such Force Majeure under Section 15.1(c) of the TSA. A termination of this Agreement pursuant to this Section 10.1(c)(ii) shall be without further recourse to either Party. In no event will any delay or failure of performance caused by any conditions or events of Force Majeure extend this Agreement beyond its stated Term.

## 11. DISPUTE RESOLUTION

11.1 Consultation.

(a) In the event of any dispute, controversy or claim between the Parties arising out of or relating to this Agreement (collectively, a "**Dispute**"), in addition to any other remedies provided hereunder, the Parties shall initially attempt to resolve any Dispute through consultations between the Parties. Subject to Section 11.2 and except as expressly provided otherwise in this Agreement, if a Dispute has not been timely resolved pursuant to this clause (a) within fifteen (15) Business Days after written notice of such Dispute has been given, then either Party may seek to resolve such Dispute in the courts of the Commonwealth of Massachusetts or a U.S. District Court in the Commonwealth of Massachusetts and any appellate court from any thereof; provided, however, that, if the Dispute is subject to Section 11.2, then either Party may elect to proceed with the mediation through FERC's Dispute Resolution Service. If one Party fails to participate in the consultations provided for in this Section 11.1, the other Party can initiate mediation prior to the expiration of the fifteen (15) Business Days. Unless otherwise agreed, the Parties will select a mediator from the FERC panel. The Parties may, by written agreement signed by both Parties, alter any time deadline, location(s) for meeting(s), or procedure outlined herein or in FERC's rules for mediation. The procedure specified herein shall be the sole and exclusive procedure for the resolution of Disputes.

(b) All negotiations, consultations, and mediations pursuant to this Section 11.1 shall be deemed to be confidential and shall be treated as compromise and settlement negotiations, and no evidence with regard to any proposal made during such negotiations, consultations, or mediations shall be admissible in any FERC proceeding or filing under Section 11.2 or in any other judicial or other proceeding.

(c) The fees and expenses associated with mediation shall be divided equally between the Parties, and each Party shall be responsible for its own legal fees, including but not limited to attorney fees, associated with any Dispute.

11.2 Disputes to be Resolved by FERC.

(a) In the event that a Dispute over any matter under the primary or exclusive jurisdiction of FERC (a "**FERC Jurisdictional Issue**") is not resolved in accordance with Section 11.1, either Party shall have the right to file for relief with FERC; provided that, in the event either Party objects to the reference of any such matter to FERC on the ground that such matter is not subject to the primary or exclusive jurisdiction of FERC, the matter shall be referred to FERC for resolution of the Dispute as to whether or not such matter is subject to the primary or exclusive jurisdiction of FERC. Nothing contained in this Agreement shall be construed as precluding a Party from filing any answer, protest or other opposition to any FERC filing made by the other Party, unless expressly prohibited under the terms of this Agreement.

(b) In the event that any Dispute is submitted to FERC for resolution as provided in Section 11.2(a), the Party submitting the Dispute to FERC shall be responsible for providing written notice of such filing to the other Party and to U.S. Transmission Provider. The Parties agree to support the consolidation of Disputes involving FERC Jurisdictional Issues that arise under this Agreement and are common to disputes involving FERC Jurisdictional Issues

that arise under the TSA or any other Proposal Agreement (as defined in the TSA). Notwithstanding the foregoing, in the event that FERC determines that it does not have the jurisdiction to, or otherwise does not want to, hear or determine any portion of a Dispute or other matter so referred to FERC, either Party may seek to resolve such Dispute in the courts of the Commonwealth of Massachusetts or a U.S. District Court in the Commonwealth of Massachusetts and any appellate court from any thereof.

11.3 Consent to Jurisdiction. Subject to Section 11.2, each Party agrees that any legal action or proceeding with respect to or arising out of this Agreement or the TSA shall be brought in or removed to the courts of the Commonwealth of Massachusetts or a U.S. District Court in the Commonwealth of Massachusetts and any appellate court from any thereof. By execution and delivery of this Agreement, each Party hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. The Parties irrevocably consent to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified airmail, postage prepaid, to the applicable Party at its respective addresses for notices as specified in Article 17. Nothing herein shall affect the right to serve process in any other manner permitted by law. Each Party hereby waives any right to stay or dismiss any action or proceeding under or in connection with this Agreement or the TSA brought before the foregoing courts on the basis of forum non-conveniens.

11.4 **Waiver of Jury Trial. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

## 12. CONFIDENTIALITY

12.1 Nondisclosure. Buyer and Seller each agrees not to disclose to any Person and to keep confidential, and to cause and instruct its Affiliates, officers, directors, employees, partners and representatives not to disclose to any Person and to keep confidential, any non-public information relating to the terms and provisions of this Agreement, and any information relating to the Products to be supplied by Seller hereunder, and such other non-public information that is designated as “Confidential.” Notwithstanding the foregoing, any such information may be disclosed:

(a) to the extent Buyer determines it is appropriate in connection with efforts to obtain or maintain the Regulatory Approval or to seek rate recovery for amounts expended by Buyer under this Agreement;

(b) as required by applicable laws, regulations, filing requirements, rules or orders or by any subpoena or similar legal process of any Governmental Entity so long as the disclosing Party gives the non-disclosing Party written notice at least two (2) Business Days prior to such disclosure, if practicable;

(c) to the Affiliates of either Party and to the consultants, attorneys, auditors, financial and other advisors, lenders or investors or potential lenders or investors and their advisors of either Party or their Affiliates, but solely to the extent they have a need to know that information;

(d) in order to comply with any rule or regulation of ISO-NE, other system operators, as applicable, or of any stock exchange or similar Person or for financial disclosure purposes;

(e) to the extent the non-disclosing Party shall have consented in writing prior to any such disclosure; and

(f) to the extent that the information was previously made publicly available other than as a result of a breach of this Section 12.1;

provided, however, that, in each case, that the Party seeking such disclosure shall, to the extent practicable, use Commercially Reasonable Efforts to prevent or limit the disclosure. The Parties shall be entitled to all remedies available at law or in equity to enforce or seek relief in connection with this Section 12.1.

12.2 Public Statements. No public statement, press release or other voluntary publication regarding this Agreement or the transactions to be made hereunder shall be made or issued without the prior consent of the other Party.

## 13. INDEMNIFICATION

13.1 Indemnification Obligations. Seller shall indemnify, defend and hold Buyer and its partners, shareholders, directors, officers, employees and agents (including, but not limited to, Affiliates and contractors and their employees), harmless from and against all liabilities, damages, losses, penalties, claims, demands, suits and proceedings of any nature whatsoever arising from or related to Seller's execution, delivery or performance of this Agreement, or Seller's negligence, gross negligence, or willful misconduct, or Seller's failure to satisfy any obligation or liability under this Agreement or Seller's failure to satisfy any regulatory requirement or commitment associated with this Agreement.

13.2 Failure to Defend. If Seller fails to assume the defense of a claim meriting indemnification, Buyer may at the expense of Seller contest, settle or pay such claim, and shall promptly reimburse Buyer for all costs incurred by Buyer associated therewith.

## 14. ASSIGNMENT AND CHANGE OF CONTROL

14.1 Prohibition on Assignments. Except as permitted under this Article 14, this Agreement (and any portion thereof) may not be assigned by either Party without the prior written consent of the other Party, which consent may not be unreasonably withheld, conditioned or delayed. The Party requesting the other Party's consent to an assignment of this Agreement will reimburse such other Party for all "out of pocket" costs and expenses such other Party reasonably incurs in connection with that consent, without regard to whether such consent is provided. When assignable, this Agreement shall be binding upon, shall inure to the benefit of,

and may be performed by, the successors and assignees of the Parties, except that no assignment, pledge or other transfer of this Agreement by either Party shall operate to release the assignor, pledgor, or transferor from any of its obligations under this Agreement (and shall not impair any Credit Support given by Seller hereunder or the Seller Guaranty) unless the other Party (or its successors or assigns) consents in writing to the assignment, pledge or other transfer and expressly releases the assignor, pledgor, or transferor from its obligations thereunder.

14.2 Permitted Assignment by Seller. Buyer's consent shall not be required for Seller or its Affiliates to pledge or assign the Hydro-Québec Power Resources, this Agreement or the revenues under this Agreement, in each case, to any Affiliate of Seller; provided, however, that, if Seller requests Buyer's consent to an assignment, (a) Buyer shall provide that consent subject to Buyer's execution of a consent to assignment in a form acceptable to Buyer and Seller, and (b) Seller will reimburse Buyer for all "out of pocket" costs and expenses Buyer reasonably incurs in connection with that consent, without regard to whether such consent is provided. Provided that Seller maintains its ability to continue to satisfy Seller's obligation to perform under this Agreement, Buyer's consent shall not be required for Seller or its Affiliates to sell or transfer any interest in the Hydro-Québec Power Resources.

14.3 Change in Control over Seller. Buyer's consent shall be required for any change in Control over Seller, except to the extent such change in Control results from the direct or indirect transfer of interests in Hydro-Québec, which consent shall not be unreasonably withheld, conditioned or delayed and shall be provided if Buyer reasonably determines that such change in Control does not have a material adverse effect on Seller's creditworthiness or Seller's ability to perform its obligations under this Agreement.

14.4 Permitted Assignment by Buyer.

(a) Buyer shall have the right to assign this Agreement without consent of Seller:

(i) in connection with any merger or consolidation of Buyer with or into another Person or any exchange of all of the common stock or other equity interests of Buyer or Buyer's parent for cash, securities or other property or any acquisition, reorganization, or other similar corporate transaction involving all or substantially all of the common stock or other equity interests in, or assets of, Buyer; provided that (x) either (A) the proposed assignee's credit rating is at least either "BBB-" from S&P or "Baa3" from Moody's or (B) the proposed assignee's credit rating is equal to or better than that of Buyer at the time of the proposed assignment or (y) if such approval is required under applicable Law, the transaction associated with such assignment, has been approved by the MDPU or the appropriate Governmental Entity, in each case, with an express assumption of Buyer's obligations hereunder in writing, reasonably acceptable to Seller and Buyer; or

(ii) to any substitute purchaser of the Products; provided that (x) both (A) the proposed assignee's credit rating is at least either "BBB-"

from S&P or "Baa3" from Moody's and (B) the proposed assignee's credit rating is equal to or better than that of Buyer at the time of the proposed assignment, and (y) if such approval is required under applicable Law, such assignment has been approved by the MDPU or the appropriate Governmental Entity, in each case, with an express assumption of Buyer's obligations hereunder in writing, reasonably acceptable to Seller and Buyer. For purposes of clarification, an assignment of this Agreement pursuant to this clause (ii) includes an assignment to any third party other than the successor in interest to Buyer pursuant to a transaction to which clause (i) applies.

14.5 Prohibited Assignments. Any purported assignment of this Agreement not in compliance with the provisions of this Article 14 shall be null and void.

## 15. TITLE; RISK OF LOSS

Title to and risk of loss related to (a) Qualified Clean Energy shall transfer from Seller to Buyer at the Delivery Point and (b) Qualified Shortfall Energy shall transfer from Seller to Buyer at the Delivery Point or the NEMASSBOST Hub, as applicable. Title to and risk of loss related to the associated Environmental Attributes shall transfer to Buyer when the same are credited to Buyer's GIS account(s) or the GIS account(s) designated by Buyer to Seller in writing. Seller warrants that it shall deliver to Buyer the Products free and clear of all liens and claims therein or thereto by any Person.

## 16. AUDIT

16.1 Audit. Each Party shall have the right, upon reasonable advance notice, and at its sole expense (unless the other Party has defaulted under this Agreement, in which case the Defaulting Party shall bear the expense) and during normal working hours, to examine the records of the other Party to the extent reasonably necessary to verify the accuracy of any statement, charge or computation made pursuant to this Agreement. If requested, a Party shall provide to the other Party additional information documenting the quantities of Qualified Clean Energy or Qualified Shortfall Energy, as applicable, and associated Environmental Attributes Delivered or provided hereunder. If any such examination reveals any overcharge, the necessary adjustments in such statement and the payments thereof shall be made promptly and shall include interest at the Late Payment Rate from the date the overpayment was made until credited or paid.

16.2 Access to Financial Information. Seller shall provide to Buyer, within fifteen (15) days after receipt of Buyer's written request, applicable financial information and statements of Hydro-Québec, as reasonably necessary for Buyer to address any reasonable inquiries relating to Seller's financial resources.

## 17. NOTICES

Any notice or communication given pursuant hereto shall be in writing and (a) delivered personally (personally delivered notices shall be deemed given upon written acknowledgment of receipt after delivery to the address specified or upon refusal of receipt); or (b) mailed by

registered or certified mail, postage prepaid (mailed notices shall be deemed given on the actual date of delivery, as set forth in the return receipt, or upon refusal of receipt); or (c) delivered by fax or electronic mail (notices sent by fax or electronic mail shall be deemed given upon confirmation of delivery); or (d) by reputable overnight courier; in each case, addressed as follows or to such other addresses as may hereafter be designated by either Party to the other in writing:

If to Buyer: James G. Daly, Vice President – Energy Supply
Eversource Energy
247 Station Drive/ SE250
Westwood, MA 02090

With a copy to: Legal Department
Eversource Energy
800 Boylston Street / P1701
Boston MA 02199

If to Seller: H.Q. Energy Services (U.S.) Inc.
75, René-Lévesque Boulevard West, 18th Floor
Montréal (Québec) Canada
H2Z 1A4
Attention: General Manager

For billing purposes only:

H.Q. Energy Services (U.S.) Inc.
75, René-Lévesque Boulevard West, 18th Floor
Montréal (Québec) Canada
H2Z 1A4
Attention: Billing Manager

For scheduling purposes only:

H.Q. Energy Services (U.S.) Inc.
75, René-Lévesque Boulevard West, 18th Floor
Montréal (Québec) Canada
H2Z 1A4
Attention: Manager Whole Sale Market – East

For credit purposes only:

H.Q. Energy Services (U.S.) Inc.
75, René-Lévesque Boulevard West, 18th Floor
Montréal (Québec) Canada
H2Z 1A4
Attention: Credit Risk Advisor

With a copy to:

H.Q. Energy Services (U.S.) Inc.
75, René-Lévesque Boulevard West, 18th Floor
Montréal (Québec) Canada
H2Z 1A4
Attention: General Counsel and Vice President – Legal Affairs

## 18. WAIVER AND MODIFICATION

This Agreement may be amended and its provisions and the effects thereof waived only by a writing executed by the Parties, and no subsequent conduct of any Party or course of dealings between the Parties shall effect or be deemed to effect any such amendment or waiver. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided. The failure of either Party to enforce any provision of this Agreement shall not be construed as a waiver of or acquiescence in or to such provision. Buyer shall determine in its sole discretion whether any amendment or waiver of the provisions of this Agreement shall require Regulatory Approval or MDPU filing and/or approval. If Buyer determines that any such approval or filing is required, then such amendment or waiver shall not become effective unless and until Regulatory Approval or such other approval is received, or such MDPU filing is made and any requested MDPU approval is received.

## 19. INTERPRETATION

19.1 Choice of Law. Interpretation and performance of this Agreement shall be in accordance with, and shall be controlled by, the laws of the Commonwealth of Massachusetts (without regard to its principles of conflicts of law).

19.2 Headings. Article and Section headings are for convenience only and shall not affect the interpretation of this Agreement. References to articles, sections and exhibits are, unless the context otherwise requires, references to articles, sections and exhibits of this Agreement. The words "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

19.3 Forward Contract. The Parties acknowledge and agree that this Agreement and the transactions contemplated hereunder are a "forward contract" within the meaning of the United States Bankruptcy Code.

19.4 Standard of Review. The Parties acknowledge and agree that the standard of review for any avoidance, breach, rejection, termination or other cessation of performance of or changes to any portion of this integrated, non-severable Agreement (as described in Article 24) over which FERC has jurisdiction, whether proposed by Seller, by Buyer, by a non-party of, by FERC acting *sua sponte* shall be the "public interest" standard of review set forth in *United Gas Pipe Line Co. v. Mobile Gas Serv. Co.*, 350 U.S. 332 (1956) and *Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956). Each Party agrees that if it seeks to amend any applicable power sales tariff during the Term, such amendment shall not in any way materially and adversely affect this Agreement without the prior written consent of the other Party. Each

Party further agrees that it shall not assert, or defend itself, on the basis that any applicable tariff is inconsistent with this Agreement.

19.5 Change in ISO-NE Rules and Practices. This Agreement is subject to the ISO-NE Rules and ISO-NE Practices. If, during the Term, any ISO-NE Rule or ISO-NE Practice relating to the Delivery of Energy to the Delivery Point is terminated, modified or amended or is otherwise no longer applicable, resulting in a material alteration of a material right or obligation of a Party hereunder, the Parties agree to negotiate in good faith in an attempt to amend or clarify this Agreement to embody the Parties' original intent regarding their respective rights and obligations under this Agreement; provided that neither Party shall have any obligation to agree to any particular amendment or clarification of this Agreement. The intent of the Parties is that any such amendment or clarification reflect, as closely as possible, the intent, substance and effect of the ISO-NE Rule or ISO-NE Practice being replaced, modified, amended or made inapplicable as such ISO-NE Rule or ISO-NE Practice was in effect prior to such termination, modification, amendment, or inapplicability; provided that such amendment or clarification shall not in any event alter (a) the purchase and sale obligations of the Parties pursuant to this Agreement or (b) the Price. In the event that the Parties cannot agree upon such amendments within sixty (60) days after such ISO-NE Rule or ISO-NE Practice change described above, the Dispute shall be resolved in accordance with Article 11.

19.6 Dodd Frank Act Representations. The Parties agree that this Agreement (including all transactions reflected herein) is not a "swap" within the meaning of the Commodity Exchange Act and the rules, interpretations and other guidance of the Commodity Futures Trading Commission (**"CFTC rules"**), and that the primary intent of this Agreement is physical settlement (i.e., actual transfer of ownership) of the nonfinancial commodity and not solely to transfer price risk. In reliance upon such agreement, each Party represents to the other that:

(a) With respect to the commodity to be purchased and sold hereunder, it is a commercial market participant, a commercial entity and a commercial party, as such terms are used in the CFTC rules, and it is a producer, processor, or commercial user of, or a merchant handling, the commodity and it is entering into this Agreement for purposes related to its business as such;

(b) It is not registered or required to be registered under the CFTC rules as a swap dealer or a major swap participant;

(c) It has entered into this Agreement in connection with the conduct of its regular business and it has the capacity or ability to regularly make or take delivery of the commodity to be purchased and sold hereunder;

(d) With respect to the commodity to be purchased and sold hereunder, it intends to make or take physical delivery of the commodity;

(e) At the time that the Parties enter into this Agreement, any embedded volumetric optionality in this Agreement is primarily intended by the holder of such option or optionality to address physical factors or regulatory requirements that reasonably influence demand for, or supply of, the commodity to be purchased and sold hereunder;

(f) With respect to any embedded commodity option in this Agreement, such option is intended to be physically settled so that, if exercised, the option would result in the sale of the commodity to be purchased or sold hereunder for immediate or deferred shipment or delivery;

(g) The commodity to be purchased and sold hereunder is a nonfinancial commodity, and is also an exempt commodity or an agricultural commodity, as such terms are defined and interpreted in the CFTC rules.

To the extent that reporting of any transactions related to this Agreement is required by the CFTC rules, the Parties agree that Seller shall be responsible for such reporting (the "**Reporting Party**"). The Reporting Party's reporting obligations shall continue until the reporting obligation has expired or has been terminated in accordance with CFTC rules. Buyer, as the Party that is not undertaking the reporting obligations shall timely provide the Reporting Party all necessary information requested by the Reporting Party for it to comply with CFTC rules.

19.7 Change in Law or Buyer's Accounting Treatment, Subsequent Judicial or Regulatory Action.

(a) If, during the Term, there is a change in Law or accounting standards or rules or a change in the interpretation or applicability thereof that, in each case, would result in adverse balance sheet or creditworthiness impacts on Buyer associated with this Agreement or the amounts paid for Products purchased hereunder, Buyer shall prepare an amendment to this Agreement to avoid or mitigate such impacts. Buyer shall use Commercially Reasonable Efforts to prepare such amendment in a manner that mitigates any material adverse effect(s) on Seller (as identified by Seller acting reasonably) that could reasonably be expected to result from such amendment, but only to the extent that such mitigation can be accomplished in a manner that is consistent with the purpose of such amendment. Seller agrees to execute such amendment provided that such amendment does not (unless Seller otherwise agrees) (i) alter the purchase and sale obligations of the Parties, including any changes to the Products, (ii) alter the Price or (iii) materially increase the cost to Seller of performance under this Agreement (except as contemplated by Sections 4.7(b) and 4.7(c)). In the event that the Parties cannot agree upon such amendment within sixty (60) days after the change described above necessitating such amendment, the Dispute shall be resolved in accordance with Article 11.

(b) Upon a determination by a court or regulatory body having jurisdiction over this Agreement or any of the Parties hereto, or over the establishment and enforcement of any of the statutes or regulations or orders or actions of regulatory agencies (including the MDPU) supporting this Agreement or the rights or obligations of the Parties hereunder that any of the statutes or regulations supporting this Agreement or the rights or obligations of the Parties hereunder, or orders of or actions of regulatory agencies (including the MDPU) implementing such statutes or regulations, or this Agreement on its face or as applied, violates any applicable Law (including the State or Federal Constitution) (an "**Adverse Determination**"), each Party shall have the right to suspend performance under this Agreement without liability. Seller may deliver and sell Products to a third party during any period of time for which Buyer suspends payments or purchases under this Section 19.7(b). Upon an Adverse Determination becoming

final and non-appealable, this Agreement shall be rendered null and void, and no Termination Payment shall be due to either Party.

## 20. ASSIGNMENT OF TRANSMISSION RIGHTS

(a) As of the Effective Date, Buyer has entered into the TSA, pursuant to which Buyer has agreed to pay for all costs of transmission related to Delivery by Seller over the U.S. Transmission Line hereunder. Notwithstanding anything to the contrary herein, including but not limited to the allocation of costs and responsibilities described in Section 3.6, Section 4.2(c) and Section 4.5(b), the Parties acknowledge and agree that (i) Buyer has the obligation to pay its Proportionate Share (as defined in the TSA) of the Transmission Service Payments (as defined in the TSA) pursuant to the TSA, (ii) such Transmission Service Payments are calculated under Section 8.1 of the TSA based on the cost of transmission service over the U.S. Transmission Line. In respect of Seller's obligations to deliver, Buyer hereby transfers, assigns and conveys to Seller all of its rights, title and interest in and to the Firm Transmission Service, Other Transmission Rights and Market Products (each as defined in the TSA) and Seller hereby accepts the assignment of such rights, title and interest in and to such Firm Transmission Service, Other Transmission Rights and Market Products (each as defined in the TSA) and collectively referred to as **"<u>TSA Transmission Rights</u>"**). If and to the extent Seller determines from time to time, and in its sole discretion, that all or any portion of the TSA Transmission Rights are not required to accomplish Delivery, Seller shall then offer to resell such unused TSA Transmission Rights to third parties in accordance with applicable Law as may then be in effect (including the terms and conditions of FERC Order No. 890 et seq., if applicable). Seller may post such offers on the Open Access Same-Time Information System (OASIS) site established by U.S. Transmission Provider pursuant to Section 10.4 of the TSA. Seller shall use Commercially Reasonable Efforts to maximize the revenues obtained through resales of any TSA Transmission Rights that Seller determines to be excess to its needs. Seller shall credit the Proportionate Share (as defined in the TSA) of ninety percent (90%) of the proceeds Seller receives through any resale of TSA Transmission Rights, net of reasonable fees (including attorneys' fees) and other expenses incurred in connection with such resale, to Buyer pursuant to Section 5.2(d). If Buyer receives from U.S. Transmission Provider any proceeds of a resale of TSA Transmission Rights assigned to Seller pursuant to this Article 20, Buyer shall then credit ten percent (10%) of such proceeds, net of reasonable fees (including attorneys' fees) and other expenses incurred in connection with such resale, to Seller pursuant to Section 5.2(d).

(b) Notwithstanding the assignment of the TSA Transmission Rights from Buyer to Seller under this Article 20, nothing set forth in this Agreement shall be construed to require Seller to pay, reimburse or indemnify Buyer for (i) any amounts that are the responsibility of U.S. Transmission Provider under the terms of the TSA, including, but not limited to, costs for Network Upgrades or (ii) any amounts paid by Buyer under the TSA, except in the case of clause (ii), (x) as provided in Sections 3.5(j) and 10.1(c)(i) and Exhibit H, (y) in connection with any Cover Damages due from Seller or (z) in connection with any Termination Payment due from Seller. Nothing in the preceding sentence shall be construed to limit any amounts that Seller would otherwise owe Buyer in accordance with Section 13.1.

## 21. WAIVER OF IMMUNITIES

The Parties acknowledge and agree that this Agreement and the transactions contemplated hereby constitute a commercial transaction. To the extent a Party (including any assignees of a Party's rights or obligations under this Agreement) may be entitled, in any jurisdiction, to claim for itself, or any of its assets, revenues or properties, sovereign or other immunity, as the case may be, from service of process, suit, the jurisdiction of any court or arbitral tribunal, attachment (whether in aid of execution or otherwise) or enforcement of a judgment (interlocutory or final) or award or any other legal process in a matter arising out of or relating to this Agreement, each Party agrees not to claim or assert, and hereby waives, such immunity. Without limiting the generality of the foregoing, each Party agrees that the waivers set forth in this Article 21 shall have the fullest scope permitted under the Immunities Act and under any other applicable Law related to sovereign immunity.

## 22. COUNTERPARTS; FACSIMILE SIGNATURES

Any number of counterparts of this Agreement may be executed, and each shall have the same force and effect as an original. Facsimile signatures hereon or on any notice or other instrument delivered under this Agreement shall have the same force and effect as original signatures.

## 23. NO DUTY TO THIRD PARTIES

Except as provided in any consent to assignment of this Agreement, nothing in this Agreement nor any action taken hereunder shall be construed to create any duty, liability or standard of care to any Person not a Party to this Agreement.

## 24. SEVERABILITY

Except as otherwise provided in Article 8 or Section 19.5 or 19.7, if any term or provision of this Agreement or the interpretation or application of any term or provision to any prior circumstance is held to be unenforceable, illegal or invalid by a court or agency of competent jurisdiction, the remainder of this Agreement and the interpretation or application of all other terms or provisions to Persons or circumstances other than those which are unenforceable, illegal or invalid shall not be affected thereby, and each term and provision shall be valid and be enforced to the fullest extent permitted by law so long as all essential terms and conditions of this Agreement for both Parties remain valid, binding and enforceable and have not been declared to be unenforceable, illegal or invalid by a Governmental Entity of competent jurisdiction. The Parties acknowledge and agree that essential terms and conditions of this Agreement for each Party include, without limitation, all pricing and payment terms and conditions of this Agreement, and that the essential terms and conditions of this Agreement for Buyer also include, without limitation, the terms and conditions of Section 19.6.

## 25. INDEPENDENT CONTRACTOR

Nothing in this Agreement shall be construed as creating any relationship between Buyer and Seller other than that of Seller as independent contractor for the sale of Products, and Buyer as principal and purchaser of the same. Neither Party shall be deemed to be the agent of the

other Party for any purpose by reason of this Agreement, and no partnership or joint venture or fiduciary relationship between the Parties is intended to be created hereby. Nothing in this Agreement shall be construed as creating any relationship between Buyer and the Interconnecting Utility.

## 26. ENTIRE AGREEMENT

This Agreement shall constitute the entire agreement and understanding between the Parties hereto and shall supersede all prior agreements and communications.

[Signature page follows]

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Agreement to be duly executed on its behalf as of the date first above written.

**NSTAR ELECTRIC COMPANY d/b/a EVERSOURCE ENERGY, as Buyer**

By: J.G. Daly
Name: James G. Daly
Title: Vice President – Energy Supply

**H.Q. ENERGY SERVICES (U.S.) INC., as Seller**

By: ______________________
Name: David Murray
Title: Chairman of the Board and President

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Agreement to be duly executed on its behalf as of the date first above written.

**NSTAR ELECTRIC COMPANY, D/B/A EVERSOURCE ENERGY, as Buyer**

By: ______________________________

Name: James G. Daly

Title: Vice President – Energy Supply

**H.Q. ENERGY SERVICES (U.S.) INC., as Seller**

By: ______________________________

Name: David Murray

Title: Chairman of the Board and President

**EXHIBIT A**

DESCRIPTION OF HYDRO-QUÉBEC POWER RESOURCES

The Hydro-Québec Power Resources shall include the following facilities as of the Effective Date:

| | Name of Facility | Location |
|---|---|---|
| Facility #1 | Robert-Bourassa | Québec |
| Facility #2 | La Grande-4 | Québec |
| Facility #3 | La Grande-3 | Québec |
| Facility #4 | La Grande 2-A | Québec |
| Facility #5 | Beauharnois | Québec |
| Facility #6 | Manic-5 | Québec |
| Facility #7 | La Grande-1 | Québec |
| Facility #8 | René-Lévesque (Manic-3) | Québec |
| Facility #9 | Jean-Lesage (Manic-2) | Québec |
| Facility #10 | Bersimis-1 | Québec |
| Facility #11 | Manic-5-PA | Québec |
| Facility #12 | Outardes-3 | Québec |
| Facility #13 | Sainte-Marguerite-3 | Québec |
| Facility #14 | Laforge-1 | Québec |
| Facility #15 | Bersimis-2 | Québec |
| Facility #16 | Outardes-4 | Québec |
| Facility #17 | Eastmain-1-A | Québec |
| Facility #18 | Carillon | Québec |
| Facility #19 | Romaine-2 | Québec |
| Facility #20 | Toulnustouc | Québec |
| Facility #21 | Outardes-2 | Québec |
| Facility #22 | Eastmain-1 | Québec |
| Facility #23 | Brisay | Québec |
| Facility #24 | Péribonka | Québec |
| Facility #25 | Laforge-2 | Québec |
| Facility #26 | Trenche | Québec |
| Facility #27 | La Tuque | Québec |
| Facility #28 | Beaumont | Québec |
| Facility #29 | Romaine-1 | Québec |
| Facility #30 | McCormick | Québec |
| Facility #31 | Rocher-de-Grand-Mère | Québec |
| Facility #32 | Paugan | Québec |
| Facility #33 | Rapide-Blanc | Québec |

| | Name of Facility | Location |
|---|---|---|
| Facility #34 | Shawinigan-2 | Québec |
| Facility #35 | Shawinigan-3 | Québec |
| Facility #36 | Manic-1 | Québec |
| Facility #37 | Rapides-des-Îles | Québec |
| Facility #38 | Chelsea | Québec |
| Facility #39 | Sarcelle | Québec |
| Facility #40 | La Gabelle | Québec |
| Facility #41 | Première-Chute | Québec |
| Facility #42 | Les Cèdres | Québec |
| Facility #43 | Rapides-Farmer | Québec |
| Facility #44 | Rapides-des-Quinze | Québec |
| Facility #45 | Chute-des-Chats | Québec |
| Facility #46 | Rapide-des-Cœurs | Québec |
| Facility #47 | Grand-Mère | Québec |
| Facility #48 | Rapide-2 | Québec |
| Facility #49 | Rapide-7 | Québec |
| Facility #50 | Chute-Allard | Québec |
| Facility #51 | Bryson | Québec |
| Facility #52 | Mercier | Québec |
| Facility #53 | Rivière-des-Prairies | Québec |
| Facility #54 | Hart-Jaune | Québec |
| Facility #55 | Chute-Hemmings | Québec |
| Facility #56 | Sept-Chutes | Québec |
| Facility #57 | Drummondville | Québec |
| Facility #58 | Saint-Narcisse | Québec |
| Facility #59 | Chute-Bell | Québec |
| Facility #60 | Mitis-1 | Québec |
| Facility #61 | Mitis-2 | Québec |
| Facility #62 | Romaine-3 | Québec |

# EXHIBIT B

SCHEDULE OF
GUARANTEED QUALIFIED CLEAN ENERGY
TO BE DELIVERED FROM THE HYDRO-QUÉBEC POWER RESOURCES

| Year | Jan (MWh per hour) | Feb (MWh per hour) | Mar (MWh per hour) | Apr (MWh per hour) | May (MWh per hour) | Jun (MWh per hour) | Jul (MWh per hour) | Aug (MWh per hour) | Sep (MWh per hour) | Oct (MWh per hour) | Nov (MWh per hour) | Dec (MWh per hour) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 2 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 3 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 4 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 5 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 6 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 7 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 8 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 9 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 10 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 11 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 12 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 13 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 14 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 15 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 16 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 17 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 18 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 19 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |
| 20 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 | 579.335 |

# EXHIBIT C

SAMPLE
MARKET EXPOSURE CALCULATION

| Future Year | Month | On-Peak Energy Quantity (MWh) | Off-Peak Energy Quantity (MWh) | On-Peak Contract Price ($/MWh) | Off-Peak Contract Price ($/MWh) | On-Peak Forward Price[1] ($/MWh) | Off-Peak Forward Price[2] ($/MWh) | Monthly Market Exposure ($) |
|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) = (G-E) * C + (H-F) * D |
| 1 | Jan | 195,954 | 235,071 | $51.51 | $51.51 | $89.10 | $69.10 | $11,500,823.63 |
| | Feb | 187,056 | 205,734 | $51.51 | $51.51 | $87.50 | $66.70 | $9,857,222.92 |
| | Mar | 205,224 | 225,801 | $51.51 | $51.51 | $53.20 | $44.50 | -$1,236,039.50 |
| | Apr | 198,642 | 218,479 | $51.51 | $51.51 | $34.30 | $26.10 | -$8,970,183.01 |
| | May | 195,954 | 235,071 | $51.51 | $51.51 | $31.60 | $23.60 | -$10,462,278.58 |
| | June | 198,642 | 218,479 | $51.51 | $51.51 | $32.70 | $23.80 | -$9,790,512.17 |
| | July | 195,954 | 235,071 | $51.51 | $51.51 | $40.30 | $27.40 | -$7,864,205.71 |
| | Aug | 205,224 | 225,801 | $51.51 | $51.51 | $39.50 | $26.70 | -$8,066,871.01 |
| | Sept | 189,373 | 227,748 | $51.51 | $51.51 | $33.60 | $23.30 | -$9,816,447.99 |
| | Oct | 205,224 | 225,801 | $51.51 | $51.51 | $33.20 | $23.70 | -$10,037,185.42 |
| | Nov | 189,373 | 227,748 | $51.51 | $51.51 | $39.40 | $30.40 | -$7,101,072.27 |
| | Dec | 195,954 | 235,071 | $51.51 | $51.51 | $60.00 | $51.30 | $1,614,288.70 |
| 2 | Jan | 195,954 | 235,071 | $52.80 | $52.80 | $90.90 | $70.50 | $11,626,618.20 |
| | Feb | 187,056 | 205,734 | $52.80 | $52.80 | $89.30 | $68.00 | $9,954,678.60 |
| | Mar | 205,224 | 225,801 | $52.80 | $52.80 | $54.30 | $45.40 | -$1,363,094.57 |
| | Apr | 198,642 | 218,479 | $52.80 | $52.80 | $35.00 | $26.60 | -$9,259,980.30 |
| | May | 195,954 | 235,071 | $52.80 | $52.80 | $32.20 | $24.10 | -$10,783,193.08 |
| | June | 198,642 | 218,479 | $52.80 | $52.80 | $33.40 | $24.30 | -$10,080,309.47 |
| | July | 195,954 | 235,071 | $52.80 | $52.80 | $41.10 | $27.90 | -$8,145,929.30 |
| | Aug | 205,224 | 225,801 | $52.80 | $52.80 | $40.30 | $27.20 | -$8,345,813.80 |

[1] CME Group, NYMEX ISO-NE Mass Hub On-Peak data, http://www.cmegroup.com/trading/energy/electricity/nepool-internal-hub-5-mw-peak-calendar-month-day-ahead-swap-futures_quotes_settlements_futures.html#tradeDate=05%2F24%2F2018, accessed May 24, 2018.

[2] CME Group, NYMEX ISO-NE Mass Hub Off-Peak data, http://www.cmegroup.com/trading/energy/electricity/nepool-internal-hub-5-mw-off-peak-calendar-month-day-ahead-swap-futures_quotes_settlements_futures.html#tradeDate=05%2F24%2F2018, accessed May 24, 2018.

| Future Year | Month | On-Peak Energy Quantity (MWh) | Off-Peak Energy Quantity (MWh) | On-Peak Contract Price ($/MWh) | Off-Peak Contract Price ($/MWh) | On-Peak Forward Price[1] ($/MWh) | Off-Peak Forward Price[2] ($/MWh) | Monthly Market Exposure ($) |
|---|---|---|---|---|---|---|---|---|
| | Sept | 189,373 | 227,748 | $52.80 | $52.80 | $34.30 | $23.80 | -$10,108,099.16 |
| | Oct | 205,224 | 225,801 | $52.80 | $52.80 | $33.90 | $24.20 | -$10,336,650.59 |
| | Nov | 189,373 | 227,748 | $52.80 | $52.80 | $40.20 | $31.00 | -$7,351,011.31 |
| | Dec | 195,954 | 235,071 | $52.80 | $52.80 | $61.20 | $52.30 | $1,528,482.28 |
| 3 | Jan | 195,954 | 235,071 | $54.12 | $54.12 | $92.70 | $71.90 | $11,739,482.01 |
| | Feb | 187,056 | 205,734 | $54.12 | $54.12 | $91.10 | $69.40 | $10,060,923.96 |
| | Mar | 205,224 | 225,801 | $54.12 | $54.12 | $55.40 | $46.30 | -$1,503,080.41 |
| | Apr | 198,642 | 218,479 | $54.12 | $54.12 | $35.70 | $27.10 | -$9,562,291.23 |
| | May | 195,954 | 235,071 | $54.12 | $54.12 | $32.80 | $24.60 | -$11,117,038.32 |
| | June | 198,642 | 218,479 | $54.12 | $54.12 | $34.10 | $24.80 | -$10,382,620.39 |
| | July | 195,954 | 235,071 | $54.12 | $54.12 | $41.90 | $28.50 | -$8,417,076.58 |
| | Aug | 205,224 | 225,801 | $54.12 | $54.12 | $41.10 | $27.70 | -$8,637,687.34 |
| | Sept | 189,373 | 227,748 | $54.12 | $54.12 | $35.00 | $24.30 | -$10,412,263.96 |
| | Oct | 205,224 | 225,801 | $54.12 | $54.12 | $34.60 | $24.70 | -$10,649,046.52 |
| | Nov | 189,373 | 227,748 | $54.12 | $54.12 | $41.00 | $31.60 | -$7,613,463.99 |
| | Dec | 195,954 | 235,071 | $54.12 | $54.12 | $62.40 | $53.30 | $1,429,745.10 |
| 4 | Jan | 195,954 | 235,071 | $55.47 | $55.47 | $94.60 | $73.30 | $11,859,010.52 |
| | Feb | 187,056 | 205,734 | $55.47 | $55.47 | $92.90 | $70.80 | $10,155,385.65 |
| | Mar | 205,224 | 225,801 | $55.47 | $55.47 | $56.50 | $47.20 | -$1,655,996.99 |
| | Apr | 198,642 | 218,479 | $55.47 | $55.47 | $36.40 | $27.60 | -$9,877,115.79 |
| | May | 195,954 | 235,071 | $55.47 | $55.47 | $33.50 | $25.10 | -$11,444,218.88 |
| | June | 198,642 | 218,479 | $55.47 | $55.47 | $34.80 | $25.30 | -$10,697,444.96 |
| | July | 195,954 | 235,071 | $55.47 | $55.47 | $42.70 | $29.10 | -$8,701,154.61 |
| | Aug | 205,224 | 225,801 | $55.47 | $55.47 | $41.90 | $28.30 | -$8,919,911.51 |
| | Sept | 189,373 | 227,748 | $55.47 | $55.47 | $35.70 | $24.80 | -$10,728,942.39 |
| | Oct | 205,224 | 225,801 | $55.47 | $55.47 | $35.30 | $25.20 | -$10,974,373.20 |
| | Nov | 189,373 | 227,748 | $55.47 | $55.47 | $41.80 | $32.20 | -$7,888,430.31 |
| | Dec | 195,954 | 235,071 | $55.47 | $55.47 | $63.60 | $54.40 | $1,341,584.24 |
| 5 | Jan | 195,954 | 235,071 | $56.86 | $56.86 | $96.50 | $74.80 | $11,984,805.09 |
| | Feb | 187,056 | 205,734 | $56.86 | $56.86 | $94.80 | $72.20 | $10,252,841.33 |
| | Mar | 205,224 | 225,801 | $56.86 | $56.86 | $57.60 | $48.10 | -$1,826,154.59 |
| | Apr | 198,642 | 218,479 | $56.86 | $56.86 | $37.10 | $28.20 | -$10,186,777.31 |
| | May | 195,954 | 235,071 | $56.86 | $56.86 | $34.20 | $25.60 | -$11,788,640.45 |
| | June | 198,642 | 218,479 | $56.86 | $56.86 | $35.50 | $25.80 | -$11,028,954.37 |
| | July | 195,954 | 235,071 | $56.86 | $56.86 | $43.60 | $29.70 | -$8,982,878.20 |
| | Aug | 205,224 | 225,801 | $56.86 | $56.86 | $42.70 | $28.90 | -$9,219,376.68 |
| | Sept | 189,373 | 227,748 | $56.86 | $56.86 | $36.40 | $25.30 | -$11,062,305.68 |
| | Oct | 205,224 | 225,801 | $56.86 | $56.86 | $36.00 | $25.70 | -$11,316,940.90 |
| | Nov | 189,373 | 227,748 | $56.86 | $56.86 | $42.60 | $32.80 | -$8,180,081.47 |
| | Dec | 195,954 | 235,071 | $56.86 | $56.86 | $64.90 | $55.50 | $1,255,777.81 |

# EXHIBIT D

QUALIFIED CLEAN ENERGY AND ENVIRONMENTAL ATTRIBUTE PRICING

1. Price for Products. Commencing on the Commercial Operation Date, the Price for the Delivered Products in nominal dollars shall be as follows:

| Contract Year | On-Peak Price ($/MWh) | Off-Peak Price ($/MWh) |
|---|---|---|
| 1 | $51.51 | $51.51 |
| 2 | $52.80 | $52.80 |
| 3 | $54.12 | $54.12 |
| 4 | $55.47 | $55.47 |
| 5 | $56.86 | $56.86 |
| 6 | $58.28 | $58.28 |
| 7 | $59.74 | $59.74 |
| 8 | $61.23 | $61.23 |
| 9 | $62.76 | $62.76 |
| 10 | $64.33 | $64.33 |
| 11 | $65.94 | $65.94 |
| 12 | $67.59 | $67.59 |
| 13 | $69.28 | $69.28 |
| 14 | $71.01 | $71.01 |
| 15 | $72.78 | $72.78 |
| 16 | $74.60 | $74.60 |
| 17 | $76.47 | $76.47 |
| 18 | $78.38 | $78.38 |
| 19 | $80.34 | $80.34 |
| 20 | $82.35 | $82.35 |

To the extent that the Delivered Products for any month include Qualified Shortfall Energy that cures a TSA Delivery Shortfall, as provided in Section 4.3(c)(ii), the Price to be paid for each megawatt-hour of such Qualified Shortfall Energy shall be increased by the amount that would have been due from Buyer to the U.S. Transmission Provider under the TSA with respect to such TSA Delivery Shortfall had the Non-Excused Outage giving rise to that TSA Delivery Shortfall not occurred, converted to a $/MWh basis assuming 100% Hourly Availability (as defined in the TSA) at the full amount of the Contract Capacity (as defined in the TSA) for that month.

Example: If the Price equals $50.00/MWh, the TSA rate equals $10,800.00 per MW of Contract Capacity (as defined in the TSA) per month, and the number of hours in such month equal 720,

then the Price for each megawatt-hour of the Qualified Shortfall Energy that cures such TSA Delivery Shortfall for such month equals $65.00/MWh.

If the market price at the Delivery Point in the Real-Time Energy Market or the Day-Ahead Energy Market, as applicable based on the market in which the applicable Internal Bilateral transaction was entered pursuant to Section 4.2(a), for Energy Delivered by Seller is negative in any hour, the payment to Seller for deliveries of Qualified Clean Energy or Qualified Shortfall Energy, as applicable, shall be reduced by the difference between the absolute value of the hourly LMP at the Delivery Point and $0.00 per MWh for that Qualified Clean Energy or Qualified Shortfall Energy, as applicable, for each such hour. Each monthly invoice shall reflect a reduction for all hours in the applicable month in which the LMP for the Energy at the Delivery Point is less than $0.00 per MWh.

Examples: If delivered Qualified Clean Energy equals 1 MWh and Price equals $50.00/MWh:

| | |
|---|---|
| LMP at the Delivery Point equals (or is greater than) | $0.00/MWh |
| Buyer payment of Price to Seller | $50.00 |
| Seller credit/reimbursement for negative LMP to Buyer | $0.00 |
| Net Result: Buyer pays Seller $50 for that hour | |

| | |
|---|---|
| LMP at the Delivery Point equals | -$150.00/MWh |
| Buyer payment of Price to Seller | $50.00 |
| Seller credit/reimbursement for negative LMP to Buyer | $150.00 |
| Net Result: Seller credits or reimburses Buyer $100 for that hour | |

# EXHIBIT E

DESCRIPTION OF THE NEW TRANSMISSION FACILITIES

*[See Attachment A to the TSA]*

**EXHIBIT F**

FORM OF PROGRESS REPORT

For the Quarter Ending: [__________]

Status of progress toward permitting for the Québec Line:

Status of progress toward acquisition of real property rights for the Québec Line:

Events expected to result in delays in achievement of permitting or acquisition of real property rights for the Québec Line:

Current projection for Commercial Operation Date: [__________]

# EXHIBIT G

FORM OF SELLER GUARANTY

**Hydro-Québec**
75, boulevard René-Lévesque ouest
5ième étage
Montréal, Québec, Canada
H2Z 1A4

## CONVENTION DE CAUTIONNEMENT

La présente convention de cautionnement ("Cautionnement"), portant la date du [ ] 2018, est conclue entre **Hydro-Québec**, société dûment constituée et régie par la Loi sur Hydro-Québec (L.R.Q., chapitre H-5) ayant son siége social et son principal lieu d'affaires au 75, boulevard René-Lévesque Ouest, Montréal, Québec, Canada, H2Z 1A4 (ci-après appelée "Caution"), et NSTAR Electric Company [doing business as] Eversource Energy, société dûment constituée en vertu des lois du Massachusetts, ayant son principal lieu d'affaires au [ ], États-Unis d'Amérique (ci-aprés appelée "Bénéficiaire").

ATTENDU QUE le Bénéficiaire et H.Q. ENERGY SERVICES (U.S.) INC., société créée en vertu des lois de l'État du Delaware, aux États-Unis, ayant son lieu d'affaires 225 rue Asylum, 27' étage, Hartford CT 06103, États-Unis d'Amérique (ci-aprés appelée "HQUS"), filiale en propriété indirecte de la Caution, ont signé une entente intitulée "Power Purchase Agreement" en date du treize Juin 2018 (appelée ci-aprés "Convention");

ATTENDU QUE la Caution bénéficiera directement ou indirectement de la Convention;

ATTENDU QUE le Bénéficiaire a exigé que la Caution garantisse inconditionnellement au Bénéficiaire toutes les obligations de paiement qui incombent à HQUS en vertu de la Convention, sous réserve de la somme maximale

## GUARANTY AGREEMENT

This Guaranty Agreement ("Guaranty"), dated as of [ ], 2018 is made and entered into between Hydro-Québec, a body politic and corporate, duly incorporated and regulated by Hydro-Québec Act (R.S.Q., chapter H-5) and having its head office and principal place of business at 75, René-Lévesque Boulevard West, Montreal, Quebec, Canada, H2Z 1A4, hereinafter referred to as the "Guarantor," and NSTAR Electric Company d/b/a Eversource Energy, a corporation duly organized under the laws of the State of Massachusetts, having its principal place of business at 800 Boylston Street, Boston, MA 02199 (hereinafter referred to as the "Beneficiary").

WHEREAS the Beneficiary and H.Q. ENERGY SERVICES (U.S.) INC., a corporation created under the laws of the State of Delaware, USA, having its place of business at 225 Asylum Street, 27th Floor, Hartford CT 06103 United States of America, (hereinafter referred to as "HQUS"), an indirectly owned subsidiary of the Guarantor, have entered into a Power Purchase Agreement dated as of June 13, 2018 (hereinafter referred to as the "Agreement");

WHEREAS the Guarantor will directly or indirectly benefit from the Agreement;

WHEREAS the Beneficiary has required that the Guarantor unconditionally guarantee to the Beneficiary all payment obligations of HQUS under the Agreement; subject to a maximum dollar limitation as provided in Section 1 of this

prévue à l'article 1 du présent Cautionnement;

EN CONSÉQUENCE, eu égard á ce qui précède, la Caution s'entend avec le Bénéficiaire sur ce qui suit:

**Article 1. Cautionnement à l'égard du paiement**. La Caution garantit absolument, irrévocablement et inconditionnellement au Bénéficiaire, ses ayants droit, endossataires et cessionnaires, le prompt paiement á l'échéance de toutes les sommes dues actuellement et ultérieurement par HQUS au Bénéficiaire conformément á la Convention, sur demande écrite du Bénéficiaire stipulant que HQUS a manqué à ses obligations découlant de la Convention et que la somme réclamée est due au Bénéficiaire; toutefois, la responsabilité qui incombe à la Caution en vertu du présent Cautionnement est limitée á la somme globale de "Unsecured Credit Limit" tel que ce terme est défini dans la Convention, majorée de tous les frais raisonnables engagés par le Bénéficiaire pour faire valoir ses droits contre la Caution en vertu du présent Cautionnement, y compris les honoraires d'avocats, frais de justice et coûts semblables.

À la demande de la Caution, le Bénéficiaire fournira à celle-ci tous les renseignements utiles se rapportant à la teneur et aux conditions des obligations de HQUS en ce qui concerne la Convention ainsi qu'un relevé de compte détaillé relatif aux factures et aux paiements. La livraison de ces informations n'est pas une condition préalable à une demande de paiement en vertu de ce Cautionnement et le défaut par le Bénéficiaire de fournir ces informations n'entraîne pas la libération des obligations, ni ne constitue un moyen de défense, de la Caution en vertu des présentes.

**Article 2. Nature du Cautionnement** Les obligations qui incombent à la Caution en vertu des présentes sont assujetties à toutes les clauses contractuelles de protection, de limitation, de renonciation et d'exclusion et à tous les droits

Guaranty;

NOW THEREFORE, in consideration of the premises, the Guarantor hereby agrees with the Beneficiary as follows:

**Section 1. Payment Guarantee**. The Guarantor absolutely, irrevocably, and unconditionally guarantees to the Beneficiary, its successors and endorsees and assignees, the prompt payment when due of all present and future amounts owed by HQUS to the Beneficiary in accordance with the Agreement, upon a written demand by the Beneficiary stating that HQUS has failed to fulfill its obligations and liabilities resulting from the Agreement and that the amount claimed is due and payable to the Beneficiary, provided that the liability of the Guarantor under this Guaranty shall be limited in the aggregate to the Unsecured Credit Limit (as defined in the Agreement) plus all reasonable expenses incurred by the Beneficiary to enforce its rights against the Guarantor under this Guaranty including, without limitation, attorneys' fees, court costs and similar costs.

At the Guarantor's request, the Beneficiary shall provide the Guarantor with any useful information respecting the content and the terms and conditions of the obligations and liabilities of HQUS with regard to the Agreement and a statement of account with details of billings and payments. The provision of such information to Guarantor shall not be a condition to a demand or payment under this Guaranty and failure by Beneficiary to so provide such information shall not excuse or otherwise release Guarantor of its obligations hereunder.

**Section 2. Nature of Guarantee**. The Guarantor's obligations hereunder shall be subject to all the contractual protections, limitations, waivers, exclusions and rights which HQUS has under the Agreement, and the Guarantor shall be entitled to the benefits of any modification of, amendment to, waiver of or consent to departure from the Agreement to the extent, if any, HQUS would have been entitled to such benefits. Nonetheless,

dont bénéficie HQUS en vertu de la Convention, et la Caution bénéficie de toute modification apportée à la Convention, de toute renonciation à ses dispositions et de tout consentement donné á l'inexécution d'une de ses dispositions dans la mesure où HQUS aurait eu droit à ces avantages, le cas échéant. Néanmoins, le présent Cautionnement ne peut être considéré comme éteint ni modifié d'aucune façon du fait de l'existence, de la validité, de l'opposabilité, de la perfection ou de la portée de toute sûreté donnée en garantie d'obligations quelconques de HQUS découlant de la Convention.

**Article 3. Consentements, renonciations et renouvellements** La Caution convient que le Bénéficiaire peut en tout temps, soit avant ou aprés l'échéance, sans donner d'avis à la Caution ou obtenir d'autre consentement de celle-ci, prolonger le délai de paiement d'obligations de paiement découlant de la Convention, échanger ou remettre toute sûreté donnée à leur égard ou encore renouveler la Convention, et qu'il peut également conclure toute entente avec HQUS ou avec toute autre partie aux obligations prévues dans la Convention, toute personne responsable á l'égard de ces obligations ou toute personne ayant un intérêt dans celles-ci, relativement au prolongement, au renouvellement, au paiement, à la décharge ou à la libération de ces obligations ou encore á la conclusion d'un compromis visant celles-ci, en tout ou en partie, ou relativement à toute modification des conditions y afférentes ou des conditions de toute convention passée entre le Bénéficiaire et HQUS ou n'importe laquelle de ces autres parties ou personnes, sans toucher le présent Cautionnement de quelque manière que ce soit. La Caution convient que le Bénéficiaire peut recourir á elle relativement au paiement des obligations découlant de la Convention, que le Bénéficiaire ait ou non recouru á une sûreté accessoire ou qu'il ait ou non exercé un recours contre tout autre débiteur principal ou secondaire de n'importe laquelle des obligations

this Guaranty shall not be deemed discharged, impaired or affected by the existence, validity, enforceability, perfection, or extent of any collateral for any obligations under the Agreement of HQUS.

**Section 3. Consents, Waivers and Renewals**. The Guarantor agrees that the Beneficiary may at any time and from time to time, either before or after maturity thereof, without notice to or further consent of the Guarantor, extend the time of payment of any payment obligations under the Agreement, exchange or surrender any collateral therefor, or renew the Agreement, and may also make any agreement with HQUS or with any other party to, or person liable for, or any of the obligations contemplated in the Agreement, or interested therein, for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification of the terms thereof or of any agreement between the Beneficiary and HQUS or any such other party or person, without in any way impairing or affecting this Guaranty. The Guarantor agrees that the Beneficiary may resort to the Guarantor for payment in virtue of the Agreement, whether or not the Beneficiary shall have resorted to any collateral security, or shall have proceeded against any other obligor principally or secondarily obligated with respect to any of the obligations in virtue of the Agreement.

**Section 4. Subrogation**. In any case, including HQUS' insolvency, the Guarantor will not exercise any rights, which it may acquire by way of subrogation, before all amounts due to the Beneficiary under the Agreement shall have been paid in full. Subject to the foregoing, upon payment of all the obligations related to the Agreement, the Guarantor shall be subrogated to the rights of the Beneficiary against HQUS and the Beneficiary agrees to take, at the Guarantor's expense, such steps as the Guarantor may reasonably request to implement such subrogation.

**Section 5. Cumulative Rights**. No failure on the part of the Beneficiary to exercise, and no delay in

découlant de la Convention.

**Article 4. Subrogation.** Dans tous les cas, y compris l'insolvabilité de HQUS, la Caution n'exercera aucun droit qu'elle peut acquérir par voie de subrogation tant que toutes les sommes dues au Bénéficiaire en vertu de la Convention n'auront pas été payées intégralement. Sous réserve de ce qui précède, sur paiement de toutes les obligations liées à la Convention, la Caution sera subrogée dans les droits du Bénéficiaire contre HQUS et le Bénéficiaire s'engage á prendre, aux frais de la Caution, les mesures que la Caution pourra raisonnablement lui demander de prendre pour faire valoir cette subrogation.

**Article 5. Droits cumulatifs**. Aucune omission de la part du Bénéficiaire d'exercer tout droit, recours ou pouvoir conféré par les présentes, et aucun retard à le faire ne constituent une renonciation á cet égard, et l'exercice unique ou partiel par le Bénéficiaire d'un droit, recours ou pouvoir quelconque conféré par les présentes n'empêche pas l'exercice ultérieur de tout droit, recours ou pouvoir. Tous et chacun des droits, recours et pouvoirs qui sont conférés par les présentes au Bénéficiaire ou dont celui-ci peut se prévaloir en vertu de la loi ou d'une autre convention sont cumulatifs et non exclusifs, et ils peuvent être exercés par le Bénéficiaire de temps à autre.

**Article 6. Renonciation aux avis**. La Caution renonce à l'avis d'acceptation du présent Cautionnement, ainsi qu'à tout avis de refus, de présentation et de demande, sauf comme il est indiqué á l'article 1, à tout avis d'exercice d'un droit et á tous autres avis, quels qu'ils soient.

**Article 7. Déclarations et garanties**.

La Caution fait les déclarations et donne les garanties suivantes:

a) Elle est une société dûment organisée, elle existe validement, elle est en règle en vertu des lois du territoire où elle a été constituée

exercising any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Beneficiary of any right, remedy or power hereunder preclude any other future exercise of any right, remedy or power. Each and every right, remedy and power hereby granted to the Beneficiary or allowed to it by law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by the Beneficiary from time to time.

**Section 6. Waiver of Notice**. The Guarantor waives notice of the acceptance of this Guaranty, notice of dishonor, presentment and demand, except as set forth in Section 1, notice of exercise of any right and all other notices whatsoever.

**Section 7. Representations and Warranties**.

The Guarantor represents and warrants that:

a) It is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has full corporate power to execute, deliver and perform this Guaranty.

b) The execution, delivery and performance of the Guaranty have been and remain duly authorized by all necessary corporate action and do not contravene any provision of law or the Guarantor's constitutional documents or any contractual restriction binding on the Guarantor or its assets.

c) The Guaranty constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other similar laws and to general principles of equity.

**Section 8. Setoff and Counterclaims**. The Guarantor shall be entitled to assert all rights and defenses that HQUS may be entitled to under the Agreement, including, but not limited to, any

en société et elle a en tant que société tous les pouvoirs nécessaires pour signer, livrer et exécuter le présent Cautionnement.

b) La signature, la livraison et l'exécution du Cautionnement ont été et demeurent dûment autorisées par toutes les mesures nécessaires de la part de la Caution et ne violent aucune disposition de la loi ou des documents constitutifs de la Caution ni aucune restriction contractuelle liant la Caution ou ses actifs.

c) Le Cautionnement constitue l'obligation juridique, valide et exécutoire de la Caution et il est susceptible d'exécution contre la Caution conformément à ses conditions, sous réserve, quant à l'exécution, de la législation en matière de faillite, d'insolvabilité et de réorganisation et de toute législation semblable et sous réserve des principes généraux d'equity.

**Article 8. <u>Compensation et demandes reconventionnelles</u>**. La Caution est fondée á faire valoir tous les droits et moyens de défense que HQUS peut invoquer en vertu de la Convention, et peut notamment exiger toute compensation ou présenter toute demande reconventionnelle que HQUS ou une autre société du même groupe que la Caution peut ou pourrait invoquer. Toutefois, la responsabilité de la Caution en vertu du Cautionnement n'est en rien modifiée en cas de faillite, d'insolvabilité, de dissolution ou de liquidation de HQUS.

**Article 9. <u>Résiliation</u>**. La présente garantie de paiement constitue un cautionnement continu en vigueur pendant la durée de la Convention jusqu'á l'exécution intégrale des obligations de HQUS en vertu de la Convention et au paiement intégral de toutes les obligations. Toutefois, la Caution peut résilier le présent Cautionnement pour les obligations futures de HQUS en remettant un avis écrit de résiliation au Bénéficiaire. Cet avis de la Caution prendra effet le dixième jour suivant sa réception par le

setoff or counterclaims that HQUS or any other affiliate of the Guarantor is or may be entitled to. Notwithstanding the preceding sentence, the liability of the Guarantor under the Guaranty shall not be affected because of the bankruptcy, insolvency, dissolution or liquidation of HQUS.

**Section 9. <u>Termination</u>**. This guarantee of payment is a continuing guarantee effective during the term of the Agreement and until complete performance by HQUS of its obligations under the Agreement and payment in full of all obligations. However, the Guarantor may terminate this Guaranty with respect to future obligations of HQUS by providing written notice of termination to the Beneficiary. The Guarantor's notice of termination will become effective on the tenth business day after receipt by the Beneficiary. Termination of this Guaranty will not affect the Guarantor's liability to the Beneficiary hereunder for the obligations of HQUS incurred prior to the effective date of termination.

**Section 10. <u>Assignment</u>**. Neither Party may assign its rights, interest or obligations hereunder to any other person without the prior written consent of the Guarantor or the Beneficiary, as the case may be.

**Section 11. <u>Notices</u>**. All notices or other communications in respect of this Guaranty shall be in writing, and delivered by hand or by registered mail (return receipt requested), overnight courier service or given by facsimile (except for a demand of payment) and addressed or directed as follows:

| <u>If to the Guarantor</u>: | <u>If to the Beneficiary</u>: |
|---|---|
| **HYDRO-QUÉBEC**<br>Attention: Vice-President Financing, Treasury and Pension Fund<br>75, René-Lévesque Boulevard West<br>5th floor | c/o Eversource Energy Service Company<br>Treasury Department<br>107 Selden Street<br>Berlin, CT 06037<br>ATTENTION:<br>MR. Aaron J. Cullen,<br>Manager Middle office |

Bénéficiaire. La résiliation du présent Cautionnement ne modifiera en rien la responsabilité qui incombe á la Caution envers le Bénéficiaire en vertu des présentes en ce qui concerne les obligations contractées par HQUS avant la date de prise d'effet de la résiliation.

**Article 10. Cession**. Aucune des parties ne peut céder ses droits, intérêts ou obligations découlant des présentes à quiconque sans le consentement écrit préalable de la Caution ou du Bénéficiaire, selon le cas.

**Article 11. Avis**. Tous les avis et autres communications se rapportant au présent Cautionnement doivent être écrits et être livrés en main propre ou par courrier recommandé (avec demande d'accusé de réception), service de messagerie pour le lendemain ou être transmis par télécopieur (sauf s'il s'agit d'une demande de paiement) et être adressés ou acheminés á l'une des adresses suivantes:

S'ils sont destinés á la Caution:
**HYDRO-QUÉBEC**
À l'attention du vice-président Financement, trésorerie et caisse de retraite
75, boulevard René-Lévesque Ouest
5e étage
Montréal (Québec)
Canada
H2Z 1A4

Télécopieur :
(514) 289-5409

S'ils sont destinés au Bénéficiaire:
c/o Eversource Energy Service Company
Treasury Department
107 Selden Street
Berlin, CT 06037
ATTENTION:
MR. Aaron J. Cullen, Manager Middle office & credit

ou á l'adresse dont la Caution ou le Bénéficiaire peut notifier à l'autre partie de temps à autre.

**Article 12. Ayants droit; lois applicables**. Le présent Cautionnement lie la Caution, ses ayants

Montréal (Québec) & credit
Canada
H2Z 1A4
Facsimile: (514) 289-5409

or such address as the Guarantor or the Beneficiary may give notice to the other party, from time to time.

**Section 12. Successors; Governing Law**. This Guaranty shall be binding upon the Guarantor, its successors and assignees, and shall be governed by and construed in accordance with the laws of the State of New York.

**Section 13. Entire agreement**. This Guaranty constitutes the entire agreement of the Guarantor and the Beneficiary pertaining to the subject matter hereof and supersedes all prior written or oral agreements and understandings between the Guarantor and the Beneficiary with respect to the subject matter hereof.

**Section 14.** If a claim is made upon the Beneficiary at any time for repayment or recovery of any amounts received by the Beneficiary from any source on account of any of the obligations under the Agreement and the Beneficiary, pursuant to a court order or applicable law, repays or returns any amounts so received, then the Guarantor shall remain liable for the amounts so repaid (such amounts being deemed part of the obligations under the Agreement) to the same extent as if such amounts had never been received by the Beneficiary, notwithstanding any termination hereof or the cancellation of any instrument or agreement evidencing any of the obligations under the Agreement.

**Section 15. Amendments**. No amendments or modifications of or to any provision of this Guaranty shall be binding until in writing and executed by the Guarantor and the Beneficiary.

IN WITNESS WHEREOF, the Guarantor hereto has executed this Guaranty, as of the date set forth

droit et ses cessionnaires, et est régie par et doit être interprétée conformément aux lois de l'État de New York.

**Article 13.** **Convention intégrale**. Le présent Cautionnement constitue la convention intégrale intervenue entre la Caution et le Bénéficiaire quant à son objet et remplace toutes les conventions et ententes antérieures, écrites ou verbales, entre la Caution et le Bénéficiaire quant à l'objet des présentes.

**Article 14.** Si une réclamation est faite au Bénéficiaire à quelque moment que ce soit pour le remboursement ou recouvrement de tout montant reçu par le Bénéficiaire, sans égard à la source, versé au compte de quelque obligation que ce soit en vertu de la Convention et que le Bénéficiaire, conformément à une ordonnance de la cour ou à une loi applicable, rembourse ou retourne quelque montant que ce soit ainsi reçu, la Caution demeurera responsable des montants ainsi repayés (tels montants étant réputés faire partie des obligations en vertu de la Convention) comme si ces montants n'avait jamais été reçus par le Bénéficiaire, malgré toute résiliation ou annulation de tout instrument ou entente démontrant n'importe quelle obligation en vertu de la Convention.

**Article 15.** **Modifications**. Aucune modification apportée aux dispositions du présent Cautionnement ne lie les parties à moins d'avoir été faite par écrit et signée par chaque partie.

EN FOI DE QUOI, la Caution partie aux présentes a signé le présent Cautionnement á la date mentionnée ci-dessus.

above.

# EXHIBIT H

DESCRIPTION OF
BASELINE HYDROELECTRIC GENERATION

1. In each Contract Year during the Services Term, in addition to Seller's obligation to Deliver Guaranteed Qualified Clean Energy in the quantities provided in Exhibit B to the Agreement, or any Qualified Shortfall Energy as may be delivered under the Agreement, Seller shall supply 3,000,000 MWh of Energy produced by the Hydro-Québec Power Resources ("**Baseline Hydroelectric Generation**") into any delivery point in the New England Control Area, in accordance with the terms of this Exhibit H, the Agreement and the ISO-NE Rules. The Baseline Hydroelectric Generation may be delivered across any transmission line connecting Québec and the New England Control Area. For the avoidance of doubt, Energy delivered across the U.S. Transmission Line that is not Delivered as either Qualified Clean Energy or Qualified Shortfall Energy shall be treated as Baseline Hydroelectric Generation.

2. In the event Seller is unable, wholly or in part, by a Force Majeure to supply Baseline Hydroelectric Generation during any Contract Year, the required Baseline Hydroelectric Generation for such Contract Year shall be reduced as follows:

| Number of hours during which Seller is unable, in whole or part, to supply Baseline Hydroelectric Generation | Reduction in required Baseline Hydroelectric Generation (%) |
|---|---|
| Up to 4000 | 0% |
| 4001 – 6000 | 50% |
| More than 6000 | 100% |

3. If Seller fails to deliver the required Baseline Hydroelectric Generation during a Contract Year, then Seller shall reimburse Buyer for an amount (the "**Baseline Hydroelectric Shortfall Damages**") calculated using the following formula:

Baseline Hydroelectric Shortfall Damages = TSA Payment x (Shortfall ÷ 12,548,400 MWh)

where:

*TSA Payment* = any costs or charges incurred by Buyer under the TSA in respect of such Contract Year associated with the quantity of Energy (expressed in MWh) Delivered under this Agreement, excluding any such costs or charges paid by Seller in connection with any Cover Damages due from Seller in respect of such Contract Year

*Shortfall* = 3,000,000 MWh minus the quantity of Baseline Hydroelectric Generation (expressed in MWh) delivered

In the event that the Baseline Hydroelectric Shortfall Damages are zero or negative, no payment shall be made. In no event shall Buyer reimburse or otherwise make any payment to Seller under this Exhibit H.

4. In the event the market price at the ISO-NE Internal Hub in the Day-Ahead Energy Market is at or below zero in any hour during any Contract Year (a "**Negative Price Hour**"), the total Baseline Hydroelectric Shortfall Damages owed by Seller in such Contract Year shall be reduced as follows:

| Number of Negative Price Hours | Reduction in Baseline Hydroelectric Shortfall Damages (%) |
|---|---|
| Up to 4000 | 0% |
| 4001 – 6000 | 50% |
| More than 6000 | 100% |

5. The rights provided in this Exhibit H shall collectively be the sole and exclusive remedies of Buyer with respect to any failure by Seller to deliver Baseline Hydroelectric Generation.

6. If and when the TSA is terminated, the Parties shall no longer be bound by the terms and provisions of this Exhibit H, except to the extent necessary to enforce the rights and obligations of the Parties arising under this Exhibit H before such termination.

**EXECUTION VERSION**

# FIRST AMENDMENT TO POWER PURCHASE AGREEMENT

This **FIRST AMENDMENT TO POWER PURCHASE AGREEMENT FOR FIRM QUALIFIED CLEAN ENERGY FROM HYDROELECTRIC GENERATION** (this "**First Amendment**") is entered into as of December 12, 2018 (the "**Amendment Date**"), by and between and NSTAR ELECTRIC COMPANY d/b/a EVERSOURCE ENERGY, a Massachusetts corporation ("**Buyer**"), and H.Q. ENERGY SERVICES (U.S.) INC., a Delaware corporation ("**Seller**"). Buyer and Seller are individually referred to herein as a "**Party**" and are collectively referred to herein as the "**Parties**."

**WHEREAS**, Buyer and Seller executed that certain Power Purchase Agreement, dated as of June 13, 2018 (the "**Agreement**").

**WHEREAS**, Buyer and Seller desire to amend the Agreement as provided herein.

**NOW, THEREFORE**, in consideration of the premises and of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## 1. DEFINITIONS

Any capitalized terms used in this First Amendment and not defined herein shall have the same meaning as ascribed to such terms in the Agreement.

## 2. AMENDMENTS

Section 8.1 "Receipt of Regulatory Approval" shall be modified by substituting "June 25, 2020" for the reference to "January 25, 2020" stated in Section 8.1.

## 3. MISCELLANEOUS

(a) Except as herein provided, the Agreement shall remain unchanged and in full force and effect. On and after the Amendment Date, this First Amendment shall constitute a part of the Agreement and every reference in the Agreement to the term "Agreement" shall be deemed to mean the Agreement, as amended by this First Amendment.

(b) This First Amendment may be amended and its provisions and the effects thereof waived only by a writing executed by the Parties.

(c) If any term or provision of this First Amendment or the interpretation or application of any term or provision to any prior circumstance is held to be unenforceable, illegal or invalid by a court or agency of competent jurisdiction, the remainder of this First Amendment and the interpretation or application of all other terms or provisions to Persons or circumstances other than those which are unenforceable, illegal or invalid shall not be affected thereby, and each term and provision shall be valid and be enforced to the fullest extent permitted by law so long as all essential terms and conditions of this First Amendment for both Parties remain valid,

binding and enforceable and have not been declared to be unenforceable, illegal or invalid by a Governmental Entity of competent jurisdiction.

(d) Any number of counterparts of this First Amendment may be executed, and each shall have the same force and effect as an original. Facsimile signatures hereon or on any notice or other instrument delivered under this First Amendment shall have the same force and effect as original signatures.

(e) Interpretation and performance of this First Amendment shall be in accordance with, and shall be controlled by, the laws of the Commonwealth of Massachusetts (without regard to its principles of conflicts of law).

(f) This First Amendment shall be binding upon, shall inure to the benefit of, and may be performed by, the successors and assignees of the Parties permitted under the Agreement.

IN WITNESS WHEREOF, each of Buyer and Seller has caused this First Amendment to be duly executed on its behalf as of the date first above written.

**NSTAR ELECTRIC COMPANY d/b/a EVERSOURCE ENERGY, as Buyer**

By: JG Daly
Name: James G. Daly
Title: Vice President – Energy Supply

**H.Q. ENERGY SERVICES (U.S.) INC., as Seller**

By: ________________________
Name: David Murray
Title: Chairman of the Board and President

**EXECUTION VERSION**

IN WITNESS WHEREOF, each of Buyer and Seller has caused this First Amendment to be duly executed on its behalf as of the date first above written.

**NSTAR ELECTRIC COMPANY d/b/a EVERSOURCE ENERGY, as Buyer**

By: ______________________________
Name: James G. Daly
Title: Vice President – Energy Supply

**H.Q. ENERGY SERVICES (U.S.) INC., as Seller**

By: ______________________________
Name: David Murray
Title: Chairman of the Board and President

# SECOND AMENDMENT TO POWER PURCHASE AGREEMENT

This **SECOND AMENDMENT TO POWER PURCHASE AGREEMENT FOR FIRM QUALIFIED CLEAN ENERGY FROM HYDROELECTRIC GENERATION** (this "**Second Amendment**") is entered into as of June 25, 2020 (the "**Amendment Date**"), by and between NSTAR ELECTRIC COMPANY d/b/a EVERSOURCE ENERGY, a Massachusetts corporation ("**Buyer**"), and H.Q. ENERGY SERVICES (U.S.) INC., a Delaware corporation ("**Seller**"). Buyer and Seller are individually referred to herein as a "**Party**" and are collectively referred to herein as the "**Parties**."

**WHEREAS**, Buyer and Seller executed that certain Power Purchase Agreement, dated as of June 13, 2018, as amended by that certain First Amendment to Power Purchase Agreement dated as of December 12, 2018 (the "**Agreement**").

**WHEREAS**, Buyer and Seller desire to amend the Agreement as provided herein.

**NOW, THEREFORE**, in consideration of the premises and of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## 1. DEFINITIONS

Any capitalized terms used in this Second Amendment and not defined herein shall have the same meaning as ascribed to such terms in the Agreement.

## 2. AMENDMENTS

(a) Section 1 "Definitions" shall be modified as follows:

(i) by restating the definition of "TSA" as follows:

**"TSA"** shall mean that certain Transmission Service Agreement, by and between Buyer and U.S. Transmission Provider, dated as of June 13, 2018, as amended from time to time.

(ii) by adding the definition of "TSA Assignment Effective Date" as follows:

**"TSA Assignment Effective Date"** shall mean the "Assignment Effective Date" as defined in the TSA.

and

(iii) by restating the definition of "U.S. Transmission Provider" as follows:

**"U.S. Transmission Provider"** shall mean (a) prior to the TSA Assignment Effective Date, Central Maine Power Company, and its successors and assignees, and (b) on and after the TSA Assignment Effective Date, NECEC Transmission LLC, and its successors and assignees.

(b) Section 8.1 "Receipt of Regulatory Approval" shall be modified by substituting "December 15, 2020" for the reference to "June 25, 2020" stated in Section 8.1.

**3. MISCELLANEOUS**

(a) Buyer acknowledges receipt of a copy of the amendment to the Seller TSA dated as of the date hereof and waives the requirement under Section 3.5(m)(ii) of the Agreement that Seller provide Buyer a copy of that proposed amendment to the Seller TSA not fewer than ten (10) Business Days prior to the execution thereof.

(b) Except as herein provided, the Agreement shall remain unchanged and in full force and effect. On and after the Amendment Date, this Second Amendment shall constitute a part of the Agreement and every reference in the Agreement to the term "Agreement" shall be deemed to mean the Agreement, as amended by this Second Amendment.

(c) This Second Amendment may be amended and its provisions and the effects thereof waived only by a writing executed by the Parties.

(d) If any term or provision of this Second Amendment or the interpretation or application of any term or provision to any prior circumstance is held to be unenforceable, illegal or invalid by a court or agency of competent jurisdiction, the remainder of this Second Amendment and the interpretation or application of all other terms or provisions to Persons or circumstances other than those which are unenforceable, illegal or invalid shall not be affected thereby, and each term and provision shall be valid and be enforced to the fullest extent permitted by law so long as all essential terms and conditions of this Second Amendment for both Parties remain valid, binding and enforceable and have not been declared to be unenforceable, illegal or invalid by a Governmental Entity of competent jurisdiction.

(e) Any number of counterparts of this Second Amendment may be executed, and each shall have the same force and effect as an original. Facsimile signatures hereon or on any notice or other instrument delivered under this Second Amendment shall have the same force and effect as original signatures.

(f) Interpretation and performance of this Second Amendment shall be in accordance with, and shall be controlled by, the laws of the Commonwealth of Massachusetts (without regard to its principles of conflicts of law).

(g) This Second Amendment shall be binding upon, shall inure to the benefit of, and may be performed by, the successors and assignees of the Parties permitted under the Agreement.

***[Signature Page Follows]***

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Second Amendment to be duly executed on its behalf as of the date first above written.

**NSTAR ELECTRIC COMPANY D/B/A EVERSOURCE ENERGY, as Buyer**

By: ______________________________
Name: James G. Daly
Title: Vice President, Energy Supply

**H.Q. ENERGY SERVICES (U.S.) INC., as Seller**

By: ______________________________
Name:
Title:

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Second Amendment to be duly executed on its behalf as of the date first above written.

**NSTAR ELECTRIC COMPANY D/B/A EVERSOURCE ENERGY, as Buyer**

By: ________________________________
Name:
Title:

**H.Q. ENERGY SERVICES (U.S.) INC., as Seller**

By: ________________________________
Name: Martin Imbleau
Title: President